

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

E. PACKMAN, et al.,

Plaintiff,

**SUMMONS IN A CIVIL ACTION**

V.

IT'S JUST LUNCH INTERNATIONAL,
IT'S JUST LUNCH, INC., and HARRY and
SALLY, INC.,

CASE NUMBER **07 CIV 9227**

Defendants.

TO: (Name and address of Defendant)

ITS JUST LUNCH INTERNATIONAL
75340 Gerald Ford Drive
Palm Dessert, CA 92211

IT'S JUST LUNCH, INC.
52 Vanderbilt Avenue
Suite 901
New York, New York 10017

HARRY and SALLY, INC.,
52 Vanderbilt Avenue
Suite 901
New York, New York 10017

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

BALESTRIERE, PLLC
225 Broadway, Suite 2700
New York, N.Y. 10007

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

_(BY) DEPUTY CLERK_

OCT 1 5 2007

DATE

Craig Stuart Lanza
John Balestriere
**BALESTRIERE PLLC**
225 Broadway
Suite 2700
New York, NY 10007
Telephone: 212-374-5401
Email: jbalestriere@balestriere.net
*Attorneys for Plaintiff and the Class*



UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------x

E. PACKMAN, individually and for all       :
others similarly situated,                 :
                                           :
                                           :     Case No.:
                        Plaintiff,         :
                                           :
                                           :     **CLASS ACTION COMPLAINT**
             -against-                     :
                                           :     **JURY TRIAL DEMANDED**
                                           :
IT'S JUST LUNCH INTERNATIONAL,             :
IT'S JUST LUNCH, INC., and HARRY and       :
SALLY, INC.,                               :
                                           :
                        Defendants.        :
------------------------------------------------x

Plaintiff, by her attorneys, Balestriere PLLC, for her Class Action Complaint

respectfully alleges as follows upon information and belief, except as to allegations

concerning Plaintiff or her counsel, which are made upon personal knowledge, and

except as otherwise indicated herein:

## PRELIMINARY STATEMENT

1.    It's Just Lunch International ("IJL" or "the Company") claims to be a

premier dating service in an industry of companies which offer to connect individuals

interested in romantic or personal relationships ("the Matchmaking Industry"). The Company claims it offers personalized, sophisticated, thoughtful matchmaking services provided by highly trained experts. This is a lie. In a massive scheme to defraud tens of thousands of single professionals throughout the country – especially busy, affluent professional women — who have paid, for years, IJL's hefty service fees, IJL actually provides services that are grossly deficient and substandard in almost every aspect.

2.    In furtherance of this fraudulent scheme, IJL has routinely and systematically overcharged its clients for its allegedly "superior" matchmaking services, charging $1500.00 per person per year, despite knowing that this exorbitant fee is not only grossly disproportionate to the level of service actually being provided, but often in violation of relevant state laws, as explained further below.

3.    Plaintiff and the Class are forced to bring this action to recover the fees that they have paid as a result of IJL's fraudulent conduct, and to compel IJL to stop defrauding tens of thousands of others.

## The Lies On IJL's Website

4.    On its website, IJL proclaims that its "service isn't about video or computer dating; it's about an *insightful, professional IJL staff member hand-selecting* appropriate matches *based upon your desires, goals, motivations* and our instincts." See It's Just Lunch's Website ("IJL Website"), http://www.itsjustlunch.com/whattoexpect.aspx, "What to Expect", attached hereto as Exhibit A, last viewed on October 11, 2007) (emphasis added).

5.    This claim is patently false in every respect. IJL does *not* "hand-select" its

matches based on clients "desires, goals, [or] motivations."   In fact, despite promises to the contrary, IJL almost completely ignores the client's stated preferences.   Rather, the Company makes matches which are driven entirely by monthly quota requirements, and which wholly and categorically disregard the client's stated "desires, goals, [and] motivations." (Id.)

6.       IJL further claims on its website that its staff members have "years of experience" in the field of matchmaking, and are expert matchmakers and first-date specialists. (See IJL Website, www.itsjustlunch.com/whoweare.aspx "Who We Are", attached hereto as Exhibit A, last viewed on October 11, 2007.)

7.       This is another lie. In truth, IJL routinely hires staff members who have no experience, training or background whatsoever in the field of matchmaking.   These are not "insightful professional" employees motivated by any standards or training, but rather by a desperate need to meet monthly quotas in order to keep their jobs.

### The Lies During The Initial Interview

8.       IJL starts lying to prospective clients on their website.   These lies continue when IJL staff first speaks to clients who make up the Class here.

9.       During the initial in-person interview, IJL routinely makes the following misrepresentations of fact:

(i) IJL already has several "perfect" matches in its database for the client, when in fact no such matches exist;

(ii) IJL has thousands of available members in the client's city, when in fact there are only hundreds or even fewer members available in that city;

(iii) IJL has an equal percentage of men and women in its system, when in fact the number of women is grossly disproportionate to the number of men in the system;

(iv) IJL is "selective" over who it allows to become members, when in fact IJL accepts *any* and *all* persons who are willing to pay its fees; and

(v) IJL carefully matches its clients with other members, when in fact the matches are made *at random* and are often done by individuals who have never even met the client.

10.    IJL makes these lies for a simple reason: to induce the client to enter into a contract with IJL.    Toward this end, IJL instructs its employees regarding the *exact words and actions* which they must use during the interview to get the client to sign the contract.  These instructions are referred to as "control points" and must be "said *verbatim* in an interview to establish control."    (See IJL Training Manual, "Taking Control in an Interview", attached as Exhibit B).    Specifically, IJL issues such directives as "Do not call it a 'contract' or 'agreement'. It is called a 'this'; "Remember, you are on stage, *play the part*";  "Stop and flip over your clipboard" and say "Ok, so far I have 3-4 ideas for your first date";   "Lean toward the client" and say "I think I am going to start you with two people, so I need some dates for lunch or a drink next week too"; "Reach over and grab your big stack of contracts on the clipboard. Do NOT EVER EVER let go of them"; and get the client to sign by saying "OK, just fill out this top part here, sign right here and make your check out to IJL for $ ___". (Id).

11.    If the client does not sign contract at the end of the interview — which IJL considers an "unusual event" which occurs only if its employees "have done something

wrong in the interview," (<u>See</u> IJL Training Manual, "What if the Client Says ....",

annexed hereto as Exhibit C) -- IJL instructs its employees to aggressively pursue clients

in order to get them to change their minds.   (<u>Id</u>).

12.    These step-by-step guidelines include such directives as "Call them the

next day!", "Assume they are joining", "Get dates of availability," etc. (<u>Id</u>).   In

addition, IJL instructs its employees to follow a precise script when trying to convince

the client to join, including telling the client such lines as, "I have a lot of great women I

want you to meet", "I already know the first two people I want you to meet", "Don't

they sound great? And I know Susie really wants to meet you!", etc.   (<u>Id</u>).    These lies

are intended "to create urgency" which will induce the client to change his or her mind,

and sign the contract with IJL. (<u>Id</u>).

### The Lies About The Qualifications of Prospective Matches

13.    Even after the contract is signed, IJL continues to lie to its clients.   For

example, in setting up dates for its members, IJL routinely lies about the qualifications

of its prospective "matches" for its members, lying about very important traits of the

other member, including the prospective match's: i) marital status ii) employment

status; iii) criminal background; iv) age; v) health status; vi) physical appearance; vii)

religious convictions; viii) political convictions; and (ix) recreational interests.

14.    IJL lies about the qualifications of other members in order to continue to

deceive IJL clients into believing that they are being carefully "matched" with other

members, when, in fact, IJL completely ignores the client's stated preferences.

## IJL's Violation of Consumer Fraud Protection Laws

15.    In addition to the lies detailed above, IJL routinely violates consumer fraud laws which regulate dating services and protect the rights of consumers who enter into contractual agreements with such dating services.

