# JON L. NORINSBERG

ATTORNEY AT LAW
TRANSPORTATION BUILDING
225 BROADWAY
SUITE 2700
NEW YORK, NEW YORK 10007

BRONX OFFICE
5626 POST ROAD
BRONX, NEW YORK 10471
TEL (718) 432-3018
FAX (718) 432-0070

TEL (212) 791-5396
(212) 791-5397
FAX (212) 406-6890
E-MAIL: NORINSBERG@AOL.COM

May 21, 2008

Honorable Sidney H. Stein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *E. Packman, Individually, et al v. It's Just Lunch, et al.,*
*07 CV 9227 (SHS)*

Your Honor:

Plaintiff respectfully submits this letter, pursuant to Fed. R. Civ. P. 36(a), seeking an Order compelling defendants to properly respond to Plaintiff's Request for Admissions, as well as an Order reimbursing plaintiff's counsel for all costs necessitated by the filing of this motion.

On March 5, 2008, plaintiff served her first set of discovery demands on defendants, including Plaintiff's Request for Admissions from Defendants. (See Exhibit A). On April 21, 2008 defendants served their Response to Plaintiff's Requests for Admissions. (See Exhibit B).

After reviewing defendants' responses, it was immediately apparent that defendants had failed to submit proper responses under Fed. R. Civ. P. 36(a). Specifically, defendants had: (1) denied factual allegations which were unequivocally true, based on defendants' own records and/or public statements; (2) offered boilerplate objections to each and every request; (3) offered self-serving statements which were non-responsive to plaintiff's requests; and (4) raised frivolous objections to plaintiff's use of words and terms that had come directly from defendants' own training materials.

In an attempt to resolve this discovery dispute without the Court's intervention, on April 28, 2008, plaintiff sent a letter to defendants setting forth numerous objections to defendants' responses – along with supporting case law – with the hope that defendants would agree to provide proper responses under Rule 36(a). (See Exhibit C). In this letter, plaintiff requested that defendants

-1-

indicate on or before May 1, 2008 whether or not defendants would be willing to provide such supplemental responses to plaintiff. (Id.)

On May 5, 2008, having received no response from defendants, plaintiff contacted defense counsel Bari Klein, Esq. via e-mail, and inquired as to whether or not defendants would be furnishing a response to plaintiff's letter of April 28, 2008. Ms. Klein indicated that defendants would, in fact, be responding to this letter, but that they could not do so until May 16, 2008.(See Exhibit D) [1]. Reluctantly, plaintiff agreed not to oppose this extension, although it seemed to be unnecessarily lengthy.

It is now May 21, 2008 – more than 3 weeks since plaintiff first wrote to defense counsel, and over *two months* since plaintiff's initial requests were served – and defendants still have not served proper responses under Rule 36(a), nor for that matter, have they served *any* response to plaintiff's letter of April 28, 2008. As a result, this motion has become necessary.

## Request For Admission No. 1 (Criminal Background Checks)

In plaintiff's first request for admission, plaintiff requested that defendants admit or deny that "IJL does not do any criminal background checks on its clients." Contrary to defendants' assertions, there is nothing "vague" or "ambiguous" about this request at all. Either IJL does, in fact, do criminal background checks on its clients, or it does not.[2] Therefore, defendants' refusal to answer this request is improper. See Booth Oil Site Administrative Group v. Safety-Kleen Corporation, 194 F.R.D.76, 79 (W.D.N.Y. 2000) ("Provided the demand is understandable and straightforward, calls for relevant information and does not violate a recognized privilege, an objection to a request to admit is improper ...")

Further, defendants' assertion that IJL "request(s) each client provide his/her driver's license to ensure his/her identity and age" is irrelevant and non-responsive. The issue is *not* whether IJL verifies the identity or age of the client, but rather, whether IJL does "criminal background checks." Therefore, IJL's explanation accompanying its denial is improper. See Wright & Miller, Federal Practice & Procedure, § 2260 at 729 ("A denial must be forthright, specific and unconditional.")

---

[1] Plaintiff had requested a response no later than May 7, 2008, but Ms. Klein indicated that this was not a sufficient amount of time for defendants to respond, and that she would need until May 16, 2008 to furnish a response. (Id.)

[2] In its own training materials, IJL expressly acknowledges that it does *not* do criminal background checks of its' clients. See IJL 000219 ("What kind of background checks do you do?"), annexed hereto as Exhibit E.

## Request For Admission No. 7 (Marriage Statistics)

In plaintiff's seventh request for admission, plaintiff requested that defendants admit or deny that "IJL does not have any statistics regarding the number of marriages that have actually resulted through IJL's services." Once again there is nothing "vague" or "ambiguous" about this request. Either IJL does, in fact, keep statistics regarding the number of marriages that have resulted through IJL's services, or it does not. Further, this request does *not* call for a "legal conclusion", as it is entirely factual in nature.

Lastly, IJL's claim that it is "unable to respond to this request" is belied by IJL's own website, which states that "thousands of marriages" have resulted from IJL's services. See Complaint, Ex. A.[3] Therefore, IJL's refusal to answer this request is improper under Rule 36(a). See Fed. R. Civ. P. 36 (a) (Absent a statement "that the party has made a reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny," the request is to be answered by its admission or denial).

## Request for Admission No. 8 (Sales Scripts – General Instructions)

In plaintiff's eighth request for admission, plaintiff requested that defendants admit or deny that "IJL requires all of its sales directors to memorize its sales scripts verbatim." Rather than admit or deny this allegation, defendants offer a series of boilerplate objections which are completely non-responsive to this request. Further, defendants state that the "the scripts are used to assist in training at First Date University." But this is *not* the issue being addressed. The issue is whether or not IJL requires its sales directors to "memorize its sales scripts verbatim." Therefore, IJL's response to this request – which sought to qualify its denial by explaining the purposes for which the scripts were being used – was improper. See Wright & Miller, Federal Practice & Procedure, § 2260 at 729 ("A denial must be forthright, specific and unconditional.")

Lastly, IJL explicitly states in its own training materials that "there are three control points that are *said verbatim* in an interview to establish control" See IJL 00253[4] ("Taking Control in An Interview")(emphasis supplied). Given this statement, defendants simply do not have a good faith basis for refusing to admit plaintiff's eighth request for admission. See Booth, 194 F.R.D. at 80 ("a refusal to admit, without detailed reasons why the responder cannot truthfully admit or deny, is the equivalent of an admission.")

---

[3] IJL's spokesperson, Marcia Horwitz, likewise stated that IJL "has arranged millions of meetings that have resulted in thousands of marriages", in response to the filing of this class action (See Exhibit F).

[4] All IJL documents referenced herein are included in Exhibit E in sequential order, according to their Bate Stamp numbers.

**Request for Admission No. 9 (Sales Scripts – Specific Instructions)**

In plaintiff's ninth request for admission, plaintiff requested that defendants admit or deny that "IJL requires its sales directors to tell all prospective clients during the first interview, inter alia, that "I have 3-4 ideas for your first date." Defendants objected to this request on the grounds that it is "vague", "ambiguous", "overbroad", "unduly burdensome" "harassing" and "calls for a legal conclusion." However, there is nothing "vague" or "ambiguous" about this request, and it does not in any way "call[] for a legal conclusion." To the contrary, the words used in this request are an exact quote from IJL's own training materials, as contained in "FDU, Taking Control of An Interview, Control Point Two". See Complaint, Ex. B. See also IJL Supplemental Disclosures, 000254, Ex. E. Therefore, defendants' objections to this request are completely baseless.[5]

**Request for Admissions Nos. 12, 13, 16 and 17 (Quota Requirements for Directors and Coordinators)**

In plaintiff's request for admission Nos. 12 and 13, plaintiff requested that defendants admit or deny that IJL instructs its sales directors that "consistently attaining your quota is a job requirement", and that failure to do so is "grounds for termination." Similarly, in plaintiff's request for admission Nos. 16 and 17, plaintiff requested that defendants admit or deny that IJL instructs its coordinators that "consistently attaining your quota is a job requirement", and that failure to do so is "grounds for termination."

Defendants objected to these requests on the grounds that they "call for speculation on behalf of the responding party with respect to the terms "monthly", "quota" and "requirements" and is therefore unintelligible as phrased." (Defendants' Response to Request No. 13). However, the words used in these requests are direct quotes from IJL, as contained in a document which defendants themselves have provided in both their initial disclosures and their supplemental disclosures. See IJL Initial Disclosures 000019, ¶ 9 ("IJL Policies"), Ex. E; IJL Supplemental Disclosures, 000425, ¶ 9 ("IJL Policy Form"), Ex. E. Therefore, it is simply untenable for defendants to claim that these same words – when used by plaintiff – "call for speculation" and are "unintelligble".[6]

**Request for Admissions Nos. 21 – 22 (IJL's Query System)**

In plaintiff's request for admission Nos. 21 and 22, plaintiff requested that defendants admit or deny that IJL "uses a computer-generated query system to determine when, and how often, each member must be sent out on a date", and that "if a member's name shows up on the query system,

---

[5]Furthermore, IJL's denial of this allegation is flatly contradicted by IJL's own training materials, which unequivocally state that control points must be said "*verbatim* in an interview to establish control" (IJL 000253) (emphasis supplied), Ex. E.

