Craig Stuart Lanza
Jon Norinsberg
John Balestriere
**BALESTRIERE LANZA PLLC**
225 Broadway
Suite 2900
New York, NY 10007
Telephone: 212-374-5404
Email: clanza@balestriere.net
*Attorneys for Plaintiffs and the Class*

RECEIVED
AuG 0 5 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CHRISTINE RODRIGUEZ,     :
SANDRA BURGA, KAREN MALAK,     :
JAMES TORTORA, LISA BRUNO,     :
JANEEN CAMERON, and     :
KAREN MCBRIDE, individually, and for     :
all others similarly situated     :
    :
          Plaintiffs,     :    Case No.: 07-CV-9227 (SHS)
    :
    :
    :    **AMENDED COMPLAINT**
       -against-     :
    :    <u>**JURY TRIAL DEMANDED**</u>
    :
    :
IT'S JUST LUNCH INTERNATIONAL,     :
IT'S JUST LUNCH, INC., and HARRY and     :
SALLY, INC.,     :
    :
          Defendants.     :
------------------------------------------------------------x

Plaintiffs, by their attorneys, Balestriere Lanza PLLC, for their Class Action

Complaint respectfully allege as follows upon information and belief, except as to

allegations concerning Plaintiffs or their counsel, which are made upon personal

knowledge, and except as otherwise indicated herein:

## PRELIMINARY STATEMENT

1.      It's Just Lunch International ("IJL" or "the Company") claims to be a premier dating service in an industry of companies which offer to connect individuals interested in romantic or personal relationships ("the Matchmaking Industry"). The Company claims it offers personalized, sophisticated, thoughtful matchmaking services provided by highly trained experts.  This is a lie.  In a massive scheme to defraud tens of thousands of single professionals throughout the country – especially busy, affluent professional women – who have paid, for years, IJL's hefty service fees, IJL actually provides services that are grossly deficient and substandard in almost every aspect.

2.      In furtherance of this fraudulent scheme, IJL has routinely and systematically overcharged its clients for its allegedly "superior" matchmaking services, charging $1500.00 per person per year, despite knowing that this exorbitant fee is not only grossly disproportionate to the level of services actually being provided, but often in violation of relevant state laws, as explained further below.

3.      Plaintiffs and the Class are forced to bring this action to recover the fees that they have paid as a result of IJL's fraudulent conduct, and to compel IJL to stop defrauding tens of thousands of others.

### The Lies On IJL's Website

4.      On its website, IJL proclaims that its "service isn't about video or computer dating; it's about an *insightful, professional IJL staff member hand-selecting* appropriate matches *based upon your desires, goals, motivations* and our instincts."  (See It's       Just       Lunch's       Website       ("IJL       Website"),

http://www.itsjustlunch.com/whoweare.aspx, "What to Expect", attached hereto as Exhibit A, last viewed on October 11, 2007) (emphasis added.)

5.      This claim is patently false in every respect.  IJL does *not* "hand-select" its matches based on clients "desires, goals, [or] motivations."  In fact, despite promises to the contrary, IJL almost completely ignores the client's stated preferences.  Rather, the Company makes matches which are driven entirely by monthly quota requirements, and which wholly and categorically disregard the client's stated "desires, goals, [and] motivations." (Id.)

6.      IJL further claims on its website that its staff members have "years of experience" in the field of matchmaking, and are expert matchmakers and first-date specialists. (See IJL Website, www.itsjustlunch.com/whoweare.aspx "Who We Are", last viewed on October 11, 2007, attached hereto as Exhibit A.)

7.      This is another lie.   In truth, IJL routinely hires staff members who have no experience, training or background whatsoever in the field of matchmaking.  These are not "insightful professional" employees motivated by any standards or training, but rather by a desperate need to meet monthly quotas in order to keep their jobs.

### The Lies During The Initial Interview

8.      IJL starts lying to prospective clients on the website.  These lies continue when IJL staff first speaks to clients who make up the Class here.