16.    For example, in the State of New York, IJL has repeatedly and systematically attempted to circumvent state laws which prohibit dating services from charging a client more than $1,000.00 per year. IJL has done this by urging its clients to simultaneously execute two separate six month agreements (for $1,000.00 and $500.00, respectively), and then falsely telling the client that he or she is receiving a 50% "discount" by signing the second six month agreement. This unlawful practice violates New York State General Business Law § 394-c(2), which expressly states "No contract for social referral shall require payment by the purchaser of such service of a cash price in excess of one thousand dollars."

17.    New York State Attorney General Andrew Cuomo, along with Assistant Attorney General Dennis Rosen, recently stopped this fraudulent conduct, extracting from the Company and several of its New York franchises a fine and promise to stop breaking the law. (See Assurance of Discontinuance Pursuant to Executive Law § 63(15), dated June 13, 2007, attached hereto as Exhibit D).

## The Lies in IJL's Public Relations Campaign

18.    IJL continues to lie in its massive and sustained public relations campaign aimed at convincing busy, single professional clients throughout the country to join IJL, and thereby ensure the continued success of the fraudulent scheme outlined above.

19.     In this public relations campaign, IJL touts its "very high" success rate and boasts that its services have resulted in "thousands of marriages. " (See IJL website www.itsjustlunch.com/oursuccess.aspx, "Our Success", last viewed October 12, 2007, attached hereto as Exhibit A.)

20.     The simplest and most overwhelming proof of IJL's massive fraud is in results: the overwhelming majority of IJL's clients – almost 200,000 in total – have not had successful matches through IJL's services. (See www.consumeraffairs.com/news04/2006/02/ijl.html, "It's Just Lunch – Or Is It?", February 13, 2006, last viewed on October 8, 2007, attached hereto as Exhibit E.)

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendants.   See 28 U.S.C. § 1332(d)(2)(A).

22.     This Court has personal jurisdiction over Defendants because they operate a franchise in the State of New York and derive substantial revenue from that franchise, and otherwise seek the legal benefits and protections afforded by the State of New York.

23.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in the Southern District of New York because Defendants reside in this District.

## PARTIES

24.     Plaintiff E. Packman is an individual residing in the County, City and State of New York, and is client of the Defendants herein.

25.     Defendant IJL is a Nevada limited liability company with its principal place of business located at 75340 Gerald Ford Drive, Palm Desert, CA 92211.

26.     IJL sells, supervises and controls franchises that operate under the "It's Just Lunch" trade name, and which provide dating services to busy single professionals. IJL asserts direct control over all of its franchises by means of training employees, developing client protocol and by strict supervision whereby IJL covertly monitors each individual franchise's adherence to IJL's rules.

27.     IJL has three franchises in the State of New York. These franchises are located in New York City, Albany and Williamsville (which includes Buffalo and Rochester).

28.     Defendant It's Just Lunch, Inc., is a New York Corporation with its principal place of business located at 52 Vanderbilt Avenue, Suite 901, New York, NY 100017.   Defendant It's Just Lunch, Inc., previously owned the New York City franchise from in or about April 1993 until on or about February 2002.

29.     Defendant Harry and Sally, Inc., d/b/a It's Just Lunch, is a New York Corporation with its principal place of business located at 52 Vanderbilt Avenue, Suite 901, New York, NY 10017. Defendant Harry and Sally, Inc., has owned the New York City franchise from on or about February 2002 until the present time.

## CLASS ACTION ALLEGATIONS

30.     Plaintiff brings this action as a Class Action pursuant to Rules 23(a)(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all similarly situated IJL clients between 1993 and 2007. Plaintiff and Class Members bring this action seeking compensatory damages, punitive damages, attorney's fees, costs, and any further relief this Court deems just and proper.

31.     Plaintiff brings this class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") in her representative capacity on behalf of herself and the Class of all persons similarly situated ("the Class"), defined as follows:

> All persons who were or are members of IJL who signed a contract with IJL during the period of 1993 to October 10, 2007 ("Class Period").

32.     This action meets the following prerequisites of Rule 23(a) by which Plaintiff may bring this action on behalf of the Class:

A.     **Numerosity**.  Although the exact number of Class Members is presently unknown, Plaintiff believes and alleges that the Class will number over two hundred thousand (200,000) consumers. Unquestionably, the members of the Class are so numerous that joinder of all members is impracticable.

B.     **Commonality**.  A substantial pool of questions of law and fact exists that is common to the Class.   Such common questions include, but are not limited to:

(i)     Did IJL make false and misleading representations as to the

nature and quality of dating services that IJL provided?

(ii)     Did IJL systematically and deliberately overcharge its clients

for services rendered?

(iii)    Did IJL fraudulently induce its clients to enter into contracts

by affirmatively misrepresenting the quantity and/or quality of

other members in its system?

(iv)    Did IJL misrepresent and/or omit material information

relating to alleged "matches" set up by IJL?

(v)     Did IJL willfully misrepresent the level of matchmaking

experience and/or qualifications of its employees?

(vi)    Did IJL violate consumer fraud protection laws which

regulate dating services and protect the rights of consumers who

enter into contractual agreements with such dating services?

C.     **Typicality**.    Plaintiff's claims are typical of the claims of the

Class.  Plaintiff is an ordinary IJL client who, along with all Class Members, has

been injured by the same wrongful acts and practices of Defendants as alleged

herein.

D.     **Adequacy**. Plaintiff will fairly and adequately protect the interests

of the Class.  Plaintiff has no interests that are antagonistic to or in conflict with

the interests of the Class as a whole, and Plaintiff has engaged competent counsel

experienced in the prosecution of complex and class litigation.

E.     **Superiority**.    A class action is superior to the alternatives, if any,

for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual actions would engender. This action will result in the orderly and expeditious administration of Class claims. Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent and varying determinations.   Plaintiff knows of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

F.    **Maintainability**. This action is properly maintainable as a class action for the prior independent reasons and under the following portions of Rule 23:

a.    The individual amounts of restitution involved, while not insubstantial, are generally so small that individual actions or other individual remedies are impracticable and litigating individual actions would be too costly;

b.    Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and

      d.     Individual actions would unnecessarily burden the courts and waste judicial resources.

      G.    **Predominance**.  Questions of law and fact common to members of the Class predominate over any questions affecting only individual members. Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class Members.

33.    New York, as the site of three franchises of defendant IJL, is the center of gravity for this action such that it is appropriate and consistent with existing law to certify a nationwide class of consumers, applying New York law.  Certification of a nationwide class under the laws of New York is appropriate because Defendants conduct substantial business in New York and a significant number of Class Members reside in New York.

## STATEMENT OF FACTS

### IJL's Origins and Growth

34.    IJL, which touts itself as a "specialized dating service for busy professionals", was founded in 1991 in Chicago by a marketing executive named Andrea McGinty.  (See IJL website, www.itsjustlunch.com, *"Corporate Home" and* www.itsjustlunch.com/oursuccess.aspx *"Our Success"*, last viewed October 12, 2007, attached hereto as Exhibit A).

35.    Since its formation in 1991, IJL has had "almost 200,000 clients", and is now "the fastest growing dating service in the world." See

www.consumeraffairs.com/news04/2006/02/ijl.html, *"It's Just Lunch – Or Is It?"*, February 13, 2006, (<u>See</u> Statement of Daniel Dolan, CEO of IJL, at 11), last viewed on October 8, 2007, attached hereto as Exhibit E.)

36.    IJL currently has "30,000 members worldwide" and is "growing by thousands each month." (<u>See</u> IJL website, www.itsjustlunch.com/oursuccess.aspx, *"Our Success"*, last viewed October 12, 2007, attached hereto as Exhibit A.)