[6]Further, IJL's objection to Request No. 16 – based on plaintiff's alleged use of the term "quota system" – is completely unfounded, as plaintiff did *not* use this term in Request No. 16.

the member must be sent out on a date with another IJL member."

Defendants objected to these requests on the ground that they "call for speculation on behalf of the responding party with respect to the term "query system" and therefore is unintelligible as phrased."However, the term "Query" is repeatedly used by IJL in its own training materials. See, e.g., IJL 000295 ("Matching Query due 10:30"); IJL 000298 (instructing directors to send "Query with Last Names of Matches Written In"); IJL 000402 (instructing franchisees to "make sure [directors] are matching off the Query"); IJL 000403 (advising franchisees that "if Directors and Coordinators are sending out the same men 7-8 times each month, they are not matching off the query."); Ex. E. Therefore, it is simply untenable for defendants to claim that the term "query" – when used by plaintiff – "calls for speculation" and is "unintelligble."

## Request For Admissions Nos. 24 and 26 (Criteria For Male Members Who Wish To Join IJL)

In plaintiff's request for admission Nos. 24 and 26, plaintiff requested that defendants admit or deny that IJL "does not have any established criteria which must be met before allowing a male member to join IJL"(No. 24), that IJL "will permit a male member to join IJL if he has a criminal record"(No. 26).

In responding to Requests No. 24 and No. 26, defendants have neither admitted nor denied the facts asserted, but instead, defendants have offered a general statement that "There is no set "criteria" in place with respect to membership requirements." Given this statement, however, the response to Requests No. 24 and No. 26 must be "admit." See Fed. R. Civ. 36. See also Booth Oil Site Administrative Group v. Safety-Kleen Corporation, 194 F.R.D. 76, 79 (W.D.N.Y. 2000) ("a refusal to admit, without detailed reasons why the responder cannot truthfully admit or deny, is the equivalent of an admission.").

## Request For Admissions No. 32 and 34 (IJL's Gender Ratio)

In plaintiff's request for admission Nos. 32, plaintiff requested that defendants admit or deny that "IJL tells prospective female members that IJL has a roughly equal percentage of men and women in its system" There is nothing "vague" or "ambiguous" about this request. Further, this request does *not* call for a "legal conclusion", as it is entirely factual in nature. Lastly, there can be no question that IJL does, in fact, make this statement to its female members, as is confirmed in IJL's own training materials. See IJL 000220 ("What is your ratio of men to women? Right around 50/50."), Ex. E. Given this statement, defendants simply do not have a good faith basis for refusing to admit request for admission No. 32.

With respect to request for admission No. 34, plaintiff requested that defendants admit or deny that "IJL does not keep any statistics on the actual ratio of male to female members in the IJL system." Once again, there is nothing "vague" or "ambiguous" about this request. Either IJL does, in fact, keep statistics regarding the ratio of male to female members – as its training materials suggest (IJL 000220) – or it does not. There is really no middle ground. Therefore, defendants'

refusal to answer this request is improper. See Booth, 194 F.R.D. at 79.

## Request for Admission Nos. 37-38 (Overcharging of New York State Residents)

In plaintiff's Requests for admission No. 37 and No. 38, plaintiff requested that defendants admit or deny that: (1) "IJL was aware that its New York franchises charge clients $1,500.00 for one year of dating services"; and (2) "IJL authorized its New York franchises to charge clients $1,500.00 for one year of dating services from IJL." In response to these requests, defendants have objected on the ground that such requests are "not relevant and [are] outside the scope of discovery." However, plaintiff has specifically alleged a cause of action under New York State General Business Law § 349, which is based upon defendants' overcharging of their New York State clients. See Complaint, Second Claim for Relief ("Deceptive Acts or Practices under NY Gen. Bus. Law § 349, ¶¶ 75-79). Moreover, plaintiff has repeatedly referred to IJL's unlawful practice of overcharging its New York State clients throughout the Complaint. See, e.g., Complaint, ¶¶ 15-17; ¶¶ 65-67, Ex. D. Therefore, defendants' claim that these requests are "not relevant" and "outside the scope of discovery" is improper. See Booth Oil, 194 F.R.D. at 79 ("A request to admit covers the full range of information discoverable under Fed. R. Civ. P. 26(b), including matters of facts as well as the application of law to the facts.")

## Request for Admission Nos. 42, 44-47 (Total Number of IJL Members)

In plaintiff's final six requests for admission, plaintiff sought to establish: (1) the total number current IJL members; and (2) the total number of IJL members since its inception. In response to these requests, defendants admitted that IJL states on its website that it has "30,000 members worldwide" (See Defendants' Response to Request No. 41, Ex. B). Yet, in response to the next request – which simply asked defendants to *verify* that "IJL does, in fact, have at least 30,000 members worldwide" – IJL objected on the grounds that this request is "vague and ambiguous", "overbroad", "unduly burdensome" and "harassing". But this information comes directly from IJL's own website! Therefore, there is nothing "vague" or "ambiguous" about this request. Moreover, plaintiff seeks only an admission or a denial of the facts asserted – *not* the underlying records for each client. Therefore, there is nothing "unduly burdensome" or "harassing" about this request. Lastly, IJL objected to this request on the ground that it "calls for a legal conclusion". However, this request is entirely *factual* in nature, consisting solely of statistical information. Either IJL has at least 30,000 members worldwide, or it does not. This does not in any way call for a "legal conclusion."

With respect to Requests No. 44 through No. 47, plaintiff had – again – merely requested a *confirmation* of the statistical information which IJL has already stated on its own website. Thus, plaintiff sought a verification of IJL's claims on its website that it is "growing by thousands each month" (Request No. 44), and that it has had "almost 200,000 clients" since its inception (Request No. 46). Once again, this information comes directly from IJL's website (see Complaint Ex. A), and

it is clearly relevant to determining the size of the class in this action.  Therefore, IJL's objections to such requests – as "vague and ambiguous", "overbroad", "unduly burdensome" and "harassing"– are completely improper.

### Conclusion

Defendants have flouted the requirements of Rule 36(a) by denying facts which are unquestionably true and/or by lodging completely frivolous and improper objections to plaintiff's request for admissions. Under such circumstances, plaintiff respectfully requests that the Court issue an Order: (1) compelling defendants to properly respond to plaintiff's request for admissions under Rule 36(a); and (2) awarding reasonable attorney's fees for the time spent needlessly litigating this issue. See Apex Oil Company v. the Belcher Company of New York, 855 F.2d 1009, 1015 (2d Cir. 1988) ("The party seeking the admission may move to test the sufficiency of any response to his or her request. If the response is deemed insufficient, Rule 36(a) provides that the district court may order that the matter is deemed admitted or that a proper response be provided.  Even if the party fails to make a motion under Rule  36(a), a party may recover sanctions under Rules 37(c) and 26(g).")

Thank you for your consideration of this request.

Very truly yours,

Jon L. Norinsberg

cc:    Lewis Brisbois Bisgaard & Smith, LLP.

Craig Stuart Lanza, Esq.

-7-

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
**EINAT PACKMAN**, Individually and for all others
similarly situated,

                        Plaintiff,                                  07 CV 9227 (SHS)

          -against-

IT'S JUST LUNCH INTERNATIONAL, IT'S JUST LUNCH,
INC., and HARRY and SALLY, INC.,

                        Defendants.
-------------------------------------------------------------------------X

### PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANTS

       Pursuant to Rule 36 of the Federal Rules of Civil Procedure, plaintiff hereby request that

defendants, admit or deny the requests as set forth below within 30 days of the service of these

requests.

      1.      IJL does not do any criminal background checks on its clients.

      2.      IJL does not do any marital status checks on its clients.

      3.      IJL does not do any employment checks on its clients.

      4.      IJl does not require its sales directors to have any prior experience in the field of
matchmaking.

      5.      IJL does not require its dating coordinators to have any prior experience in the field
of matchmaking.

      6.      IJl does not have any instruction or training  materials on how to make successful
matches.

      7.      IJL does not have any statistics regarding the number of marriages that have
actually resulted through IJL's services.

8.    IJl requires all of its sales directors to memorize its sales scripts verbatim.

9.    IJL requires its sales directors to tell all prospective clients during the first interview, inter alia,  that "I have 3-4 ideas for your first date."

10.    IJL occasionally matches its members with individuals who are not paying members of IJL.

11.    IJL requires its sales directors to reach a quota every month.

12.    IJL instructs its sales directors that "consistently attaining your quota is a job requirement."

13.    IJL instructs its sales directors that failing to meet the monthly quota requirement is "grounds for termination."

14.    IJL sales directors will not receive any sales commissions, regardless of how many sales they make, unless they meet the quota for that given month.