9.      During the initial in-person interview, IJL routinely makes the following misrepresentations of fact:

(i)  IJL already has several "perfect" matches in its database for the client, when

in fact no such matches exist;

(ii) IJL has thousands of available members in the client's city, when in fact there are only hundreds or even fewer members available in that city;

(iii) IJL has an equal percentage of men and women in its system, when in fact the number of women is grossly disproportionate to the number of men in the system;

(iv) IJL is "selective" over who it allows to become members, when in fact IJL accepts *any* and *all* persons who are willing to pay its fees; and

(v) IJL carefully matches its clients with other members, when in fact the matches are made *at random* and are often done by individuals who have never even met the client.

10.     IJL makes these lies for a simple reason: to induce the client to enter into a contract with IJL.   Toward this end, IJL instructs its employees regarding the *exact words and actions* which they must use during the interview to get the client to sign the contract.   These instructions are referred to as "control points" and must be "said *verbatim* in an interview to establish control."     (See IJL Training Manual, "Taking Control in an Interview", attached as Exhibit B.)  Specifically, IJL issues such directives as "Do not call it a 'contract' or 'agreement'. It is called a 'this'; "Remember, you are on stage, *play the part*";  "Stop and flip over your clipboard" and say "Ok, so far I have 3-4 ideas for your first date";  "Lean toward the client" and say "I think I am going to start you with two people, so I need some dates for lunch or a drink next week too"; "Reach over and grab your big stack of contracts on the clipboard. Do NOT EVER EVER let go of them"; and get the client to sign by saying "OK, just fill out this top part here, sign

right here and make your check out to IJL for $ ___". (Id.)

11.  If the client does not sign the contract at the end of the interview – which IJL considers an "unusual event" which occurs only if its employees "have done something wrong in the interview," (See IJL Training manual, "What if the Client Says ….", annexed hereto as Exhibit C) – IJL instructs its employees to aggressively pursue clients in order to get them to change their minds.  (Id.)

12.  These step-by-step guidelines include such directives as "Call them the next day!", "Assume they are joining", "Get dates of availability," etc.  (Id.)  In addition, IJL instructs its employees to follow a precise script when trying to convince the client to join, including telling the client such lines as, "I have a lot of great women I want you to meet", "I already know the first two people I want you to meet". "Don't they sound great?  And I know Susie really wants to meet you!" etc.  (Id.)  These lies are intended "to create urgency" which will induce the client to change his or her mind and sign the contract with IJL.  (Id.)

### The Lies About The Qualifications of Prospective Matches

13.  Even after the contract is signed, IJL continues to lie to its clients.  For example, in setting up dates for its members, IJL routinely lies about the qualifications of its prospective "matches" for its members, lying about very important traits of the other member, including the prospective match's:  i) marital status ii) employment status; iii) *criminal background*; iv) age; v) health status; vi) physical appearance; vii) religious convictions; viii) political convictions; and (ix) recreational interests.

14.  IJL lies about the qualifications of other members in order to continue to

deceive IJL clients into believing that they are being carefully "matched" with other members, when, in fact, IJL completely ignores the client's stated preferences.

## IJL's Violation of Consumer Fraud Protection Laws

15.    In addition to the lies detailed above, IJL routinely violates consumer fraud laws which regulate dating services and protect the rights of consumers who enter into contractual agreements with such dating services.

16.    For example, in the State of New York, IJL has repeatedly and systematically attempted to circumvent state laws which prohibit dating services from charging a client more than $1,000.00 per year.  IJL has done this by urging its clients to simultaneously execute two separate six month agreements (for $1,000.00 and $500.00, respectively), and then falsely telling the client that he or she is receiving a 50% "discount" by signing the second six month agreement.   This unlawful practice violates New York State General Business Law § 394-c(2), which expressly states "No contract for social referral shall require payment by the purchaser of such service of a cash price in excess of one thousand dollars."

17.    New York State Attorney General Andrew Cuomo, along with Assistant Attorney General Dennis Rosen, recently stopped this fraudulent conduct, extracting from the Company and several of its New York franchises a fine and a promise to stop breaking the law. (See Assurance of Discontinuance Pursuant to Executive Law § 63(15), dated June 13, 2007, attached hereto as Exhibit D.)