37.    IJL "arrange(s) 50,000 dates" each month and has set up "over 2 million" dates since its foundation in 1991 (<u>Id</u>).

38.    IJL has opened up offices throughout the United States, as well as in Canada and Asia.    (<u>Id.</u>) The Company now has "100 locations all over the world" (<u>Id.</u>), and generates annual revenue in excess of $30,000,000.00 per year.    (<u>See</u> http://www.theglobeandmail.com/servlet/story/RTGAM.20050214.wxrlunchdate14/BNStory/specialSmallBusiness/), *"Getting Dumped by Fiancé Inspired Launch of It's Just Lunch Matchmaker"*, February 14, 2005, attached hereto as Exhibit F.)

<u>**IJL Franchises:    Staffing And Structure**</u>

39.    Each of IJL's 100 franchises is staffed by at least three individuals: the franchise owner, a sales "director", and a matchmaking "coordinator."    There are often multiple "directors" and "coordinators" in larger metropolitan offices.

40.    The franchise owner is responsible for handling all aspects of business operations of the franchise.    The "director" is responsible for generating "sales", i.e., getting new clients to sign up with IJL, and is also responsible for making matches between existing IJL members. The "coordinator" is responsible for contacting IJL

members and informing them of proposed matches, as well as handling all aspects of setting up the date.

### IJL's Control of Its Franchisees

41.     While IJL claims that each of its franchises is independently owned and operated, IJL in fact exercises complete dominion and control over its franchises. IJL accomplishes this first through a rigid and highly structured training program.

42.     This training program, which IJL refers to as "First Date University", is held at corporate headquarters in Palm Desert, California and lasts for five (5) days. All IJL franchise owners and directors must attend this seminar.

43.     At this seminar, IJL methodically trains its franchise owners and directors to learn and strictly follow the unlawful and deceptive sales practices outlined above.

44.     Specifically, IJL requires all attendees to memorize, *verbatim*, the sales scripts which must be followed during all phone calls and in-person interviews with each potential IJL client.  Further, the Company instructs its attendees on how to respond, *verbatim*, to each and every possible objection that a prospective IJL client might raise during the initial phone call and/or in-person interview.

45.     The Company then compels all attendees to engage in extensive role-play scenarios, in which an IJL "professor" assumes the role of a potential IJL client, and the attendee must demonstrate a complete mastery of the above scripts and sales techniques when speaking to this potential "client."

46.     All of the training done at "First Date University" is geared toward teaching attendees *how to make a sale* to prospective IJL clients.   *None* of the training is

focused upon teaching attendees about *how to make appropriate matches* between IJL clients who are already in the Company's database.

### IJL's Covert Monitoring of Its Franchisees

47.     The control does not end at the training stage.    After the training seminar is over, the Company systematically and covertly monitors its franchisees in order to ensure full compliance with its methods, procedures and practices for making sales.

48.     The Company does this by making "ghost calls" to each of its franchisees, in which the caller pretends to be a potential new client interested in learning more about IJL.    The Company then evaluates the performance of the employee based upon his/her adherence to IJL scripts and sales techniques.    Employees who do not follow Company scripts are terminated.

49.     The Company also makes unannounced visits to its franchisees, sending a regional coordinator to monitor the local office and ensure that all scripts and sales techniques are being followed.    Franchise owners who do not scrupulously follow Company scripts are subject to penalties and/or termination of their franchise rights.

### IJL's "All-or-Nothing" Quota System

50.     IJL exerts further dominion and control over its franchises by imposing an "all-or-nothing" monthly quota system for compensation of its sales directors.

51.     Under this system, IJL directors do not receive *any* commissions on their sales – regardless of how many sales they make in a given month – unless the total number of sales equals or exceeds the monthly quota set by IJL.

52.     As a direct result of this "all-or-nothing" system, IJL directors are

compelled to spend a disproportionate amount of their time each day attempting to make sales in order to meet the monthly quota, thereby spending little or no time on making successful matches for IJL clients.

53.     The IJL compensation system thus does not allow for "hand-selecting" matches for IJL clients – as the Company promises on its website (See IJL website, www.itsjustlunch.com/whattoexpect.aspx, *What to Expect*," last viewed October 11, 2007, attached hereto as Exhibit A) – as doing so would completely preclude IJL sales directors from meeting their monthly sales quotas.

### IJL's Extraction of Monthly Payments From Its Franchisees

54.     The Company is interested in maintaining this control since its profits are directly linked to the profits generated by the franchisees.   The Company receives monthly royalty payments from each and every one of its 100 franchisees.   The amount of the royalty payment is dependent upon the number of sales generated by each franchisee in a given month.

55.     Specifically, IJL extracts a royalty fee of 9% of gross sales made by each franchisee every month.    (See IJL website, www.itsjustlunch.com/franchise information.aspx,               http://www.itsjustlunch.com/kit/kit.aspx                and http://www.itsjustlunch.com/kit/kit.aspx?actiontype=investment             *Franchise Info/Franchise Kit/Investment Overview*, last viewed October 12, 2007, attached hereto as Exhibit G).   In the event that the franchisee does not generate a sufficient number of sales per month, IJL still requires payment of "a predetermined minimum monthly royalty", as by IJL (Id.) IJL also receives a "franchise fee" of $25,000.00 to $30,000.00

from each one of its franchises when the franchise is first started. (Id.)

### IJL's Massive Public Relations Campaign

56.     In order to continue its rapid expansion – and thus further increase its massive and fraudulently earned profits – IJL has systematically generated "world wide exposure    through    effective    public    relations    campaigns."    (See http://www.itsjustlunch.com/franchiseinformation.aspx,    http://www.itsjustlunch /kit/kit.aspx    and    http://www.itsjustlunch.com/in    thenews.aspx    *Franchise Info/Franchise Kit/IJL In The News*, last viewed October 12, 2007, attached hereto as Exhibit G.)

57.     At the national level, IJL accomplishes this by advertising heavily in business and airline magazines, as well as in upscale urban publications, touting its services in colorful advertisements, with photos of attractive young sales associates eager to help busy professionals find their ideal matches. (See, e.g., IJL ads from several New York Magazines, dated July 2-9, 2007, October 1, 2007 and October 8, 2007, attached hereto as Exhibit K.)   This type of advertising is "designed to increase [IJL's] brand awareness" to potential IJL clients throughout the country. (See IJL website, http://www.itsjustlunch.com/franchiseinformation.aspx,    http://www.itsjustlunch /kit/kit.aspx and http://www.itsjustlunch.com/inthenews.aspx *FranchiseInfo/Franchise Kit/IJL In The News*, last viewed October 12, 2007, attached hereto as Exhibit G.).

58.     At the local level, IJL supplies "a detailed marketing advertising and public relations program" for each one of its franchises." (Id.) Specifically, IJL provides its franchisees with "sample print ads, direct mail pieces, radio and TV ads." (See IJL

website, http://www.itsjustlunch.com/franchiseinformation.aspx, www.itsjustlunch

/kit/kit.aspx and http://www.itsjustlunch.com/kit/kit.aspx ?actiontype=support

*Franchise Info/Franchise Kit/Support and Training).*   This type of advertising is "designed

to increase sales in our local offices., last viewed October 12, 2007, attached hereto as

Exhibit G." (<u>See</u> IJL website, http://www.itsjustlunch.com /franchiseinformation.aspx,

http://www.itsjustlunch/kit/kit.aspx and http://www.itsjustlunch.com/kit/kit.aspx

?actiontype=support, *Franchise Info/Franchise Kit/Support and Training*, last viewed

October 12, 2007, attached hereto as Exhibit G).