15.    IJL requires its dating coordinators  to reach a quota every day.

16.    IJL instructs its dating coordinators that "consistently attaining your quota is a job requirement."

17.    IJL instructs its dating coordinators that failing to meet the daily quota requirement is "grounds for termination."

18.    IJL  instructs its employees that, when describing a prospective match, "omit unless asked" any information relating to the marital status of the prospective match.

19.    IJL  instructs its employees that, when describing a prospective match, "omit unless asked" any information relating to whether or not the prospective match has any children.

20.    As a matter of policy, IJL does not issue refunds to clients who are dissatisfied with IJL's services.

21.    IJL uses a computer-generated "query system" to determine when, and how often, each member must be sent out on a date.

22.    If a member's name shows up on the query system, the member must be sent out on a date with another IJL member.

23.    IJL tells prospective female members that it is selective in choosing which male members it allows to join IJL.

24.    IJL does not have any established criteria which must be met before allowing a male member to join IJL.

25.    IJL will permit a male member to join IJL if he is married.

26.    IJL will permit a male member to join IJL if he has a criminal record.

27.    IJL will permit a male member to join IJL if he is unemployed.

28.    IJL will permit a male member to join IJL if he is employed in a "blue collar," or working-class job.

29.    IJL will permit a male member to join IJL regardless of his annual income.

30.    IJL will permit a male member to join IJL regardless of his level of education.

31.    IJL will accept any and all male members who are willing to pay its membership fees.

32.    IJL tells prospective female members that IJL has a roughly equal percentage of men and women in its system.

34.    IJL does not keep any statistics on the actual ratio of male to female members in the IJL system.

35.    IJL does not accept female clients who are over the age of fifty (50).

36.    IJL uses "ghost calls" (i.e., calls from individuals pretending to be prospective clients) to monitor its employees' adherence to IJL sales scripts.

37.    An employee's failure to strictly adhere to IJL sales scripts is, by itself, grounds for termination.

38.    IJL was aware that its New York franchises were charging clients $1,500.00 for one year of dating services.

39.    IJL authorized its New York franchises to charge clients $1,500.00 for one year of dating services from IJL.

40.    IJL receives 9% of the total gross monthly revenue generated by each of its franchises, including but not limited to, all IJL franchises located in the State of New York.

41.    On its website, IJL claims that it has "30,000 members worldwide."

42.    IJL does, in fact, have at least 30,000 members worldwide.

43.    On its website, IJL claims that it is "growing by thousands each month."

44.    IJL is, in fact, growing by thousands of members each month.

45.    On its website, IJL claims that it has had "almost 200,000 clients" since its inception.

46.    IJL has, in fact, had almost 200,000 clients since its inception.

47.    IJL has had more than 200,000 clients since its inception.

Dated:  New York, New York
        March 4, 2008                        BALESTRIERE, PLLC.
                                             Attorney for Plaintiff
                                             225 Broadway, Suite 2700
                                             New York, N.Y. 10007
                                             (212) 791-5396


                            By:    _____
                                   JON L. NORINSBERG (JN2133)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
**EINAT PACKMAN**, Individually and for all others
similarly situated,

                                        Plaintiff,

                                                        07 CV 9227 (SHS)


              -against-

IT'S JUST LUNCH INTERNATIONAL, IT'S JUST LUNCH,
INC., and HARRY and SALLY, INC.,

                      Defendants.
---------------------------------------------------------------------------X

### PLAINTIFF'S FIRST SET OF INTERROGATORIES FROM DEFENDANTS

Pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure and Local Civil Rules

26.2, 26.3 and 26.4 of this Court, plaintiff hereby requests that defendants serve upon the undersigned

sworn written answers to each of the interrogatories set forth below within thirty days after service

hereof.

These interrogatories are continuing. If at any time after service of answers hereto, and prior

to the trial of this action, defendants obtain or become aware of additional information pertaining to

any of these interrogatories, the disclosure of which may be required pursuant to Rule 26 (e) of the

Federal Rules, defendants shall, within thirty days serve upon the undersigned supplemental sworn

written answers setting forth such additional information.

### INSTRUCTIONS

1.      If the answer to all or any part of an interrogatory is not presently known or available,

include a statement to that effect and furnish any information currently known or available and a

description of the source of information that was once known or available which could have been

used to respond to the interrogatory.

2.    If any information called for by an interrogatory is withheld by reason of a claim of privilege, state with specificity the information required by Local Rule 26.2.

## DEFINITIONS

1.    These definitions incorporate by reference the Uniform Definitions in Discovery Requests set forth in Local Rule 26.3.

2.    The term "IJL" shall include all named defendants in this action, unless otherwise specified.

3.    The term "New York Franchises" shall include all IJL franchises in the State of New York, including but not limited to, franchises in New York City, Long Island, Albany and Williamsville.

## INTERROGATORIES

1.    Identify any documents, including videotapes and/or audiotapes, used by IJL as part of the training at First Date University.

2.    Identify any documents which refer or relate to IJL's monthly quota requirement for its sales directors.

3.    Identify any documents which refer or relate to IJL's daily quota requirement for its dating coordinators.

4.    Identify any documents which refer or relate to the base salary and/or commission structure for IJL sales directors.

5.    Identify any documents which refer or relate to the base salary and/or commission structure for IJL dating coordinators.

6.     Identify any documents which refer or relate to the job duties and responsibilities of an IJL sales director.

7.     Identify any documents which refer or relate to the job duties and responsibilities of an IJL dating coordinator.

8.     Identify any documents which refer or relate to the criteria that IJL uses in deciding whether or not to allow a prospective member to join IJL.

9.     Identify any documents which set forth the instructions and/or guidelines given to IJL employees regarding how they should describe prospective matches to other members in the system.

10.     Identify any documents which set forth IJL's policy regarding refunds to clients who are dissatisfied with IJL's services.

11.     Identify any documents which refer or relate to IJL's "query system" for deciding when, and how often, each member must be sent out on a date.

12.     Identify any individuals who are responsible for creating the "control points" that are taught at First Date University.

13.     Identify any individuals who have knowledge about the training program at First Date University.

14.     Identify any individuals who are responsible for the creation of IJL's website.

15.     Identify any individuals who are responsible for the advertising, marketing and/or promotion of IJL.

16.     Identify any documents which refer or relate to the ratio of male  to female members in the IJL system.

17.    Identify each newspaper, magazine, trade journal or other publication in which IJL has placed print advertisements for IJL's services.

18.    Identify any document which refers or relates to the minimum and/or maximum age requirements for male and female IJL members.

19.    Identify any individuals responsible for creating and/or implementing the practice of the New York Franchises of using two separate contracts to charge $1,500.00 for IJL's services for one year.

20.    State the total number of IJL members in New York State who paid $1,500.00 to IJL for a one year membership, from 1993 to 2007 (please specify separately for each New York franchise).

21.    Identify all sales directors who were employed at the New York City IJL franchise owned by defendant IT'S JUST LUNCH, INC., and/or HARRY and SALLY, INC., from 1993 to 2007.

22.    Identify any documents which support IJL's claim on its website that it has "30,000 members worldwide."

23.    Identify any documents which support IJL's claims that it has had "almost 200,000 clients" since its inception.

24.    Identify any third-party investigation into IJL, including but not limited to, any federal, state or local investigation by any governmental agency, division or subdivision thereof, and/or by any consumer-rights group.

25.    Identify any lawsuit brought against IJL, including but not limited to, any lawsuit filed by any former client and/or franchise owner (please provide the names of all parties, the venue, and the index or CV number for said action).

Dated:  New York, New York
        March 5, 2008

                                        BALESTRIERE, PLLC.
                                        Attorney for Plaintiff
                                        225 Broadway, Suite 2700
                                        New York, N.Y. 10007
                                        (212) 791-5396


                            By:         _____
                                        JON L. NORINSBERG (JN2133)

E. PACKMAN, individually and for all others similarly situated,

Plaintiff,

-against-

IT'S JUST LUNCH INTERNATIONAL, IT'S JUST LUNCH, INC., and HARRY and SALLY, INC.,

Defendants.

## PLAINTIFF'S REQUEST FOR ADMISSIONS FROM DEFENDANTS

### BALESTRIERE, PLLC.

*Attorney for Plaintiffs*
225 Broadway - Suite 2700
New York, New York 10007
(212) 374-5401

Signature (Rule 130-1.1a)

Print Name Beneath

To
Attorney(s) for          Defendants

Service of a copy of the within is hereby admitted.          Dated

Attorney(s) for

PLEASE TAKE NOTICE

☐     <u>NOTICE OF ENTRY</u>

that the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on          20

☐     <u>NOTICE OF SETTLEMENT</u>

that an order                                        of which the within is a true copy
will be presented for settlement to the HON.          one of the judges of the
within named Court, at
on                    20          at

Dated,                                               Yours, etc.