## The Lies in IJL's Public Relations Campaign

18.     IJL continues to lie in its massive and sustained public relations campaign aimed at convincing busy, single professional clients throughout the country to join IJL, and thereby ensures the continued success of the fraudulent scheme outlined above.

19.     In this public relations campaign, IJL touts its "very high" success rate and boasts that its services have resulted in "thousands of marriages." (See  IJL website www.itsjustlunch.com/oursuccess.aspx , "Our Success", last viewed October 12, 2007, attached hereto as Exhibit A.)

20.     The simplest and most overwhelming proof of IJL's massive fraud is in results: the overwhelming majority of IJL's clients – almost 200,000 in total – have not had successful matches through IJL's services. (See www.consumeraffairs.com/news04/2006/02/ijl.html, "It's Just Lunch – Or Is It?, February 13, 2006,  last viewed on October 8, 2007, attached hereto as Exhibit E.)

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different than Defendants.  See 28 U.S.C. § 1332(d)(2)(A).

22.     This Court has personal jurisdiction over Defendants because they operate a franchise in the State of New York and derive substantial revenue from that franchise, and otherwise seek the legal benefits and protections afforded by the State of New York.

23.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in the Southern District of New York because Defendants reside in this District.


## PARTIES

24.     Plaintiff Christine Rodriguez is an individual residing in New York, New York, and is a client of Defendants herein.

25.     Plaintiff Sandra Burga is an individual residing in Los Angles, California and is a client of Defendants herein.

26.     Plaintiff Janeen Cameroon is an individual residing in Denver, Colorado.

27.     Karen Malak is an individual residing in Chicago, Illinois.

28.     James Tortora is an individual residing in West Palm Beach, Florida.

29.     Lisa Bruno is an individual residing in Brooklyn, New York.

30.     Karen McBride is an individual residing in Austin, Texas.

31.     Defendant IJL is a Nevada limited liability company with its principal place of business located at 75340 Gerald Ford Drive, Palm Desert, California 92211.

32.     IJL sells, supervises and controls franchises that operate under the "It's Just Lunch" trade name, and that provide dating services to busy single professionals. IJL asserts direct control over all its franchises by means of training employees, developing client protocol and by strict supervision whereby IJL covertly monitors each individual franchise's adherence to IJL's rules.

33.     IJL has three franchises in the State of New York. These franchises are located in New York City, Albany, and Williamsville (which includes Buffalo and

8

Rochester).

34.    Defendant It's Just Lunch, Inc., is a New York Corporation with its principal place of business located at 52 Vanderbilt Avenue, Suite 901, New York, New York 10017.  Defendant It's Just Lunch, Inc., previously owned the New York City franchise from on or about April 1993 until on or about February 2002.

35.    Defendant Harry and Sally, Inc., d/b/a It's Just Lunch, is a New York Corporation with its principal place of business located at 52 Vanderbilt Avenue, Suite 901, New York, New York 10017. Defendant Harry and Sally, Inc., has owned the New York City franchise from until on or about February 2002 to the present time.

## CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action as a Class Action pursuant to Rules 23(a)(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all similarly situated IJL clients between 1993 and 2007. Plaintiffs and Class Members bring this action seeking compensatory damages, punitive damages, attorney's fees, costs, and any further relief this Court deems just and proper.

37.    Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") in their representative capacity on behalf of themselves and the Class of all persons similarly situated ("the Class"), defined as follows:

> All persons who were or are members of IJL who signed a contract with IJL during the period of 1993 to October 15, 2007 ("Class Period").

38.    This action meets the following prerequisites of Rule 23(a) by which Plaintiffs may bring this action on behalf of the Class:

A.    **Numerosity**.   Although the exact number of Class Members is presently unknown, Plaintiffs believe and allege that the Class will number over 200,000 consumers. Unquestionably, the members of the Class are so numerous that joinder of all members is impracticable.