**IJL's   Target Market: "Busy Professionals"**

59.    All of the above advertising efforts are geared toward reaching a specific

class of consumers, namely: "busy successful men and women who want to be in

relationships but don't have time to meet people." (<u>See</u> http://www.itsjustlunch.com

/franchiseinformation.aspx,        http://www.itsjustlunch/kit/kit.aspx        and

http://www.itsjustlunch.com/kit/kit.aspx?actiontype=support *Franchise Info/Franchise*

*Kit/Support and Training* (quoting Daniel Dolan, CEO of IJL, in the *Harvard Law Bulletin*),

last viewed October 12, 2007, attached hereto as Exhibit G).

60.    IJL targets this group because it represents is "a huge, untapped and

ever-growing national and international market" and because such professionals earn a

high enough income that the cost of an IJL membership is an "affordable indulgence"

which     "easily     fits     within     their     budgets"     (<u>See</u>     IJL     website,

http://www.itsjustlunch.com/franchiseinformation.aspx, *"Franchise Info"*, attached

hereto as Exhibit G.)   It is for this reason that IJL promotes itself as "a dating service for

busy professionals". (See IJL Website, www.ItsJustLunch.com, "*Corporate Home,*" attached hereto as Exhibit A.)

61.    Plaintiff is one such "busy professional" who entered into a contract with Defendants and spent $1,500.00. Plaintiff was induced to enter into this contract as a result of misrepresentations made by defendants on their website, in their advertisements and in their interview with plaintiff. After being set up with several "matches", Plaintiff realized that Defendants' services were grossly deficient and substandard in almost every aspect. More importantly, Plaintiff realized that Defendants had blatantly misrepresented the nature and quality of the services that they provided, as well as the qualifications of other members in the system.

<u>**Consumer Complaints Against IJL**</u>

62.    Notwithstanding IJL's massive public relations campaign, IJL has been the subject of a litany of complaints from a large number of dissatisfied members, who have complained to IJL about many of the unlawful and deceptive business practices set forth herein.    (See, e.g., "Consumer Complaints About It's Just Lunch – Angry Women", attached hereto as Exhibit H.)

63.    IJL has also been the subject of a consumer-fraud investigation conducted by ConsumerAffairs.com – an independent Web-based consumer news and resource center – regarding IJL's fraudulent and misleading business practices. (See http://www.consumeraffairs.com/news04/2006/02/ijl.html "*It's Just Lunch – Or Is It?*", February 13, 2006, attached hereto as Exhibit E.)

64.    The ConsumerAffairs.com investigation found that IJL has misled its

clients by stating all of the following lies:

- Claiming to be experts at matching busy professionals with like-minded busy professionals;

- Claiming to arrange dates based on clients' specific requirements;

- Claiming only to have professionals in its files;

- Claiming to have hundreds and in some cases thousands of clients in its files;

- Exaggerating age, profession and other characteristics of clients when arranging dates; and

- Refusing to give refunds when dates didn't meet clients' criteria.

### Government Investigations Into IJL

65.    Even government agencies have felt compelled to investigate the Company.   For example, the New York State Attorney General's Office recently found that IJL was systematically violating New York state laws by forcing its clients to sign two six-month contracts at the same time – for a total of $1,500.00 – thus circumventing a state law that limits the amount a consumer can be charged for a social referral service to $1,000.00 per year. (See Assurance of Discontinuance Pursuant to Executive Law § 63(15), dated June 13, 2007, attached hereto as Exhibit D).

66.    The Attorney General's Office further found that IJL violated state laws by "prohibiting consumers from filing lawsuits against the company and by failing to provide    many    consumer-friendly    provisions."    (Id).    (See http://www.legalnewsline.com/news/197685-ag-cuomo-unhappy-with-dating-service

*AG Cuomo Unhappy With Dating Service*, July 27, 2007, last viewed October 8, 2007, attached hereto as Exhibit I.)

67.    IJL has also been the subject of multiple complaints with the Better Business Bureau.  For example, in New York City alone, the Better Business Bureau received five separate complaints from IJL New York clients over the last 12 months. (See Better Business Bureau Statistics, IJL New York City Office http://www.newyork.bbb.org/reports/PrintReport.aspx?id=38028&lang=en, attached hereto as Exhibit J).

### The Necessity For This Class Action

68.    Despite being the target of a government inquiry, as well as the subject of a consumer-fraud investigation, IJL has thus far largely avoided liability for its fraudulent and deceptive business practices.  This is so because the majority of IJL's clients simply do not have the time, energy, or resources to start a lawsuit against IJL. Indeed, the very nature of the class herein – busy, career-oriented professionals – virtually ensures that dissatisfied IJL clients will not take legal action against IJL, simply because the demands of their professional lives preclude them from doing so.  Further, the amount of damages sustained by each IJL client is simply not large enough for these clients to justify their hiring an attorney to commence a lawsuit against IJL.  Finally, while IJL clients know that they have been defrauded, they undoubtedly feel reluctant to admit that they have joined a dating service – much less that they have been duped by one – and this, too, acts as a strong deterrent against taking legal action against IJL.

69. For all of these reasons, this class action has become necessary, as it is the only means by which to completely and permanently stop IJL from continuing its massive scheme to defraud single professionals throughout the country.

## FIRST CLAIM FOR RELIEF

### (Fraudulent Inducement and Misrepresentation)

70. Plaintiff repeats and realleges each allegation of paragraphs 1 through 69 above as if fully set forth herein.

71. As alleged above, Defendants knowingly made material misrepresentations on their website, in their advertisements and in their interviews.

72. Defendants made such material misrepresentations in order to induce Plaintiff and Class members to enter into a contract with IJL.

73. Plaintiff and Class members relied upon Defendants' material misrepresentations to their determent, and entered into a contract with IJL.

74. As a result of Defendants' fraudulent conduct, Plaintiff and Class members suffered monetary damages and other losses.

## SECOND CLAIM FOR RELIEF

### (Deceptive Acts or Practices under NY Gen. Bus. Law § 349)

75. Plaintiff repeats and realleges each allegation of paragraphs 1 through 81 above as if fully set forth herein.

76. Defendants knowingly made material misrepresentations on their website, in their advertisements and in their interviews with Class members.

77. Defendants' material misrepresentations were intended to deceive, and

did in fact deceive, Plaintiff and Class members regarding the rights and protections available to consumers, as well as the services provided by Defendants.

78.    Defendants' actions constituted a violation of NY Gen. Bus. Law § 349.

79.    Plaintiff and Class members suffered monetary damages and other losses as a result of Defendants' violation of NY Gen. Bus. Law § 349.

## THIRDCLAIM FOR RELIEF

(False Advertising NY Gen. Bus. Law § 350-a)

80.    Plaintiff repeat and realleges each allegation of paragraphs 1 through 79 above as if fully set forth herein.

81.    Defendants made false and misleading statements on their website and in their advertisements.

82.    Defendants' false and misleading statements were consumer oriented.

83.    Defendants' false and misleading statements were made in connection with the sale of consumer services.

84.    Defendants' false and misleading statements were made knowingly and with the intention of misleading Plaintiff and Class members regarding the nature and quality of services being offered by Defendants.

85.    Defendants' false and misleading statements did in fact mislead Plaintiff and Class members regarding the nature and quality of services being offered by Defendants.

86.    Plaintiff and Class members suffered monetary damages and other losses as a result of Defendants' false and misleading statements.

## FOURTH CLAIM FOR RELIEF

(Negligent Misrepresentation)

87.    Plaintiff repeats and realleges each allegation of paragraphs 1 through 86 above as if fully set forth herein.

88.    Defendants made false and misleading statements to Plaintiff and Class members.

89.    Defendants made such statements in a careless and reckless manner.

90.    Defendants knew or should have known that Plaintiff and Class members would rely on such false and misleading statements.

91.    Plaintiff and Class members did in fact rely on Defendants' false and misleading statements to their determent.

92.    Defendants owed Plaintiff and Class members a duty of care.

93.    Defendants breached the duty of care which they owed to Plaintiff and Class members

94.    Plaintiff and Class members suffered monetary damages and other losses as a result of Defendants' fraudulent conduct.