**EXHIBIT B**

John L. Doody (JD-0552)
Bari Klein (BK-5784)
Lewis Brisbois Bisgaard & Smith, LLP
199 Water Street
New York, New York 10038

UNITED STATE DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

E. PACKMAN, individually and for all others similarly
situated,

Docket No.: 07 CIV 9227

                                        Plaintiff,

            -against-

IT'S JUST LUNCH INTERNATIONAL, IT'S JUST
LUNCH, INC. and HARRY and SALLY, INC.,

                                        Defendants.

**DEFENDANTS' RESPONSE
TO PLAINTIFF'S REQUEST
FOR ADMISSIONS
[SET ONE]**

------------------------------------------------------------------X

## OBJECTIONS

1.     Defendants object to each and every request to the extent such request, seeks the
disclosure of privileged communications or other privileged documents, whether
such privilege is based on statutory or common law, including without limitation,
documents protected by attorney-client privilege, documents protected as attorneys'
work product or trial preparation, on the ground that such discovery is not permitted
under the Federal Rules of Civil Procedure.

2.     Defendants object to the requests to the extent they call for the production of
documents that are irrelevant and not reasonably calculated to lead to the discovery
of admissible evidence.

3.     Defendants object to the document requests to the extent they seek the production of
documents that are not in Defendants' possession, custody or control.

4.  Defendants object to each document request to the extent that it seeks a response to production of documents, which is duplicative of responses to one or more of the Noticing Plaintiff's other requests.

5.  Defendants object to the document requests to the extent that they purport to require production of irrelevant material merely because some portion of a particular document may be subject to production under the Federal Rules. Plaintiffs are entitled to redact irrelevant material and thereby limit its production to material that is relevant to the prosecution or defense of this action.

6.  Defendants reserve their right to make additional objections at any time or to move for an appropriate protective order.

7.  Defendants object to the extent that the information and material requested seeks highly confidential business information of a proprietary nature.

8.  Defendants object to each and every request on the basis that Plaintiff's requests does not include a section defining specifying which Defendant each request is directed to.

9.  Any and all information or materials to be produced by Defendants must be subject to the Confidentiality "Attorney-Eyes" only Stipulation that was So-Ordered by Justice Sidney H. Stein on or about March 13, 2008 whereby the information or materials is protected from disclosure beyond the purposes necessary for the prosecution or defense of this action.

10. Defendants incorporates the foregoing general objections into each of the responses set forth below as if each such objection were fully and separately stated therein. The responses are made subject to and without waiving the general objections. In addition to the general objections set forth above. Defendants will also state specific

objections to document requests where appropriate. By setting forth such specific objections, Defendants do not intend to limit or restrict the general objections set forth above. To the extent that Defendants respond to document requests to which it objects, such objections are not waived. In addition, the inadvertent disclosure of privileged information or release of privileged documents shall not constitute a waiver of any applicable privilege.

11.     Defendants reserve their right to supplement and/or amend their Responses if Defendants learn that the Responses or incomplete or incorrect and the additional information has not been disclosed to Plaintiff in any other manner.

## DEFENDANTS' FIRST SET OF RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS

1.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Defendants request each client provide his/her driver's license to ensure his/her identity and age.

2.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each client is asked his/her martial status during the initial interview.

3.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each client is asked his/her employment status during the initial interview.

4.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: Admit.

5.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: Admit.

6.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

7.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

8.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. The scripts are used to assist in training at First Date University. Each franchise and/or employee then personalizes the training script to meet the needs, wants and desires of each respective client.

9.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

10.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

11.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own compensation package, including a base salary and/or commission.

12.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own compensation package, including base salary and/or commission.

13.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the terms "monthly," "quota" and "requirements" and therefore is unintelligible as phrased. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own standards regarding "grounds for termination."

14.     Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own compensation package, including base salary and/or commission.

15.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the term "quota" and therefore is unintelligible as phrased. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own standards regarding "quotas."

16.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the term "quota system" and therefore is unintelligible as phrased. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own standards.

17.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the term "quota" and therefore is unintelligible as phrased. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own standards.

18.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own standards.

19.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements its own standards.

20.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

21.    Objection. This request is compound, vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the term "query system" and therefore is unintelligible as phrased. Subject to and without waiving said objection, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

22.    Objection. This request is compound, vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the term "query system" and therefore is unintelligible as phrased. Subject to and without waiving said objection, Defendants

Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

23. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

24. Objection. This request is compound, vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the term "criteria" and therefore is unintelligible as phrased. Subject to and without waiving said objection, Defendants Respond: There is no set "criteria" in place with respect to membership requirements. Each franchise is responsible to interview each prospective client and send him/her out on a date.

25. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

26. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: There is no set membership requirements. Each franchise is responsible to interview each prospective client and send him/her out on a date.

27. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Admit.

28. Objection. This request is compound, vague and ambiguous, overbroad, unduly burdensome and harassing. The Request calls for speculation on behalf of the responding party with respect to the terms "blue collar," or working-class job and therefore is unintelligible as phrased. Subject to and without waiving said objection, Defendants Respond: There is no set "criteria" in place with respect to membership requirements. Each franchise is responsible to interview each prospective client and send him/her out on a date.

29. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Admit.

30. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Admit.

31.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

32.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

33.    Plaintiff's Admissions does not contain a Number 33.

34.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

35.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. IJL does not impose an age restriction on clients, however, each individual Franchise can set their own restrictions.

36.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied. Each franchise implements their own standards.

37.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Denied.

38.    Objection. Subject to and without waiving said objections, Defendants Respond: This Request is not relevant and is outside the scope of discovery.

39.    Objection. Subject to and without waiving said objections, Defendants Respond: This Request is not relevant and is outside the scope of discovery.

40.    Objection. Subject to and without waiving said objections, Defendants Respond: This Request is not relevant and is outside the scope of discovery.

41.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Admit.

42.    Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without

waiving said objections, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

43. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: Admit.

44. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for legal conclusion. Subject to and without waiving said objections, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

45. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

46. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

47. Objection. This request is vague and ambiguous, overbroad, unduly burdensome and harassing. The Request also calls for a legal conclusion. Subject to and without waiving said objections, Defendants Respond: It is unable to respond to this Request based upon the above objections, and therefore the Request is denied.

Dated: New York, New York
     April 21, 2008

Yours, etc.
**LEWIS BRISBOIS BISGAARD & SMITH LLP**

By:

John L. Doody, Esq. (JD-0552)
Bari Klein (BK 5784)
Nadia L. Moussa Esq. (NLM-8934)
Attorneys for Defendant
*IT'S JUST LUNCH INTERNATIONAL, LLC,*
*IT'S JUST LUNCH, INC. and*
*HARRY and SALLY, INC.*
199 Water Street – Suite 2500
New York, New York 10038
(212) 232-1300

TO:    John Balestriere, Esq.

4838-0644-5058.1

Craig Stuart LAnza, Esq.
Balestruere, PLLC
25 Broadway, Suite 2700
New York, New York 10007
(212) 374-5401

E. PACKMAN, individually and for all others similarly situated,

Plaintiff,

-against-

IT'S JUST LUNCH INTERNATIONAL, IT'S JUST LUNCH, INC. and HARRY and SALLY, INC.,

Defendants

## DEFENDANTS' RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS [SET ONE]

# LEWIS BRISBOIS BISGAARD & SMITH LLP

*Attorney(s) for Defendants*

*Office Address & Tel. No.:*  199 Water Street, 25th Floor
New York, New York 10038
(212) 232-1300

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

Dated:  July 24, 2006

Signature _____
Print Signer's Name

*Service of a copy of the within*
Dated:                                                                                  *is hereby admitted.*

_____
*Attorney(s) for*

*PLEASE TAKE NOTICE*

Check Applicable Box

☐ **NOTICE OF ENTRY**
*that the within is a (certified) true copy of a
entered in the office of the clerk of the within named Court on*

☐ **NOTICE OF SETTLEMENT**
*that an Order of which the within is a true copy will be presented for settlement to the
Hon.          one of the judges of the within named Court, at
on        , at        AM.*

Dated:

*Attorney(s) for*

To:
*Attorney(s) for*                           *Office Address & Tel. No.:*

**EXHIBIT C**

## JON L. NORINSBERG
### ATTORNEY AT LAW
TRANSPORTATION BUILDING
225 BROADWAY
SUITE 2700
NEW YORK, NEW YORK 10007

BRONX OFFICE
5626 POST ROAD
BRONX, NEW YORK 10471
TEL (718) 432-3018
FAX (718) 432-0070

TEL (212) 791-5396
(212) 791-5397
FAX (212) 406-6890
E-MAIL: NORINSBERG@AOL.COM

April 28, 2008

Lewis Brisbois Bisgaard & Smith, LLP.
199 Water Street, Suite 2500
New York, NY 10038

Attn: Bari Klein, Esq.

Re:    *E. Packman, Individually and for all others similarly situated,*
       *v. It's Just Lunch International, It's Just Lunch, Inc., and*
       *Harry and Sally, Inc.*

Dear Ms. Klein:

We are in receipt of Defendants' First Set of Responses To Plaintiff's Requests For Admissions, and we write now in response to same.