B.    **Commonality**.   A substantial pool of questions of law and fact exists that is common to the Class.  Such common questions include, but are not limited to:

(i)     Did IJL make false and misleading representations as to the nature and quality of dating services that IJL provided?

(ii)    Did IJL systematically and deliberately overcharge its clients for services rendered?

(iii)   Did IJL fraudulently induce its clients to enter into contracts by affirmatively misrepresenting the quantity and/or quality of other members in its system?

(iv)    Did IJL misrepresent and/or omit material information relating to alleged "matches" set up by IJL?

(v)     Did IJL willfully misrepresent the level of matchmaking experience and/or qualifications of its employees?

(vi)    Did IJL violate consumer fraud protection laws which regulate dating services and protect the rights of consumers who enter into contractual agreements with dating services?

C.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Class.

Plaintiffs are ordinary IJL clients who, along with all Class Members, have been injured by the same wrongful acts and practices of Defendants as alleged herein.

D.    **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have no interests that are antagonistic to or in conflict with the interests of the Class as a whole, and Plaintiffs have engaged competent counsel experienced in the prosecution of complex and class litigation.

E.    **Superiority**.   A class action is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual actions would engender. This action will result in the orderly and expeditious administration of Class claims. Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent and varying determinations.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

F.    **Maintainability**.  This action is properly maintainable as a class action for the prior independent reasons and under the following portions of Rule 23:

a.    The individual amounts of restitution involved, while not insubstantial, are generally so small that individual actions or other individual remedies are impracticable and litigating individual actions

would be too costly;

  b. Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;

  c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and

  d. Individual actions would unnecessarily burden the courts and waste judicial resources.

  G. **Predominance**.  Questions of law and fact common to members of the Class predominate over any questions affecting only individual members. Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class Members.

39. New York, as the site of three franchises of Defendant IJL, is the center of gravity for this action such that it is appropriate and consistent with existing law to certify a nationwide class of consumers applying New York law.  Certification of a nationwide class under the laws of New York is appropriate because Defendants conduct substantial business in New York and a significant number of Class Members reside in New York.

**STATEMENT OF FACTS**

**IJL's Origins and Growth**

40.    IJL, which touts itself as a "specialized dating service for busy professionals", was founded in 1991 in Chicago by a marketing executive named Andrea McGinty.  (See IJL website, www.itsjustlunch.com, "*Corporate Home*" *and* www.itsjustlunch.com/oursuccess.aspx "*Our Success*", last viewed October 12, 2007, attached hereto as Exhibit A.)

41.    Since its formation in 1991, IJL has had "almost 200,000 clients", and is now "the fastest growing dating service in the world." See www.counsumeraffairs.com/news04/2006/02/ijl.html, "*It's Just Lunch – Or Is It?*", February 13, 2006, (See Statement of Daniel Dolan, CEO of IJL, at 11), last viewed on October 8, 2007, attached hereto as Exhibit E.)

42.    IJL currently has "30,000 members worldwide" and is "growing by thousands each month." (See IJL website www.itsjustlunch.com/oursuccess.aspx, "*Our Success*", last viewed October 12, 2007, attached hereto as Exhibit A.)

43.    IJL "arrange(s) 50,000 dates" each month and has set up "over 2 million" dates since its foundation in 1991.  (Id.)

44.    IJL has opened up offices throughout the United States, as well as in Canada and Asia.  (Id.)  The Company now has "100 locations all over the world" (Id.), and generates annual revenue in excess of $30,000,000.00 per year.  (See http://www.theglobeandmail.com/servlet/story/RTGAM.20050214.wxrlunchdate14/BNStory/specialSmallBusiness/), "*Getting Dumped by Fiancé Inspired Launch of It's Just Lunch Matchmaker*", February 14, 2005, annexed hereto as Exhibit F.)

**IJL Franchises:  Staffing And Structure**

45.    Each of IJL's 100 franchises is staffed by at least three individuals: the franchise owner, a sales "director", and a matchmaking "coordinator."  There are often multiple "directors" and "coordinators" in larger metropolitan offices.