## FIFTH CLAIM FOR RELIEF

(Unjust Enrichment)

95.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 94 above as if fully set forth herein.

96.    Considerations of justice and good conscience preclude allowing Defendants to retain any fees paid to them from any Class members.   These class

members were fraudulently induced to enter into a contract with Defendants, and, in turn, pay fees, and the fees paid far exceed the reasonable value of the services rendered by Defendants.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court enter judgment against Defendant as follows:

1. an order certifying the Class, and appointing Plaintiff and her undersigned counsel of record to represent the Class;

2. a permanent injunction enjoining Defendants, their partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under or in concert with them, directly or indirectly, or in any manner, from in any way engaging in the practices set forth herein;

3. a permanent injunction enjoining Defendants, their partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with them directly or indirectly, or in any manner, from utilizing any monies acquired by Defendants' unfair business practices, including all profits, revenues, and proceeds both direct and indirect;

4. imposition of a constructive trust upon all monies and assets Defendants have acquired as a result of their unfair practices;

5. compensatory damages and full restitution of all funds acquired from Defendants' unfair business practices, including disgorgement of profits and actual damages suffered by Plaintiff and Class members;

6. punitive damages, to be awarded to Plaintiff and each Class member;

7. costs of suit herein;

8. investigative costs;

9. both pre- and post-judgment interest on any amounts awarded;

10. payment of reasonable attorneys' fees;

11. declaratory relief; and

12. such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated:      New York, New York
            October 12, 2007

By: _____
Craig Stuart Lanza (CL-2452)
John Balestriere (JB-3247)
**BALESTRIERE PLLC**
225 Broadway
Suite 2700
New York, NY 10007
Telephone 212-374-5401
Email: jbalestriere@balestriere.net
*Attorneys for Plaintiff and Class*

**Exhibit A**

Locations

Dating Service News

Who We Are

What To Expect

Our Success

Dating & Relationship Facts

Restaurant Partners

It's Just Lunch Careers

Franchise Info



**Dating for busy professionals**

Get More Info!

**888.300.9500**

## Get More **Info!**

Please fill out a little more info on yourself - so we can find out if we have the types of people you'd like to meet.

First Name:

Last Name:

Address:

City:

State:    Zip:

Email:

Home Phone:

Cell/Work:

Age:

Gender: ○ Male ○ Female

Why are you thinking of doing something like this?

Select your region... ▾

How did you hear of us? ▾

SUBMIT    *IJL will never sell or trade your personal info.

## What To **Expect**

### How does it work?

First, you schedule a discreet, confidential interview with us. This interview enables us to carefully discern what it is you look for in a potential partner. We talk about what has worked for you in the past (and what hasn't) and what your interests are. Then, we match you with other IJL clients.

### How are clients matched?

We select a person for you based upon the information we discuss in the interview. Our staff members have years of experience and create matches based on personality and physical requirements. Our service isn't about video or computer dating; it's about an insightful, professional IJL staff member hand-selecting appropriate matches based upon your desires, goals, motivations and our instincts.

### How is the date arranged?

Once we select a match for you, we contact you by phone to tell you about the person we have chosen. We respect your confidentiality and only give out your first name, never revealing your address, phone number or company name. We give you a concise description of your potential date and why we think this match is appropriate. Everything we know about you is taken into consideration for this process.

### How and where do I meet my date?

The only work you need to do is to show up at the restaurant and enjoy the date. We handle every step. If your schedule makes meeting for lunch difficult, we can arrange for a drink after work. Our goals are that the match is well-suited and the time and place are convenient for both of you. We like to create an environment

Locations

Dating Service News

Who We Are

What To Expect

Our Success

Dating & Relationship Facts

Restaurant Partners

It's Just Lunch Careers

Franchise Info



**Dating for busy professionals**

Get More Info!

**888.300.9500**

# Get More Info!

Please fill out a little more info on yourself - so we can find out if we have the types of people you'd like to meet.

First Name:

Last Name:

Address:

City:

State:    Zip:

Email:

Home Phone:

Cell/Work:

Age:

Gender:  ◯ Male   ◯ Female

Why are you thinking of doing something like this?

Select your region...

How did you hear of us?

SUBMIT    *IJL will never sell or trade your personal info.

## Who We Are

IJL is celebrating over 15 years in the dating business, with thousands of professional singles. We've created a service where everyone feels comfortable with the process of meeting a new person. The company was born in 1991 in Chicago and now has locations from New York to Singapore, and everywhere in between. It's Just Lunch was founded by a Chicago woman whose engagement was called off. Finding herself suddenly single, she began the tedious search to meet "normal", well-educated professionals. Her friends sent her out on blind dates, she tried personal ads, contemplated the internet and dating services, but she wasn't comfortable with any of these options. The ideal date, she decided, was a lunch date or a drink after work. A fun, laid back, stress-free way to meet!



Locations

Dating Service News

Who We Are

What To Expect

Our Success

Dating & Relationship Facts

Restaurant Partners

It's Just Lunch Careers

Franchise Info

**Dating for busy professionals**

Get More Info!
**888.300.9500**

## Get More **Info!**

Please fill out a little more info on yourself - so we can find out if we have the types of people you'd like to meet.

First Name:

Last Name:

Address:

City:

State:    Zip:

Email:

Home Phone:

Cell/Work:

Age:

Gender:  ○ Male  ○ Female

Why are you thinking of doing something like this?

Select your region...

How did you hear of us?

**SUBMIT**        *IJL will never sell or trade your personal info.*

## Our **Success**

It's Just Lunch is a fun, proactive approach to your personal life. As first date specialists, we arrange fun lunch dates and drinks after work for busy professionals. We began in a tiny office in Chicago in 1991 and have grown to over 80 offices Worldwide. In summer 2004, we opened our first international locations in Singapore and Toronto. Many of our first dates lead to 2nd dates and our matchmaking is responsible for thousands of marriages. We have arranged over 2 million fun first dates in our 15 years. Each month we arrange 50,000 dates for our 30,000 members worldwide----and growing by thousands each month!—that's a lot of lunch dates!

A Chicago woman founded It's Just Lunch over 15 years ago after her engagement was suddenly called off. She attended her first IJL wedding after the company had been in business for just 5 months. Since then, The IJL Team has been responsible for many weddings and she still gets goose bumps when she hears about another engagement!

**Exhibit B**



FIRST DATE UNIVERSITY

# Taking Control in an Interview

There are three control points that are said verbatim in an interview to establish control. Below is an explanation of how to convey these three points. On your interview sheet you'll see a star(s) (∗) when you need to say one of the control points.

• Walk into Interview room and greet the client.
• Take clipboard—read how the client heard about us.
• Ask the first couple of questions to break the ice:
>  "So, you heard about us through 'The San Diego Union Tribune'..."
>  Women: "Have you had any friends who have gotten married through us or are dating someone through us?"
>  Men: "Did you read the article about us that was in Forbes or the one in the Wall Street Journal?"
>  "Ok, have you ever done anything like this before?"
>  If they say no: "Oh, most of my clients have never done anything like this before! So you are in good company!"

At this point you will have reached the first star (∗) on your interview sheet so you now say the first control point to establish control.

---

**∗ Control Point One**

Ok, just so you know what we are going to do...I'm going to ask you a TON of questions...all about you, your likes, people you've dated, what you do in your free time.. just lots of questions all about you... and feel free to pop in at anytime to ask me anything! Then, if I have what you're looking for, I'll get you started today! If I don't, then we just hold off.... OKAY?
(POINT: THEY MUST SAY OK!!!!)

---

43

• Ask the client questions 2-14 on your interview sheet

At this point you will have reached the second star (**) on your interview sheet so you now say the second control point to establish control.