Upon reviewing Defendants' responses, it appears that there are multiple instances in which defendants have failed to properly answer under 36(a) of the Federal Rules of Civil Procedure. Specifically, defendants have: (1) denied factual allegations which are unequivocally true, based on defendants' own records and/or public statements; (2) offered boilerplate objections which are non-responsive to plaintiff's requests; and (3) objected to the use of words and terms which come directly from IJL's own training materials, and as such, are neither "speculative" nor "unintelligible." Each of the Requests at issue will be discussed below.

### Request For Admission No. 1 (Criminal Background Checks)

In plaintiff's first request for admission, plaintiff requested that defendants admit or deny that "IJL does not do any criminal background checks on its clients." There is nothing

-1-

"vague" or "ambiguous" about this request. Either IJL does, in fact, do criminal background checks on its clients, or it does not.[1] Therefore, defendants' refusal to answer this request is improper. See Booth Oil Site Administrative Group v. Safety-Kleen Corporation, 194 F.R.D.76, 79 (W.D.N.Y. 2000) ("Provided the demand is understandable and straightforward, calls for relevant information and does not violate a recognized privilege, an objection to a request to admit is improper ...")

Further, defendants' assertion that IJL "request(s) each client provide his/her driver's license to ensure his/her identity and age" is irrelevant and non-responsive. The issue is *not* whether IJL verifies the identity or age of the client, but rather, whether IJL does "criminal background checks." Therefore, IJL's explanation accompanying its denial is improper. See Wright & Miller, Federal Practice & Procedure, § 2260 at 729 ("A denial must be forthright, specific and unconditional.")

Therefore, we request that you amend your response, and provide an answer which is responsive to the specific factual allegation contained in this request.

## Request For Admission No. 7 (Marriage Statistics)

In plaintiff's seventh request for admission, plaintiff requested that defendants admit or deny that "IJL does not have any statistics regarding the number of marriages that have actually resulted through IJL's services." There is nothing "vague" or "ambiguous" about this request. Either IJL does, in fact, keep statistics regarding the number of marriages that have resulted through IJL's services, or it does not. Further, this request does *not* call for a "legal conclusion", as it is entirely factual in nature.

Lastly, IJL's claim that it is "unable to respond to this request"is belied by IJL's own website, which states that "thousands of marriages" have resulted from IJL's services. See Complaint, Ex. A.[2] Therefore, IJL's refusal to answer this request is improper under Rule 36(a). See Fed. R. Civ. P. 36 (a) (Absent a statement "that the party has made a reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny," the request is to be answered by its admission or denial). Please amend your response accordingly.

---

[1] IJL in its training materials, acknowledges that it does *not* do criminal background checks of its' clients. See IJL 000219 ("What kind of background checks do you do?")

[2] Similarly, IJL's spokesperson, Marcia Horwitz, stated that IJL "has arranged millions of meetings that have resulted in thousands of marriages", in response to the filing of this class action.

**Request for Admission No. 8 (Sales Scripts – General Instructions)**

In plaintiff's eighth request for admission, plaintiff requested that defendants admit or deny that "IJL requires all of its sales directors to memorize its sales scripts verbatim." Rather than admit or deny this allegation, IJL has offered a series of boilerplate objections which are completely non-responsive to this request. Further, IJL has stated that the "the scripts are used to assist in training at First Date University." But this is *not* the issue being addressed. The issue is whether or not IJL requires its sales directors to "memorize its sales scripts verbatim." The answer to this request is either "admit" or "deny." Therefore, IJL's response to this request – which seeks to qualify its denial by explaining the purposes for which the scripts are being used – is improper. See Wright & Miller, Federal Practice & Procedure, § 2260 at 729 ("A denial must be forthright, specific and unconditional.")

Lastly, IJL explicitly states in its own training materials that "there are three control points that are *said verbatim* in an interview to establish control" See IJL-00253 ("Taking Control in An Interview")(emphasis supplied). Given this statement, defendants simply do not have a good faith basis for refusing to admit plaintiff's eighth request for admission. See Booth, 194 F.R.D. at 80 ("a refusal to admit, without detailed reasons why the responder cannot truthfully admit or deny, is the equivalent of an admission.") Therefore, please amend your response accordingly.

**Request for Admission No. 9 (Sales Scripts – Specific Instructions)**

In plaintiff's ninth request for admission, plaintiff requested that defendants admit or deny that "IJL requires its sales directors to tell all prospective clients during the first interview, inter alia, that "I have 3-4 ideas for your first date." Defendants have objected to this request on the grounds that it is "vague", "ambiguous", "overbroad", "unduly burdensome" "harassing" and "calls for a legal conclusion." However, there is nothing "vague" or "ambiguous" about this request, and it does not in any way "call[] for a legal conclusion." To the contrary, the words used in this request are an exact quote from IJL's own training materials, as contained in "FDU, Taking Control of An Interview, Control Point Two". See Complaint, Ex. B. See also IJL Supplemental Disclosures, 000254. Therefore, defendants' objections to this request are completely baseless. Furthermore, IJL's denial of this allegation is flatly contradicted by IJL's own training materials, which unequivocally state that control points must be said *verbatim* in an interview to establish control" (IJL 000253) (emphasis supplied). Therefore, please amend your answer accordingly.

**Request for Admissions Nos. 12, 13, 16 and 17 (Quota Requirements for Directors and Coordinators)**

In plaintiff's request for admission Nos. 12 and 13, plaintiff requested that defendants admit or deny that IJL instructs its sales directors that "consistently attaining your quota is a job requirement", and that failure to do so is "grounds for termination." Similarly, in plaintiff's request for admission Nos. 16 and 17, plaintiff requested that defendants admit or deny that IJL instructs its coordinators that "consistently attaining your quota is a job requirement", and that failure to do so is "grounds for termination."

IJL objects to these requests on the grounds that they "call for speculation on behalf of the responding party with respect to the terms "monthly", "quota" and "requirements" and is therefore unintelligible as phrased." (Defendants' Response to Request No. 13). However, the words used in these requests are <u>direct quotes</u> from IJL, as contained in a document which defendants have previously provided in both their initial disclosures and their supplemental disclosures. See IJL Initial Disclosures 000019, ¶ 9 ("IJL Policies"); IJL Supplemental Disclosures, 000425, ¶ 9 ("IJL Policy Form"). See also IJL 000282 ("Remember, a minimum of 25 calls a day will get you *over quota* every month.") (emphasis supplied). Therefore, it is simply untenable for defendants to claim that these same words – when used by plaintiff – "call for speculation" and are "unintelligble".[3] Please amend your response accordingly.

**Request for Admissions Nos. 21 – 22 (IJL's Query System)**

In plaintiff's request for admission Nos. 21 and 22, plaintiff requested that defendants admit or deny that IJL "uses a computer-generated query system to determine when, and how often, each member must be sent out on a date", and that "if a member's name shows up on the query system, the member must be sent out on a date with another IJL member."

IJL objects to these requests on the ground that they "call for speculation on behalf of the responding party with respect to the term "query system" and therefore is unintelligible as phrased."However, the term "Query" is repeatedly used by IJL in its own training materials. See, e.g., IJL 000295 ("Matching Query due 10:30"), IJL 000298 (instructing directors to send "Query with Last Names of Matches Written In"), IJL -000402 (instructing franchisees to "make sure [directors] are matching off the Query"). IJL-000403 (advising franchisees that "if Directors and Coordinators are sending out the same men 7-8 times each

---

[3]Moreover, IJL's objection to Request No. 16 – based on plaintiff's alleged use of the term "quota system" – is completely unfounded, as plaintiff did *not* use this term in Request No. 16.

month, they are not matching off the query."). Therefore, it is simply untenable for defendants to claim that the term "query" – when used by plaintiff – "calls for speculation" and is "unintelligible." Please amend your response accordingly.

### Request For Admissions Nos. 24 and 26 (Criteria For Males Who Wish To Join IJL

In plaintiff's request for admission Nos. 24 and 26, plaintiff requested that defendants admit or deny that IJL "does not have any established criteria which must be met before allowing a male member to join IJL"(No. 24), that IJL "will permit a male member to join IJL if he has a criminal record"(No. 26).

In responding to Requests No. 24 and No. 26, IJL has neither admitted nor denied the facts asserted, but instead, IJL has offered a general statement that "There is no set "criteria" in place with respect to membership requirements." Given this statement, the response to Requests No. 24 and No. 26 should be "admit." See Fed. R. Civ. 36. See also Booth Oil Site Administrative Group v. Safety-Kleen Corporation, 194 F.R.D. 76, 79 (W.D.N.Y. 2000) ("a refusal to admit, without detailed reasons why the responder cannot truthfully admit or deny, is the equivalent of an admission."). Please amend your responses accordingly.