46.    The franchise owner is responsible for handling all aspects of business operations of the franchise.    The director is responsible for generating "sales":, i.e., getting new clients to sign up with IJL, and is also responsible for making matches between existing IJL members. The coordinator is responsible for contacting IJL members and informing them of proposed matches, as well as handling all aspects of setting up the date.

### IJL's Control of Its Franchisees

47.    While IJL claims that each of its franchises is independently owned and operated, IJL in fact exercises complete dominion and control over its franchises. IJL accomplishes this first with a rigid and highly structured training program.

48.    This training program, which IJL refers to as "First Date University", is held at corporate headquarters in Palm Desert, California and lasts for five days.  All IJL franchise owners and directors must attend this seminar.

49.    At this seminar, IJL methodically trains its franchise owners and directors to learn and strictly follow the unlawful and deceptive sales practices outlined above.

50.    Specifically, IJL requires all attendees to memorize, *verbatim*, the sales scripts which must be followed during all phone calls and in-person interviews with each potential IJL client.  Further, the Company instructs its attendees on how to respond, *verbatim*, to each and every possible objection that a prospective IJL client

might raise during the initial phone call and/or in-person interview.

51.    The Company then compels all attendees to engage in extensive role-play scenarios, in which an IJL "professor" assumes the role of a potential IJL client, and the attendee must demonstrate a complete mastery of the above scripts and sales techniques when speaking to this potential "client."

52.    All of the training done at First Date University is geared toward teaching attendees *how to make a sale* to prospective IJL clients. *None* of the training is focused upon teaching attendees about *how to make appropriate matches* between IJL clients who are already in the Company's database.

### IJL's Covert Monitoring of Its Franchisees

53.    The control does not end at the training stage. After the training seminar is over, the Company systematically and covertly monitors its franchisees in order to ensure full compliance with its methods, procedures and practices for making sales.

54.    The Company does this by making "ghost calls" to each of its franchisees, in which the caller pretends to be a potential new client interested in learning more about IJL. The Company then evaluates the performance of the employee based upon his/her adherence to IJL scripts and sales techniques. Employees who do not follow Company scripts are terminated.

55.    The Company also makes unannounced visits to its franchisees, sending a regional coordinator to monitor the local office and ensure that all scripts and sales techniques are being followed. Franchise owners who do not scrupulously follow Company scripts are subject to penalties and/or termination of their franchise rights.

## IJL's "All-or-Nothing" Quota System

56.    IJL exerts further dominion and control over its franchises by imposing an "all-or-nothing" monthly quota system for compensation of its sales directors.

57.    Under this system, IJL directors do not receive *any* commissions on their sales – regardless of how many sales they make in a given month – unless the total number of sales equals or exceeds the monthly quota set by IJL.

58.    As a direct result of this "all-or-nothing" system, IJL directors are compelled to spend a disproportionate amount of their time each day attempting to make sales in order to meet the monthly quota, thereby spending little or no time on making successful matches for IJL clients.

59.    The IJL compensation system thus does not allow for "hand-selecting" matches for IJL clients – as the Company promises on its website (See IJL website, www.itsjustlunch.com/whattoexpect.aspx, "*What to Expect*." Last viewed October 11, 2007, attached hereto as Exhibit A) – as doing so would completely preclude IJL sales directors from meeting their monthly sales quotas.


## IJL's Extraction of Monthly Payments From Its Franchisees

60.    The Company is interested in maintaining this control since its profits are directly linked to the profits generated by the franchisees.  The Company receives monthly royalty payments from each and every one of its 100 franchisees.  The amount of the royalty payment is dependent upon the number of sales generated by each franchisee in a given month.

61.     Specifically, IJL extracts a royalty fee of 9% of gross sales made by each franchisee every month. (See IJL website, www.itsjustlunch.com/franchise information.aspx, http://www.itsjustlunch.com/kit/kit.aspx and http://www.itsjustlunch.com/kit/kit.aspx?actiontype=investment *Franchise Info/Franchise Kit/Investment Overview*, last viewed October 12, 2007, attached hereto as Exhibit G.)   In the event that the franchisee does not generate a sufficient number of sales per month, IJL still requires payment of "a predetermined minimum monthly royalty", as by IJL. (Id.) IJL also receives a "franchise fee" of $25,000.00 to $30,000.00 from each one of its franchises when the franchise is first started. (Id.)