---

**** Control Point Two**

Stop and flip over your clipboard. "Ok, so far I have 3-4 ideas for your first date... but first I want to make sure about one thing that's really important. I just want to make sure that you'll be comfortable with the feedback. You have to call me after each date and tell me what you thought... Will you be comfortable with that? (listen to their answer)

Ok, what I want to do next is go over your parameters on the front sheet that you checked off... That will give me a really good idea of HOW MANY dates I'll have for you!!!

GO TO FRONT SHEET and review what they checked off.

---

44

- Review all the parameters on front sheet

- Confirm their phone numbers
    "What is the best phone number to reach you? Can I leave a detailed message on that phone number?"

- Lean toward the client and review their availability for this week for lunch.
    "OK, so when are you available for a lunch date this week?" Write it in.
    "OK, when can you meet for drinks this week?" Write it in.
    "I think I am going to start you with two people, so I need some dates for lunch or a drink NEXT week too." Write it in.

- Take the photo

Now you have come to the third star (∗∗∗) on your interview sheet so do control point three.

---

### ∗∗∗ Control Point Three

Reach over and grab your big stack of contracts on the clipboard. Do NOT EVER EVER let go of them. Do not call it a 'contract' or an 'agreement'. It's called a 'this'.

"OK, I always get the same questions about this!

The first thing is that you are guaranteed at least _____ dates.

The second thing is you can put your membership on hold for up to one year...let's say you decide after your 7th date that you really like Steve and just want to date him... we'll put you on hold...all you have to do is call me and let me know... we always get really excited when that happens and it happens every day!!!

And last, any of your friends that you refer, you get an extra date for each one.. that's where most of my clients come from, REFERRALS! OK, just fill out this top part here, sign right here and make your check out to IJL for $_____...there's not tax or anything extra added.. You don't have to write out It's Just Lunch, you can just make it out to IJL. I also need your driver's license...I'm going to go get your welcome package and a list of our restaurants and I'll be right back!"

---

Come back in... make a copy of the contract. Put the copy in their package. You keep the original contract. Walk them out! Tell them we'll talk with them tomorrow and we're so excited to hear the feedback! Shake hands and close the door!

**Exhibit C**



**FIRST DATE UNIVERSITY**

# "What if the Client Says...?"

## How to Approach the Unusual Event Known as a "Pending"

So! If you do get a pending you have done something wrong in the interview. Remember they came in wanting to join - they even knew to bring their checkbook and our clients are way too busy to come in and meet with you just to "check it out". So how do you re-establish their confidence in you and get them to join? Follow these steps!

**Client:**       I think I want to think about it.

**Director:**    Is there anything else I can answer for you?

**Client:**       No.

**Step 1:**      Establish that you will call them the next day!
**Director:**    Okay, then what I'll do is get you the list of restaurants and a letter that goes over the process. I already know the first two people I want you to meet and normally I call them right away, but what I'll do is hold off calling until them today and I will call you tomorrow morning instead.

**Step 2:**      Call them the next day!
Assume that they are joining and call them the next day with two people who fit their profile and are excellent matches. Describe the matches in great detail so you paint an exciting and accurate picture. Often times it's your description is what makes them want to join.
**Director:**    Hi Jack! It's Anne! How are you? Well, the first thing I want you to know is that I felt like we had a really great interview yesterday. Secondly, I've had a blast picking out dates for you this morning. I have a lot of great women I want you to meet, but these are the ones I want you to meet first! So, let's go over the first two I picked out for you...I'm so excited!

**Step 3:**      Get dates of availability.
Ask for their dates of availability for the next day and later on in the week! This creates the urgency for you. Once you get the dates of availability you know they're joining!
Director:        Don't they sound great? And I know Susie really wants to meet you! I got a little excited about the match and told her about you; I know she said this week looks good, is it possible you can do tomorrow for drinks?

48

**Client:**     I still want to think about it (or) I wasn't sure if I was going to join
**Director:**    Jack! I have so many great people for you, there's no reason you shouldn't join! You're going to have a blast, the only thing you need to make sure you'll do is be very good with giving feedback so I can keep bringing you the right kind of people!

**Step 4:**     Arrange for messenger to pick up check.
Once you have their availability, tell them you want to go ahead and get their dates set up for this week and will send a messenger to pick up the check. Don't let them mail it! Let them know that you're going to set it up and you'll call and confirm the exact place and time later that day.
**Director:**    Okay, I'm really excited for you to meet these two women - I know you're going to really like them! What I'm going to do is call the women and then I'll call you back to confirm the place and time. Now, we can do two things regarding the check, you can drop it off tonight, or I can have the messenger pick up your check, they are already doing that for three other clients this afternoon.

**Note:**
Even if the client doesn't join, you still need to:
• Complete the client's file (detailed notes and photo)
• Enter them into the computer database
• Write a thank you note the day of the interview (see below)

*Dear John,*

*It was a pleasure meeting you today and I can't wait to get started! Please call me as soon as you are ready to go... I already have a few ideas for good lunch dates for you!*

*Sincerely,*
*Nancy*

49

**Exhibit D**

THE ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUFFALO REGIONAL OFFICE
--------------------------------------------------------------------

It's Just Lunch International LLC

--------------------------------------------------------------------

### ASSURANCE OF DISCONTINUANCE
### PURSUANT TO EXECUTIVE LAW
### SECTION 63(15)

Pursuant to the provisions of Executive Law § 63(12) and General Business Law

("GBL") Art. 22-A and § 394-c, Andrew M. Cuomo, Attorney General of the State of New York,

caused an inquiry to be made into certain practices of It's Just Lunch International LLC ("IJLI"),

and based upon that inquiry makes the following findings ("Findings"):

1.      IJLI is a Nevada limited liability company with its principal place of business

located at 75340 Gerald Ford Drive, Palm Desert, CA 92211. IJLI sells and services franchises

that operate social referral services, *i.e.*, dating services, under the It's Just Lunch trade name.

IJLI has three New York State franchisees. They are located in New York City (which includes

Long Island), Albany, and Williamsville (which includes Buffalo and Rochester).

2.      Daniel Dolan ("Dolan") was Chairman and Chief Executive Officer of IJLI until

on or about December 31, 2006.

3.      Dolan was also the sole or major shareholder of It's Just Lunch, Inc., a New York

corporation which owned and operated the New York City franchise from in or about April, 1993

to in or about February, 2002. When Dolan's New York City franchise was sold to its current

owners, they inherited, and continued to use, the contracts that Dolan had used. They also

continued his practice of offering consumers the option of purchasing one social referral service

contract ("contract") for six months for $1,000.00, or two six-month contracts, to run

consecutively, totaling $1,500.00.

      4.    Dolan, from in or about September, 2005 to in or about March, 2006, was also the sole or major shareholder of IJL New York LLC, a Nevada limited liability company which owned the IJLI Williamsville franchise. Although Dolan's Williamsville franchise did not employ the two-contract approach, it did utilize the same contract as his New York City franchise, which he passed on to the current owner of the franchise.

      5.    Jill Vandor is a current owner of the New York City franchise. She is also an IJLI Certified Trainer. As such, other franchise owners may seek her advice with respect to the operation of their franchises.

      6.    Ms. Vandor recommended to the current Williamsville and Albany franchisees, shortly after they purchased their respective franchises, that they utilize, as she has, Dolan's practice of offering consumers the two-contract option.

      7.    Consequently, all of IJLI's New York State franchisees offer consumers two options: (i) consumers may sign one contract for which they pay $1,000.00 for a six-month membership or six dates, whichever comes later, if the membership is offered in New York City, or six months or eight dates, whichever comes later, if offered in Albany, Buffalo, or Rochester, or (ii) consumers may simultaneously sign two six-month contracts, to run consecutively, paying $1,000.00 for the first and $500.00 for the second (occasionally, pursuant to a national promotion, the second contract is offered for $300.00).