### Request For Admissions No. 32 and 34 (IJL's Gender Ratio)

In plaintiff's request for admission Nos. 32, plaintiff requested that defendants admit or deny that "IJL tells prospective female members that IJL has a roughly equal percentage of men and women in its system" There is nothing "vague" or "ambiguous" about this request. Further, this request does *not* call for a "legal conclusion", as it is entirely factual in nature. Lastly, there can be no question that IJL does, in fact, make this statement to its female members, as is confirmed in the training materials which you sent last week. See IJL 000220 ("What is your ratio of men to women? Right around 50/50.") Given this statement, defendants simply do not have a good faith basis for refusing to admit request No. 32.

With respect to request for admission No. 34, plaintiff requested that defendants admit or deny that "IJL does not keep any statistics on the actual ratio of male to female members in the IJL system." Once again, there is nothing "vague" or "ambiguous" about this request. Either IJL does, in fact, keep statistics regarding the ratio of male to female members – as its training materials seem to suggest (IJL 000220) – or it does not. There is really no middle ground. Therefore, defendants' refusal to answer this request is improper. See Booth, 194 F.R.D. at 79. Please amend your response accordingly.

**Request for Admission Nos. 37-38 (Overcharging of New York State Residents)**

In plaintiff's Requests for admission No. 37 and No. 38, plaintiff requested that defendants admit or deny that: (1) "IJL was aware that its New York franchises charge clients $1,500.00 for one year of dating services"; and (2) "IJL authorized its New York franchises to charge clients $1,500.00 for one year of dating services from IJL." In response to these requests, defendants have objected on the ground that such requests are "not relevant and [are] outside the scope of discovery." However, plaintiff has specifically alleged a cause of action under New York State General Business Law § 349, which is based upon defendants' overcharging of their New York State clients. See Complaint, Second Claim for Relief ("Deceptive Acts or Practices under NY Gen. Bus. Law § 349, ¶¶ 75-79). Moreover, plaintiff has repeatedly referred to IJL's unlawful practice of overcharging its New York State clients throughout the Complaint. See, e.g., Complaint, ¶¶ 15-17; ¶¶ 65-67;Ex. D. Therefore, defendants' claim that these requests are "not relevant" and "outside the scope of discovery" is improper. See Booth Oil, 194 F.R.D. at 79 ("A request to admit covers the full range of information discoverable under Fed. R. Civ. P. 26(b), including matters of facts as well as the application of law to the facts.") Please amend your responses accordingly.

**Request for Admission Nos. 42, 44-47 (Total Number of IJL Members)**

In plaintiff's final six requests for admission, plaintiff sought to establish: (1) the total number current IJL members; and (2) the total number of IJL members since its inception. In response to these requests, IJL has admitted that its website claims that IJL has "30,000 members worldwide" (See Defendants' Response to Request No. 41). Yet, in response to the next request – which simply asks IJL to verify that "IJL does, in fact, have at least 30,000 members worldwide" – IJL objects on the grounds that this request is "vague and ambiguous", "overbroad", "unduly burdensome" and "harassing". But this information comes directly from IJL's website. Therefore, there is nothing "vague" or "ambiguous" about this request. Moreover, plaintiff seeks only an admission or a denial of the facts asserted – *not* the underlying records for each client. Therefore, there is nothing "unduly burdensome" or "harassing" about this request. Lastly, IJL objects to  this request on the ground that it "calls for a legal conclusion". But this request is entirely *factual* in nature, consisting solely of statistical information. Either IJL has at least 30,000 members worldwide, or it does not. This  does not in any way call for a "legal conclusion." Therefore, please amend your response accordingly.

With respect to Requests No. 44 through No. 47, plaintiff has – again –  merely requested a *confirmation* of the statistical information which IJL has already  stated on its website. Thus, plaintiff seeks only a verification of IJL's claims on its website that it is "growing by thousands each month" (Request No. 44)., and that it has had "almost 200,000

clients" since its inception (Request No. 46). This information comes directly from IJL's website (see Complaint Ex. A), and is clearly relevant to determining the size of the class in this action. Therefore, IJL's objections to such requests – as "vague and ambiguous", "overbroad", "unduly burdensome" and "harassing"– are completely unavailing. Please amend your responses accordingly.

## Conclusion

Please accept this letter as a good faith attempt to resolve our differences without intervention of the Court. We are hopeful that once you have had an opportunity to review your initial responses to plaintiff's Requests for Admissions, you will see fit to amend them as requested herein. However, in the event that you are not willing to do so, we will have no choice but to file a motion with the Court seeking an Order compelling defendants to properly respond under Rule 36(a), as well as an Order reimbursing plaintiff for all costs necessitated by the filing such a motion. See Apex Oil Company v. the Belcher Company of New York, 855 F.2d 1009, 1015 (2d Cir. 1988) ("The party seeking the admission may move to test the sufficiency of any response to his or her request. If the response is deemed insufficient, Rule 36(a) provides that the district court may order that the matter is deemed admitted or that a proper response be provided. Even if the party fails to make a motion under Rule 36(a), a party may recover sanctions under Rules 37(c) and 26(g).")

Please advise me by May 1, 2008 as to how you wish to proceed in this matter. Thank you.

Very truly yours,

Jon L. Norinsberg

-7-

**EXHIBIT D**

Get trade secrets for amazing burgers. **Watch "Cooking with Tyler Florence" on AOL Food**.
------------------
Forwarded Message:

Subj:                    **Re: Follow-up On Request For Admissions**

Date:                    5/5/2008 1:14:40 PM Eastern Daylight Time

From:                    **bklein@lbbslaw.com**

To:                      **NORINSBERG@aol.com**

*Sent from the Internet (Details)*

Jon,

I object to the time frame you have unilaterally imposed in that it is not reasonable.

In a good faith effort to resolve discovery issues we will respond to your letter dated April 28, 2008 (re: Admissions) and received on or about April 30, 2008 by May 16, 2008.

Bari

008 11:40 AM >>>

Bari,

We did not demand a response "within 1 day of receipt", as you claim. It was actually 4 days, including the date of hand-delivery.

In any event, it is now one <u>week</u> since you received our letter, which is more than reasonable.

Please furnish a response no later than May 7, 2008.

Jon

**EXHIBIT E**

# IJL Policies

Please read the following and sign below to confirm your acknowledgement of these policies between yourself and _____, dba It's Just Lunch!

1. All client information is confidential.

2. We never give out a client's last name, phone number, address or their employer's name or address under any circumstances. None of this information is ever given to anyone outside of the office.

3. Client information recorded during the initial interview (i.e. past relationships, how long they've been a member, number of dates they've had, current status of their membership (active, expired, on-hold, etc.) and any feedback about a date or another client is completely confidential and is not shared with any other clients or anyone outside of the office.

4. No one is permitted to view a client's file except Franchisees, Directors, Coordinators and IJL Corporate-no exceptions. This includes clients –do not fax, send a copy of, or allow a client to view their file. As you are aware, client files not only contain personal information, but also Director's notes, other client's names and additional information that is not to be revealed under any circumstances.

5. Any information that is learned in the office stays in the office. As an IJL employee, you are expected to never reveal who our clients are to anyone, including family and friends. Never talk about our clients, client feedback, or arrangements outside of the office, even if it is to another IJL employee. The potential of someone overhearing is too great.

6. We maintain a professional relationship with our clients at all times. Specifically, all Directors and Coordinators are prohibited from socializing and/or dating clients. In addition, all client interviews must take place at an IJL office.

7. Dishonesty is unacceptable under any circumstances. When describing a client's match, there is no room or need for dishonesty.

8. Employees are not to take any IJL property home. Client files are never permitted to leave the office.

9. Consistently attaining your quota is a job requirement (Directors, monthly quota; Coordinators, daily quota).

10. Both while employed by IJL and thereafter, you are not permitted to talk about your employment with, or the operations of, IJL with any newspaper, magazine, radio or television station, or website, without the prior permission of IJL.

11. Your photo may be used in various advertising such as newsletters, ads, brochures, internet, etc. If your employment ends, your photo may continue to run in any ads that have already been placed before the end of your employment.

12. IJL employees are not permitted to email potential client or clients under any circumstances. That includes getting feedback, dates of availability, information about IJL etc.

13. You must abide by the IJL dress code.

**The violation of an above Policy is grounds for termination.**

_____          _____          _____
Employee Signature                       Print Name                                    Date

IJL-000019

PRIVILEGED & CONFIDENTIAL
FOR ATTORNEYS EYES ONLY

like to meet. They want me to be very picky for them. But that's something we'll talk more about later today when we meet face to face-exactly what your idea of attractive is.

**Do women and men pay the same price?**

Absolutely!

**Can we be set up for dinner dates?**

Oh, no! We can either do lunch or a drink after work...I even have lots of clients on Saturday and Sundays at lunch, brunch or even a late afternoon drink...that's my job...juggling everyone's hectic schedules!

**Why don't we do dinner?**

Oh, an hour is just right for lunch or a drink after work. All a first date should be is-"do you want to go on a second date."

**I'll come in but I'm not joining today. I want to think about it.**

Oh, I don't even know if I'll have what you're looking for and whether I'll be able to take you on a as a client! All we're going to do is talk for an hour. You'll meet me and see if you're comfortable with me and how I work, and I'll get to meet you and see if I have the types of people you'll like. It's really fun!