### IJL's Massive Public Relations Campaign

62.     In order to continue its rapid expansion – and thus further increase its massive and fraudulently earned profits – IJL has systematically generated "world wide exposure through effective public relations campaigns." (See www.itsjustlunch.com/franchiseinformation.aspx, http://www.itsjustlunch .com/kit/kit.aspx and http://www.itsjustlunch.com/inthenews.aspx *Franchise Info/Franchise Kit/IJL In The News*, last viewed October 12, 2007, attached hereto as Exhibit G.)

63.     At the national level, IJL accomplishes this by advertising heavily in business and airline magazines, as well as in upscale urban publications, touting its services in colorful advertisements, with photos of attractive young sales associates eager to help busy professionals find their ideal matches. (See, e.g., IJL ad from *New York Magazines*, dated July 2-9, 2007, October 1, 2007 and October 8, 2007, attached

hereto as Exhibit K.)  This type of advertising is "designed to increase [IJL's] brand awareness" to potential IJL clients throughout the country. (See IJL website, www.itsjustlunch.com/franchiseinformation.aspx,     http://www.itsjustlunch.com /kit/kit.aspx     and     http://www.itsjustlunch.com/inthenews.aspx  *Franchise Info/Franchise Kit/IJL In The News*, last viewed October 12, 2007, attached hereto as Exhibit G.)

64.     At the local level, IJL supplies "a detailed marketing advertising and public relations program" for each one of its franchises." (Id.)  Specifically, IJL provides its franchisees with "sample print ads, direct mail pieces, radio and TV ads." (See IJL website,     http://www.itsjustlunch.com/franchiseinformation.aspx, http://www.itsjustlunch/kit/kit.aspx     and     http://www.itsjustlunch/kit/kit.aspx ?actiontype=support, *Franchise Info/Franchise Kit/Support and Training*, last viewed October 12, 2007, attached hereto as Exhibit G.)

### IJL's  Target Market: "Busy Professionals"

65.     All of the above advertising efforts are geared toward reaching a specific class of consumers, namely: "busy successful men and women who want to be in relationships but don't have time to meet people." (See http://www.itsjustlunch.com /franchiseinformation.aspx,     http://www.itsjustlunch.com/kit/kit.aspx     and http://www.itsjustlunch.com/kit/kit.aspx?actiontype=support, *Franchise Info/Franchise Kit/Support and Training* (quoting Daniel Dolan, CEO of IJL, in the *Harvard Law Bulletin*), last viewed October 12, 2007, attached hereto as Exhibit G).

66.     IJL targets this group because it represents  "a huge, untapped and ever-

growing national and international market" and because such professionals earn a high enough income that the cost of an IJL membership is an "affordable indulgence" which "easily fits within their budgets" (See IJL website, http://www.itsjustlunch.com/franchiseinformation.aspx, "*Franchise Info*", attached hereto as Exhibit G). It is for this reason that IJL promotes itself as "a dating service for busy professionals". (See IJL Website www.ItsJustLunch.com, "*Corporate Home*", attached hereto as Exhibit A.)

67.    Plaintiffs are such "busy professional[s]" who entered into a contract with Defendants and spent between $1,000.00 and $1,500.00. Plaintiffs were induced to enter into this contract as a result of misrepresentations made by Defendants on their website, in their advertisements, and in their interview with Plaintiffs. After being set up with several "matches," Plaintiffs realized that Defendants' services were grossly deficient and substandard in almost every aspect. More importantly, Plaintiffs realized that Defendants had blatantly misrepresented the nature and quality of the services that they provided, as well as the qualifications of other members in the sytem.