      8.    GBL § 394-c(2) provides that "No contract for social referral service shall require payment by the purchaser of such service of a cash price in excess of one thousand dollars." By having consumers sign two contracts simultaneously, for an aggregate amount in excess of

$1,000.00. IJLI's New York State franchisees have violated GBL § 394-c(2).

9.    Further, numerous provisions of the contract used by IJLI's New York State

franchisees violate GBL § 394-c. These provisions, and explanations referencing the subsections

of 394-c which they violate, follow:

      A.    Contract Provision

If despite IJL's [It's Just Lunch's] efforts, IJL is unable to provide clients
with the number of introductions agreed to under Client's membership...all
remaining monies will be refunded on a pro-rated basis, [sic] (receive a
refund equal to the pro rata amount that Client paid for the number of
dates provided to Client), less a Two Hundred Dollar ($200.00) interview
processing charge.

Violation

GBL § 394-c(4) does not permit the retention by a social referral service of

an "interview processing charge" if the requisite number of referrals is not provided. It only

allows the retention of either 15% of the contract price or a pro rated amount equal to the value

of the referrals that were provided, whichever is greater. The contract's "interview processing

charge" violates this provision, although, in practice, the franchisees did not impose the charge.

      B.    Contract Provision

IJL will provide Client with at least one (1) date every two months. In the
event IJL fails to provide Client with at least one date during any two or
more successive months, Client shall have the option to cancel this
agreement and to receive a refund equal to the pro rata amount that Client
paid for the number of dates provided to Client.

Violation

GBL § 394-c(3) states that a social referral service must provide a

specified number of referrals per month, and where the referrals have not been provided for two

successive months, the service must furnish the consumer with a full refund, except that, as noted

3

above, the service may retain 15% of the contract price or a pro rated amount equal to the value

of the referrals that were provided.

        C.     <u>Contract Provision</u>

           At the expiration of this agreement, upon the written request of Client, IJL will return to Client via certified mail all information and material of a personal or private nature acquired from Client...

           <u>Violation</u>

           GBL § 394-c(6) provides that all personal information provided by the

consumer to the service must be returned "promptly" by "certified mail," and does not require

that the consumer first request the return of the materials.

        D.     <u>Contract Provision</u>

           This agreement is the sole and entire agreement between Client and IJL....This agreement may not be terminated except in accordance with the terms hereof and any claim or dispute shall be on an individual basis only.

           <u>Violation</u>

           This provision, to the extent that it seeks to prohibit consumers from

initiating or joining a class action lawsuit against the franchisee, is illegal because it is against

public policy.

        E.     <u>Contract Provision</u>

           An additional two (2) weeks and/or one (1) additional date will be added for each new member that Client refers to IJL. Client may place membership on hold at any time for a period of up to one (1) year (cumulatively) by notifying IJL in writing (at which time Client's membership expires regardless of times or dates remaining).

           <u>Violation</u>

           GBL § 394-c(5-a) gives the consumer a "unilateral right" to place a

membership on hold for up to one year without losing any rights under the contract. The contract does not clearly set forth this right.

10.    Further, the contract used by IJLI's New York City, Williamsville and Rochester franchisees states that "ANY DISPUTE OF ANY NATURE RELATING TO THIS AGREEMENT OR THE BREACH THEREOF SHALL BE SETTLED EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION..." This violates GBL § 399-c which prohibits mandatory arbitration clauses in consumer contracts.

11.    By reason of the foregoing conduct, the Attorney General concludes that IJLI has engaged in business practices which violate GBL §§ 394-c and 399-c, and therefore also violate GBL Art. 22-A, which prohibits deceptive business practices, and New York Executive Law § 63(12), which prohibits repeated or persistent illegal conduct in the transaction of business.

12.    IJLI does not admit the Findings, but is willing to enter into this Assurance of Discontinuance ("Assurance") for purposes of settlement, and to avoid the expense of litigation.

13.    The Attorney General accepts this Assurance pursuant to Executive Law § 63(15) in lieu of commencing a statutory proceeding.

## I

## PARTIES SUBJECT TO ASSURANCE

IT IS HEREBY AGREED that this Assurance shall extend to IJLI, its officers, agents, employees, successors and assigns, and any individual or entity through which IJLI may now or hereinafter act.

5

## II

## PROHIBITED PRACTICES

IT IS FURTHER AGREED that IJLI shall immediately implement procedures and policies to reasonably ensure that every current and future IJLI franchisee in New York State is informed of the Attorney General's Findings and of their obligation to comply with GBL §§ 394-c and 399-c.

## III

## PENALTIES AND COSTS

IT IS FURTHER AGREED that IJLI shall pay to the State of New York, at the time of the execution of this Assurance, the sum of $45,000.00 as civil penalties, and the sum of $2,000.00 as costs, by certified check for the aggregate sum of $47,000.00, delivered to Andrew M. Cuomo, Attorney General of the State of New York, c/o Dennis Rosen, Assistant Attorney General, 107 Delaware Avenue, Buffalo, NY 14202.

## IV

## AFFIDAVIT OF COMPLIANCE

IT IS FURTHER AGREED that IJLI shall file with the Attorney General, within 90 days of execution of this Assurance by both parties, an affidavit, signed by an officer of IJLI, demonstrating that IJLI has complied with the terms of this Assurance.

## V

## CHARACTERIZATION OF THIS ASSURANCE

IT IS FURTHER AGREED that the acceptance of this Assurance by the Attorney General shall not be deemed or construed as an approval of the Attorney General of any of the

6

activities of IJLI, and IJLI shall not make any representation to the contrary.

## VI

### PRIVATE RIGHTS

IT IS FURTHER AGREED that nothing contained herein shall be construed to deprive

any person, corporation, association or any other entity of any private right under the law.

## VII

### ENFORCEMENT

IT IS FURTHER AGREED that, pursuant to Executive Law § 63(15), evidence of a

violation of this Assurance shall constitute *prima facie* proof of a violation of the above cited

statutes in any civil action or proceeding hereafter commenced by the Attorney General.

Dated: ~~Desert Springs~~, San Diego CA.
       ~~May~~ June 13, 2007

It's Just Lunch International LLC

By: _____
    ~~IRENE LaCOTA~~
    President

7

STATE OF CALIFORNIA        )
                                                  ) SS:
COUNTY OF ~~RIVERSIDE~~        )
                    San Diego

On this 1̲2̲ day of ~~May~~, 2007, before me came Irene LaCota, who, being duly sworn, did
                    June

depose and say that she is the President ~~and Chief Operating Officer~~ of It's Just Lunch

International LLC described herein, and which executed the above Assurance of Discontinuance,

and that she executed such Assurance of Discontinuance on behalf of It's Just Lunch

International LLC with full authorization to do so.

_____
NOTARY PUBLIC

Consented to:

ANDREW M. CUOMO
Attorney General of the
State of New York

By:_____
    DENNIS ROSEN
    Assistant Attorney General



# Non-Verbal
# Selling Skills

• When you enter the interview room, stand and walk tall so you project an air of confidence. Do not slump in. Remember you are on stage, play the part. You are the expert. Our clients come to IJL because we are the experts. Everyone wants to be a part of something that is fun and successful. So have fun!
Remember, our clients are successful and are used to hiring professionals. Show them you are an expert and that they are in good hands.

Initial Greeting. Make strong eye contact, smile and extend your hand for a firm handshake. There is no difference between a man's and a woman's handshake. A handshake should never be limp. On the other hand, you do not want to overdo it either and have an overly aggressive handshake.

• Always use the clients name the way they give it. If your client introduces himself as Anthony, do not call him Tony. He may hate that name, so do not ever change their name.