**What kind of background checks do you do?**

How we screen is that you come in and meet with us for an hour face to face. Then, if we have what you are looking for, we'll get you started. And, we only give out first names, NEVER last names or phone numbers and we send you to popular restaurant for lunch or a drink after work. Most of my clients are referrals. We are a really tight knit group.

**Two of my friends have done this before. One met someone, and the other thought the service was just horrible.**

Oh, most of our clients come from referrals and we love that! One thing I've noticed is that my clients who have the most fun...and seem to end up meeting people they really like are the ones who are good at calling me right after each date with feedback. That's what really makes this work for my clients.

**It's really expensive!!! (part 2)**

1) Oh, absolutely! It's an investment for my clients. My clients tell me it is an investment they have made because they want to meet good people and go on good dates.

I'm in my _____'s just like so many of our clients and

**PRIVILEGED & CONFIDENTIAL**
**FOR ATTORNEYS EYES ONLY**

**How old are you?** Of course I also have lots of clients in their ____ 's.

**How many offices do you have?**

We just keep growing! We have over 100 offices with more opening this year and several openings in Europe and Asia.

**I'm thinking of joining a dating service and I am calling around. How are you different?**

You know...I really don't know about other services. Most of my clients are referred to me by my clients. And they love how I work. It's really personalized, I don't use videos or computers or anything like that and I really like my clients a lot! I work with very upscale, busy people here in _____ and they love that I do all the work for them. I do think it's a great idea that you are calling around and talking to others because the most important thing is that you feel really comfortable and that you like the person that you'll be working with. But let me tell you about my clients and how our process works.

**What is your ratio of men to women?**

Right around 50/50

**I find it hard to believe normal men would do this.**

That's funny because men always ask that. Do normal, attractive women do this...Yes! I get to see everyone and I'm normal and my clients are normal. Our men are busy, attractive, well educated and are usually dating a lot...but they are tired of their friends fixing them up and many of our male clients tell us they use us because it's just the most efficient use of their time.

**But do they want marriage?**

We never promise that! They are really using us as a resource to introduce them to people outside of their current social or business circle. They just want to meet someone they really like.

**I'm too busy to come in...**

1) That's exactly why all my clients love me! I'm great at juggling everyone's schedule. *OR*

2) I know what you mean...I don't know what is going on...must be that article in USA Today. I'm swamped...SO when are you more open?

| If the caller says they're open next week say: |
|---|

Oh, good, we can get some lunch dates set up for you for next week then...( book the appointment). You know...I have been doing this a long time...I am really good at this. When you come in later

**IT'S JUST LUNCH**
DATING FOR BUSY PROFESSIONALS

**FDU**

# Taking Control in an Interview

PRIVILEGED & CONFIDENTIAL
FOR ATTORNEYS EYES ONLY

There are three control points that are said verbatim in an interview to establish control. Below is an explanation of how to convey these three points. On your interview sheet you'll see a star(s) (*) when you need to say one of the control points.

- Walk into Interview room and greet the client.
- Take the clipboard-read how the client heard about us.
- Ask the first couple of questions to break the ice:

-"So, you heard about us through 'The San Diego Union Tribune'..."

- Women: "Have you had any friends who have gotten married through us or are dating someone through us?"
- Men: "Did you read the article about us in Forbes or the one in the Wall Street Journal?"

-"Ok, have you ever done anything like this before?"

- If they say no: "Oh, most of my clients have never done any thing like this before! So you are in good company!"

At this point you will have reached the first star (*) on your interview sheet so you now say the first control point to establish control.

---

**\*Control Point One**

Ok, just so you know what we are going to do...I'm going to ask you a TON of questions...all about you, your likes, people you've dated, what you do in your free time...just lots of questions all about you... and feel free to pop in at anytime to ask me anything! Then, if I have what you're looking for, I'll get you started today! If I don't, then we just hold off...OKAY?

(POINT: THEY MUST SAY OK!!!!!)

---



**PRIVILEGED & CONFIDENTIAL**
- Ask the client questions 2-14 on your interview sheet    **FOR ATTORNEYS EYES ONLY**

At this point you will have reached the second star (**) on your interview sheet so you now say the second control point to establish control

---

**\*\* Control Point Two**

Stop and flip over your clipboard. "Ok, so far I have 3-4 ideas for your first date...but first I want to make sure about one thing that's really important. I just want to make sure that you'll be comfortable with the feedback. You have to call me after each date and tell me what you thought... Will you be comfortable with that?" (listen to their answer)

"Ok, what I want to do next is go over the first sheet that you checked off... That will give me a really good idea of HOW MANY dates I'll have for you!!!"

GO TO FIRST SHEET and review what they checked off.

---

- Confirm their phone numbers.

"What is the best phone number to reach you? Can I leave a detailed message on that phone number?"

- Lean toward the client and review their availability for this week for lunch.
    "Ok, so when are you available for a lunch date this week?" Write it in.
    "Ok, when can you meet for drinks this week?" Write it in.
    "I think I am going to start you with two people, so I need some dates for lunch or a drink NEXT week too." Write it in.
- Take the photo.

PRIVILEGED & CONFIDENTIAL
FOR ATTORNEYS EYES ONLY

# Daily ("Take Charge of My Day) Schedule

| Time | Day:    Name: | Check off | Fax/Give to Franchise Owner |
|---|---|---|---|
| 8:00 | | | |
| 8:30 | | | |
| 9:00 | | | |
| 9:30 | | | |
| 10:00 | | | |
| 10:30 | | | Matching Query due 10:30 |
| 11:00 | | | |
| 11:30 | | | |
| 12:00 | | | |
| 12:30 | | | |
| 1:00 | | | |
| 1:30 | | | |
| 2:00 | | | RDA Log Sheet due 1:00 |
| 2:30 | | | |
| 3:00 | | | |
| 3:30 | | | |
| 4:00 | | | |
| 4:30 | | | |
| 5:00 | | | |
| 5:30 | | | |
| 6:00 | | | Daily Schedule for Next Day due 6:00 |
| 6:30 | | | Daily Deposits due 6:30 |
| 7:00 | | | |
| | Hot RDA's | | |
| ☐ | 1.* | | |
| ☐ | 2.* | | |
| ☐ | 3.* | | |
| | | | |
| | CR to Resolve Today | | |
| ☐ | 1.* | | |
| ☐ | 2.* | | |
| ☐ | 3.* | | |

IT'S JUST LUNCH
DATING FOR BUSY PROFESSIONALS



| | CR to Resolve Today | | |
|---|---|---|---|
| ☐ | 1.* | | |
| ☐ | 2.* | | |
| ☐ | 3.* | | |
| Note: | Fridays: Fax Join, DNJ & Dep. Recap to Franchise Owner. | | |

**PRIVILEGED & CONFIDENTIAL**
**FOR ATTORNEYS EYES ONLY**

# Director's Daily Faxes to their Franchisee

**10:30a.m. Query With Last Names of Matches Written in**

**2:00p.m. RDA Log**

**6:00p.m. Daily Deposit & Copies of Checks**

**6:00p.m. Director's Daily Schedule for the Next Day**

### Fax Every Friday Night After 5:00 P.M.:

☐         **Director Join Sheet**

☐         **Pending Sheet (Did not Join Sheet)**

☐         **Weekly Deposit Recap**

PRIVILEGED & CONFIDENTIAL
FOR ATTORNEYS EYES ONLY

**Actually Coordinated per day:** Without using a formula this automatically tells you how many dates your office needs to be coordinating daily to get clients out twice a month. You also know what your office is actually doing.

## If Dates To Be Coordinated Each Day is 12 or more:

- A good coordinator can consistently coordinate 9-12 dates a day. If you office needs to coordinate more than that, you need to add a 2nd coordinator.

- If you have more than 200 Active Clients, you probably need a 2nd Coordinator. By the time you have 225-235 Active clients, you definitely need a 2nd Coordinator. If you have 450+ Active clients, you need 3rd coordinator.

- If The Actual Dates Coordinated is less than what "Dates to be Coordinated" is:

  - Coordinator is not following Daily Schedule.

  - Coordinator is not sticking to "5" minute rule talking with clients.

  - Coordinator is not selling the matches effectively and is getting "passes" reschedules and/or cancellations.

  - Coordinator is not calling Greens 3 days in a row.

  - Coordinator is not enforcing "3-Day" hold policy and is waiting for days, and maybe weeks, for some people to get back to her.

  - Coordinator is booking dates too far in future (never more than 10-12 days in advance) and getting reschedules/cancels.

  - Director is not completing matching according to Daily Schedule by 10:30.

- Determine if you need a new coordinator.

## Clients without a date in Past 3 weeks.

**What to know:**

- 5% or below indicates clients are going out regularly. Continue the good work.

- 5%-10%. Your office is getting Clients out, but make sure they are matching off the Query and watch your matching and coordinating this next week.