### Consumer Complaints Against IJL

68.    Notwithstanding IJL's massive public relations campaign, IJL has been the subject of a litany of complaints from a large number of dissatisfied members, who have complained to IJL about many of the unlawful and deceptive business practices set forth herein. (See, e.g., "Consumer Complaints About It's Just Lunch – Angry Women", attached hereto as Exhibit H.)

69.    IJL has also been the subject of a consumer-fraud investigation conducted

by ConsumerAffairs.com – an independent Web-based consumer news and resource center – regarding IJL's fraudulent and misleading business practices. (See http://www.consumeraffairs.com/news04/2006/02/ijl.html, "*It's Just Lunch – Or Is It*?, February 13, 2006, attached hereto as Exhibit E.)

70.     The ConsumerAffairs.com investigation found that IJL has misled its clients by stating all of the following lies:

- Claiming to be experts at matching busy professionals with like-minded busy professionals;

- Claiming to arrange dates based on clients' specific requirements;

- Claiming only to have professionals in its files;

- Claiming to have hundreds and in some cases thousands of clients in its files;

- Exaggerating age, profession and other characteristics of clients when arranging dates; and

- Refusing to give refunds when dates didn't meet clients' criteria.

<u>**Government Investigations Into IJL**</u>

71.     Even government agencies have felt compelled to investigate the Company.  For example, the New York State Attorney General's Office recently found that IJL was systematically violating New York State laws by forcing its clients to sign two six-month contracts at the same time – for a total of $1,500.00 – thus circumventing a state law that limits the amount a consumer may be charged for a social referral service to $1,000.00 per year. (See Assurance of Discontinuance Pursuant to Executive

20

Law § 63(15), dated June 13, 2007, attached hereto as Exhibit D.)

72.    The Attorney General's Office further found that IJL violated state laws by "prohibiting consumers from filing lawsuits against the company and by failing to provide many consumer-friendly provisions." (Id.) (See http://www.legalnewsline.com/news/197685-ag-cuomo-unhappy-with-dating-service, AG *Cuomo Unhappy With Dating Service*, July 27, 2007, last viewed October 8, 2007, attached hereto as Exhibit I.)

73.    IJL has also been the subject of multiple complaints with the Better Business Bureau.  For example, in New York City alone, the Better Business Bureau received five separate complaints from IJL New York clients over the last 12 months. (See Better Business Bureau Statistics, IJL New York City Office http://www.newyork.bbb.org/reports/PrintReport.aspx?id=38028&lang=en, last viewed October 8, 2007, attached hereto as Exhibit J.)

## The Necessity For This Class Action

74.    Despite being the target of a government inquiry, as well as the subject of a consumer-fraud investigation, IJL has thus far largely avoided liability for its fraudulent and deceptive business practices.  This is so because the majority of IJL's clients simply do not have the time, energy, or resources to start a lawsuit against IJL. Indeed, the very nature of the class herein – busy, career-oriented professionals – virtually ensures that dissatisfied IJL clients will not take legal action against IJL, simply because the demands of their professional lives preclude them from doing so.  Further, the amount of damages sustained by each IJL client is simply not large enough for these

clients to justify their hiring an attorney to commence a lawsuit against IJL.  Finally, while IJL clients know that they  have been defrauded, many undoubtedly  feel reluctant to admit that they have joined a dating service – much less that they have been duped by one – and this, too, acts as a strong deterrent against taking legal action against IJL.

75.    For all of these reasons, this class action has become necessary, as it is the only means by which to completely and  permanently stop IJL from continuing its massive scheme to defraud single professionals throughout the country.

### FIRST CLAIM FOR RELIEF

(Fraudulent Inducement and Misrepresentation)

76.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 75 above as if fully set forth herein.

77.    As    alleged    above,    Defendants    knowingly    made    material misrepresentations on their website, in their advertisements and in their interviews.

78.    Defendants made such material misrepresentations in order to induce Plaintiffs and Class members to enter into a contract with IJL.

79.    Plaintiffs   and   Class   members   relied   upon   Defendants'   material misrepresentations to their detriment, and entered in to a contract with IJL.

80.    As a result of Defendants' fraudulent conduct, Plaintiffs and Class members suffered monetary damages and other losses.