• Eye contact. Always maintain good eye contact. This does not mean you stare at your client the whole time. Maintaining good eye contact shows you are listening and are interested in what the client is saying.

• Sit up straight. Slumping in your chair shows the client you are uninterested and bored with what their saying.

• Dress professionally. Visually illustrates to client that we are a professional organization. See the IJL Dress Code. Do not forget the appearance of your shoes/toes if wearing open toe shoes.

• Grooming. Always go to work well groomed. See the IJL Dress Code. Make note that we are a smoke and fragrance-free work environment. Any type of perfume, aroma, etc could be a turn off to a client.

• Smile. But do not smile the entire time. Smiling during the entire interview could be read as fake. When you first meet someone, always smile. People do not want to be around an unpleasant person.

46

• Do not fold your arms. Folding your arms tells the client they are unwelcome.

• Make note of their voice. When you first start listening to someone speak, adjust your rate, speed and volume so as to not overwhelm them. You do not want to be talking in a loud volume at a fast rate if your client is a meticulous and soft-spoken person. If you are too fast, it can be difficult for him or her to follow you which can lead to frustration.

• Do not interrupt. Again, shows you are interested in what the client is saying. This allows you to respond to what they are telling you and not giving them a pre-rehearsed sales pitch. (Customize the response.)

• Do not ever show that you disapprove of what your client is telling you no matter how odd it may seem (for example rolling eyes, frowning, looking away, smirking, covering up a laugh, etc.).

• Never eat during an interview (you or the client). Do not bring in a Starbucks coffee unless you can offer the client the same.

• Do NOT hand the clipboard to the client before you go through control point three. If you do, the client will start reading and stop listening to you.

47

**Exhibit E**

Case 1:07-cv-09227-SHS-KNF     Document 1     Filed 10/15/2007     Page 52 of 55

consumeraffairs.com
*knowledge is power!*



PRINTTHIS

Powered by Clickability

NEWS   Latest  |  Archives  |  Auto  |  Cells, etc.  |  Computers  |  Financial  |  Health  |  Homeowners  |  Parents  |  Privac



## It's Just Lunch -- Or Is It?

**A ConsumerAffairs.Com Investigation**
**By Lisa Wade McCormick**
**ConsumerAffairs.Com**

*February 13, 2006*

A scam of the heart.

A matchmaking rip-off.

A dating service disaster.

That's how singles across the country describe their experiences with a company that claims to be the premier dating service for busy professionals.



*Looking for Love in All the Wrong Places*

It's Just Lunch -- Or Is It?
• No Refunds
• Typical Complaints
• Dating Service Tips
• It's Just Lunch Responds
• Other Dating Services
---
• "It's Just Lunch" Settles
Overcharging Complaints
• Illinois May Require More Protection
For Online Dating
---
**IJL Consumer Complaints**
• Irate Men
• Angry Women
• Insiders
• Settled in Court
• Emily's Story
• Sandra's Log

"I was absolutely horrified with the experience I had," says Jennifer P. of Wilmington, Delaware, one of the more than 50 former dating service clients who have filed complaints with ConsumerAffairs.com since 2003.

Horrified because one of her dates started to stalk her.

"That scared the hell out of me," says Jennifer, who joined the service in 2004. "He called me every day. I had to get my number changed. I asked the company if they do background checks on their clients and they said 'no, we don't need to because every one of our clients is a professional.'"

Not the ones Jennifer dated.

Here's how the company described the so-called professional who stalked her.

"They said I have a fantastic person I'm dying for you to meet," she recalls, adding the company told her it had a client base of more than 3,400 professionals. "He's adorable and exactly the type of person you're looking for. They also told me he owns his own landscaping company."

Jennifer, however, quickly discovered he didn't own a landscaping service. He mowed lawns at a local college.

He also didn't have the two minimum requirements Jennifer requested in her dates: a college degree and a full head of hair.

"This has just been a nightmare. My advice to other singles is to never call this dating service unless they want to open a Pandora's box and waste their time and money."

**It's Not Cupid□It's Just Lunch**

The dating service is called It's Just Lunch (IJL), which touts itself as a "specialized dating service for busy professionals."

A marketing manager named Andrea McGinty founded the company in 1991 after her engagement was called off a few weeks before her wedding. The company is headquartered in San Diego and its literature says it has more than 80 franchises worldwide.

IJL claims its staff members have "years of experience and create matches based on personality and physical requirements."

The company interviews clients to determine exactly what they're looking for in a potential partner.

"Our service isn't about video or computer dating," IJL's Web site states. "It's about an insightful, professional IJL staff member hand-selecting appropriate matches based upon your desires, goals, motivations and our instincts."

Singles pay about $1500 for up to 14 dates -- usually at lunch or for drinks after work -- that are supposedly hand-picked by IJL's experts based on clients' specific criteria.

**Not The Love Connections Promised**

But a two-month investigation by ConsumerAffairs.com reveals IJL doesn't deliver the "hand picked" love connections promised.

During our investigation, we interviewed more than 30 former IJL clients and employees across the country who say the dating service misled them by:

• Claiming to be experts at matching busy professionals with like-minded busy professionals;

• Claiming to arrange dates based on client's specific requirements;

• Claiming to only have professionals in its files;

• Claiming to have hundreds and in some cases thousands of clients in its files;

• Exaggerating clients' age, profession and other characteristics when arranging dates;

• Refusing to give refunds when dates didn't meet clients' criteria.

Singles also say IJL's management blamed them for mismatched dates, asked them to change their requirements in a potential partner, ignored their calls, and sometimes yelled at them -- especially if they had complaints about their poor matches.

"When she finally did speak to me (after leaving 13 messages) she did nothing but act in a totally unprofessional manner," Jennifer P. says of the IJL franchise owner who set her up with the stalker. "Using profanity, threatening me with my money, stating that she does not have to give me a refund□that she can do whatever she pleases with the money, she answers to no one, not even corporate."

Eric S. of Miami, Florida describes IJL as a total misrepresentation.

"It's not fair to consumers," says Eric, who joined IJL in 2004. "This isn't a new car. This is potentially a lifelong partner and the stakes are high. You're dealing with people who are lonely and worried about not finding someone. It's easy to prey on these fears."

Former employees confirm the dating service preys on lonely hearts and dupes singles out of their money and dreams of finding a soul mate.

"I think it's a total scam" say Michelle S. a former director in IJL's

downtown San Diego office. "I would tell anyone thinking of signing up to definitely not join. They're wasting their money and their time."

Jennifer S., who also worked as a director in IJL's San Diego office, warns consumers: "If it seems too good to be true, it probably is. That line fits perfectly for this company. It's playing on someone's emotions. What is more emotional than the heart? It exploits people who are looking for love."

### Attraction to the Company

Tracy M. of Los Angeles is a successful advertising executive whose busy travel schedule doesn't leave much time to meet new people -- especially men who share her interests and professional ambitions.

That's why It's Just Lunch appealed to her.

"They tell you they have an entire data base of men and women who are professional people just like you," says Tracy, who joined the service in 2003. "And for $1500, they guarantee you 14-16 dates with someone who is a busy, successful person -- just like you."

But none of the three "love connections" the company made matched Tracy's specific requirements.

"One guy was manager of an apartment complex, another guy was a student who graduated from architectural school and didn't have a job, and another guy was a handyman," she says. "These are not busy executives to me. This is false advertising.

You can't sucker people and say you have a huge data base of single men when you don't. It's so insane what they do. It's a total scam."

An ad touting IJL's professional clientele attracted Stephanie H. of Vernon Hills, Illinois to the matchmaking service.

"It was in one of those in-flight magazines and it looked so believable," says Stephanie, who joined IJL in 2004. "The ad said the CEO of the company was Harvard-bred."

Those Ivy League credentials impressed Stephanie and convinced her IJL was a legitimate dating service.

But after paying $1200 in advance -- and only going on two dates