- 10%-15%. This is not acceptable. Your office is either not matching off the query or simply not coordinating enough dates. You receive an email each Sunday telling you which clients to match.

- 15%-20%. You have clients that are not going out regularly and if you don't improve your office will be in Default under your franchise agreement.
  a. Your Director or Coordinator may think some clients are difficult to match so the same clients are not going out.

    b. The office is not matching from the correct query

    c. You should print the 3 week query, mark up, and give to the Director and Coordinator. They should fax back to you daily by 10:30 with names of matches and at the end of day with dates scheduled.

- The Director or Coordinator is not following their Daily Schedule.

- Over 20%. You have a serious matching/coordinating issue and you are in Default under your franchise agreement. Match only from the 3 week query until at or below 10%. The same reasons apply and the same action steps should be taken by you to prevent serious service issues.

**PRIVILEGED & CONFIDENTIAL
FOR ATTORNEYS EYES ONLY**

**Active Men% / Active Women%: Tells you quickly your male/female client ratio.**

**If the ratio is more than 60/40 female to male (or vice versa):**

- Evaluate your age caps and make changes if necessary.

- Try to get male clients off hold.

- Evaluate your advertising.

- Focus on male Renewals.

- Review your matching and coordinating procedures. If Directors and Coordinators are sending out the same men 7-8 times each month, they are not matching off the query.

**Total Renewal Possibilities: Shows you how much RDA renewal potential is in your office.**

**What to do:**

- Divide the Renewals between Directors by splitting the alphabet.

- Make a goal with Directors how many Renewals they will get weekly/monthly.

- Make sure these clients have great last dates!

- Directors should be calling a minimum of **25** RDA's daily. They should fax their RDA Call Log to you daily by 2:00 PM each day.

- Show your Director the potential for Joins in renewals. For example, an office has **908** Renewal potentials x **$1300** average renewal = **$1,180,400.00** dollars in potential! Generating just **20%** of this = an additional **$236,080** dollars into the office and **181** more clients!

# Policy Form

1. All client information is confidential.

2. We never give out a client's last name, phone number, address or name of company they work for under any circumstances. None of this information is ever given to anyone outside of the office.

3. Client information recorded during the initial interview (i.e. past relationships, how long they've been a member, number of dates they've had, current status of their membership (active, expired, on-hold, etc.) and any feedback about a date or another client is completely confidential and is not shared with any other clients or anyone outside of the office.

4. No one is permitted to view a client's file except Franchisees, Directors, Coordinators and IJL Corporate—no exceptions. This includes clients—do not fax, send a copy of, or allow a client to view their file. As you are aware, client files not only contain personal information, but also Director's notes, other client's names and additional information that is not to be revealed under any circumstances.

5. Any information that is learned in the office stays in the office. As an IJL employee, you are expected to never reveal who our clients are to anyone, including family and friends. Never talk about our clients, client feedback, or arrangements outside of the office, even if it is to another IJL employee. The potential of someone overhearing is too great.

6. We maintain a professional relationship with our clients at all times. Specifically, all Directors and Coordinators are prohibited from socializing and/or dating clients. In addition, all client interviews must take place at an IJL office.

7. Dishonesty is unacceptable under any circumstances. When describing a client's match, there is no room or need for dishonesty. Our client's trust the Director's opinion in his/her matches and something as simple as an issue on "height" can be overcome by allowing the client to hear the full picture.

8. Employees are not to take any IJL property home. Client files are never permitted to leave the office.

9. Consistently attaining your quota is a job requirement (Directors, monthly quota; Coordinators, daily quota).

10. Your photo may be used in various advertising such as newsletters, ads, brochures, internet, etc. If your employment ends, your photo may continue to run in any ads that have already been placed before the end of your employment.

11. You must abide by the IJL dress code.

The violation of an above Policy is grounds for termination.

Employee Signature: _____

Print Name: _____

Date: _____

**EXHIBIT F**

**NEWS**

# :upid Shook Me Down: Top-Tier Dating Service Sued

**awsuit Says $1,500 a Year Matchmaker Broke Hearts**

**y CHRIS FRANCESCANI**
**BC News Law & Justice Unit**

ct. 22, 2007 —

group of well-heeled women who paid up to $1,500 to snag a man through one of the nation's priciest and fast-
'owing online dating services □ It's Just Lunch □ has filed a civil lawsuit in Manhattan federal court, claiming the
nchtime setups were not what they bargained for.

ourt papers filed last week portray the company □ which has sold IJL franchises to more than 100 matchmaking
itrepreneurs in big and small cities across the nation and worldwide □ as focused solely on profits, at the expense
`matchmaking, and willing to lie to clients to close deals.

`hey lie every step of the way," plaintiff lawyer John Balestriere told ABC News. "They lie to sign up the client.
hey lie in the initial interview and they lie about the prospective dates."

he lawyer claimed clients are routinely misled about their blind dates, "including marital status, employment
atus, criminal background, age, health status, physical appearance, religious convictions, politicians and
creational interests."

ι court papers, Balestriere claims that the company imposes monthly client sign-up quotas on their franchises, who
ceive commissions when they sign clients up. Franchises "do not receive any compensation on their sales & unless
e total number of sales equals or exceeds the monthly quota set by IJL," plaintiffs say in the complaint. Balestriere
seeking class action status for the case.

larcia Horowitz, a spokesperson for It's Just Lunch, defended the company.

Ve have been in business for 16 years and in that time we have arranged millions of meetings that resulted in
ousands of marriages," she said in a statement. "Our success is based largely on word of mouth and we wouldn't
: successful without having a vocal majority of satisfied members. The allegations in the lawsuit are completely
ithout merit and we will defend vigorously against them."

ι court papers, Balestriere cites internal company documents, like a training manual included in the filing, called
`irst Date University." The document instructs employees to parrot company "control points," which the manual
.ys "are said verbatim in an interview to establish control."

ne point instructs employees, engaged in introductory pitch meetings with potential clients, to "stop and flip over
ıur clipboard" halfway through the interview, and say, "OK, so far, I have three to four ideas for your first date," in
·der to land the client.

nother control point requires icebreaker questions, like "Did you read the article about us in Forbes, or the one in

e Wall Street Journal?" to potential male clients, and "Have you had any friends that have gotten married through ;& ?" to potential female clients, according to court papers.

third point instructs employees, toward the close of an introductory meeting, to "reach over and grab your big ack of contracts on the clipboard. DO NOT EVER let go of them. Do not call it a 'contract' or an 'agreement.' It's a ıis,'" according to a copy of the manual.

orowitz did not dispute the authenticity or contents of the cited documents. "We believe our uniform training ıidelines insure consistent services and quality among our franchisees and the incomplete and out of context inted forms referenced in the lawsuit don't reflect the extensive phone and in-person process that takes place ;fore we accept members. We believe our uniform training guidelines insure consistent services and quality among ır franchisees and the incomplete and out of context printed forms referenced in the lawsuit don't reflect the ;tensive phone and in-person process that takes place before we accept members," she said in a statement.

alestriere declined to identify or make his clients available for interviews. One plaintiff, identified as E. Barkman ʿNew York City, is listed in the complaint, which was first reported in the New York Post.

Jot only do people feel screwed, but a lot of people are understandably reluctant to come forward and say they gned up," he said. "People are reluctant to admit, 'Yeah, I spent $1,500 to try and meet some guy.'"

ı court papers, Balestriere cites complaints filed with consumeraffairs.com, an online "consumer news and resource ;nter."

ne woman complained to the site that she specifically requested no Republicans or "religious types," but her first ⁄o dates were with a Catholic Republican and a Seventh-day Adventist.

nother said a date with an art dealer turned out to be a guy who worked for a freight company. A landscaping ;ecutive turned out to be a man who mowed lawns, according to court records. Another woman said the blind date ıe met in a bar for an introductory drink turned out to be an alcoholic. Yet another said her setup was still legally arried, a fact she said she was not made aware of by the company.

L's Web site boasts more than 30,000 current clients worldwide, and the California-based company reported $35 illion in sales for the 2005 fiscal year, with a one-year-sales growth of 16.7 percent, according to Hoover's, an ıline business information research site.

he company was founded in 1992 by Andrea McGinty, after her fiance jilted her weeks before the wedding, oover's reports. McGinty went on to marry Dolan. They sold the business last year to a New York private equity ɪm Riverside Co.

alestriere said that a three-month investigation by his law firm turned up "dozens and dozens" of disgruntled ɪmer clients of It's Just Lunch, and that he and his colleagues spoke with a number of former IJL employees. He d not make the former employees available.

ne affluent former client of IJL contacted independently by ABC News said there didn't seem to be much "rhyme ʾreason" to the matches she was set up with.

was slightly disappointed, but I didn't really have very high expectations," she said. "I wouldn't have believed em if they had told me they were setting me up with some amazing Prince Charming type." The woman said that, general, she'd had a good experience.

t gets you out of the house," she said.

*BC News' Gerard Middleton contributed to this report.*

opyright © 2008 ABC News Internet Ventures