### SECOND CLAIM FOR RELIEF

(Deceptive Acts or Practices under NY Gen. Bus. Law § 349)

81.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 80 above as if fully set forth herein.

82.    Defendants knowingly made material misrepresentations on their website, in their advertisements and in their interviews with Class members

83.    Defendants' material misrepresentations were intended to deceive, and did in fact deceive, Plaintiffs and Class members regarding the rights and protections available to consumers, as well as the services provided by Defendants.

84.    Defendants' actions constituted a violation of NY Gen. Bus. Law § 349.

85.    Plaintiffs and Class members suffered monetary damages and other losses as a result of Defendants' violation of NY Gen. Bus. Law  § 349

### THIRD CLAIM FOR RELIEF

(False Advertising NY Gen. Bus. Law § 350-a)

86.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 85 above as if fully set forth herein.

87.    Defendants made false and misleading statements on their website and in their advertisements.

88.    Defendants' false and misleading statements were consumer oriented.

89.    Defendants' false and misleading statements were made in connection with the sale of consumer services.

90.    Defendants' false and misleading statements were made knowingly and with the intention of misleading Plaintiffs and Class members regarding the nature and

quality of services being offered by Defendants.

91.    Defendants' false and misleading statements did in fact mislead Plaintiffs and Class members regarding the nature and quality of services being offered by Defendants.

92.    Plaintiffs and Class members suffered monetary damages and other losses as a result of Defendants' false and misleading statements.

## FOURTH CLAIM FOR RELIEF

### (Negligent Misrepresentation)

93.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 92 above as if fully set forth herein.

94.    Defendants made false and misleading statements to Plaintiffs and Class members.

95.    Defendants made such statements in a careless and reckless manner.

96.    Defendants knew or should have known that Plaintiffs and Class members would rely on such false and misleading statements.

97.    Plaintiffs and Class members did in fact rely on Defendants' false and misleading statements to their detriment.

98.    Defendants owed Plaintiffs and Class members a duty of care.

99.    Defendants breached the duty of care which they owed to Plaintiffs and Class members.

100.    Plaintiffs and Class member suffered monetary damages and other losses as a result of Defendants' fraudulent conduct.

## FIFTH CLAIM FOR RELIEF

(Unjust Enrichment)

101.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 100 above as if fully set forth herein.

102.    Considerations of justice and good conscience preclude allowing Defendants to retain any fees paid to them from any Class members.  These class members were fraudulently induced to enter into a contract with Defendants, and, in turn, pay fees, and the fees paid far exceed the reasonable value of the services rendered by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court enter judgment against Defendants as follows:

1. an order certifying the Class, and appointing Plaintiffs and their undersigned counsel of record to represent the Class;

2. a permanent injunction enjoining Defendants, their partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under or in concert with them, directly or indirectly, or in any manner, from in any way engaging in the practices set forth herein;

3. a permanent injunction enjoining Defendants, their partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with them directly or indirectly, or in any manner, from utilizing any monies acquired by Defendants' unfair business practices, including all profits, revenues, and proceeds both direct and indirect;

4. imposition of a constructive trust upon all monies and assets Defendants have acquired as a result of their unfair practices;

5. compensatory damages and full restitution of all funds acquired from Defendants' unfair business practices, including disgorgement of profits and actual damages suffered by Plaintiffs and Class members;

6. punitive damages, to be awarded to Plaintiffs and each Class member;

7. costs of suit herein;

8. investigative costs;

9.  both pre- and post-judgment interest on any amounts awarded;

10. payment of reasonable attorneys' fees;

11. declaratory relief; and

12. such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated:      New York, New York
            August 4, 2008

                                        By: _____
                                        Craig Stuart Lanza (CL-2452)
                                        John Balestriere (JB-3247)
                                        BALESTRIERE LANZA PLLC
                                        225 Broadway
                                        Suite 2900
                                        New York, NY 10007
                                        Telephone 212-374-5404
                                        Email: clanza@balestriere.net
                                        *Attorneys for Plaintiffs and Class*