John G. Balestriere (JB2900)
Jon L. Norinsberg (JN2133)
**BALESTRIERE FARIELLO**
225 Broadway, Suite 2900
New York, NY 10007
Telephone: 212-374-5401
Fax: 212-208-2613
john.balestriere@balestrierefariello.com
norinsberg@aol.com
*Attorneys for Plaintiffs and Putative Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **CHRISTINE RODRIGUEZ, SANDRA BURGA, KAREN MALAK, JAMES TORTORA, LISA BRUNO, JANEEN CAMERON, and KAREN McBRIDE,** individually, and for all others similarly situated,<br><br>          Plaintiffs,<br><br>  - against –<br><br><br>**IT'S JUST LUNCH INTERNATIONAL, IT'S JUST LUNCH, INC., HARRY and SALLY, INC, IJL NEW YORK CITY FRANCHISE, IJL ORANGE COUNTY FRANCHISE, IJL CHICAGO FRANCHISE, IJL PALM BEACH FRANCHISE, IJL DENVER FRANCHISE, IJL AUSTIN FRANCHISE, IJL LOS ANGELES-CENTURY CITY FRANCHISE, and DOES 1-136**,<br><br>          Defendants. | Index No.: 07-CV-9227 (SHS)(KNF)<br><br>**THIRD AMENDED COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiffs, by their attorneys, Balestriere Fariello, for their Class Action Complaint respectfully allege as follows upon information and belief, except as to allegations concerning Plaintiffs or their counsel, which are made upon personal knowledge, and except as otherwise indicated herein:

## PRELIMINARY STATEMENT

1.      It's Just Lunch ("IJL") International ("IJL Corporate," or "the Company") claims to be a premier dating service in an industry of companies which offer to connect individuals interested in romantic or personal relationships ("the Matchmaking Industry"). The Company claims it offers personalized, sophisticated, thoughtful matchmaking services provided by highly trained experts.

2.      This is a lie.  In a massive scheme to defraud tens of thousands of single professionals throughout the country – especially busy, affluent, professional women – who have paid, for years, IJL Corporate's hefty service fees, IJL Corporate actually provides services that are not only grossly deficient and substandard in almost every aspect, but are simply not what the Company promises.

3.      In furtherance of this fraudulent scheme, IJL Corporate, through its individual franchises including New York defendants It's Just Lunch, Inc. ("IJL Inc."), Harry and Sally, Inc. ("Harry & Sally"), and IJL New York City Franchise, and non-New York defendants IJL Orange County Franchise, IJL Chicago Franchise, IJL Palm Beach Franchise, IJL Denver Franchise, IJL Austin Franchise, IJL Los Angeles-Century City Franchise, in addition to all other IJL Corporate franchises in the United States, defined herein as Does 1-136 (together, all franchises are "IJL Franchises")—has routinely and

systematically overcharged its clients for its allegedly "superior" matchmaking services, charging $1500.00 per person per year, despite knowing that this exorbitant fee is not only grossly disproportionate to the level of services being actually provided, but often in violation of relevant state laws, as explained further below.

4.     IJL Corporate did all of this under the control of Riverside Company ("Riverside"), a private equity company whose chief of the fund which owns IJL Corporate Loren Schlachet ("Schlachet") sits on Defendant IJL Corporate's board of directors, thus controlling IJL Corporate as confirmed by confidential informants.

5.     Plaintiffs and the Class are forced to bring this action to recover the fees that they have paid as a result of IJL Corporate's fraudulent conduct, and to compel IJL Corporate to stop defrauding tens of thousands of others.

### The Lies On IJL's Website

6.     On its website, IJL Corporate proclaims that its "service isn't about video or computer dating; it's about an *insightful, professional* IJL staff member *hand-selecting* appropriate matches *based upon your desires, goals, motivations* and our instincts."  (See It's Just Lunch's Website ("IJL Corporate's Website"), http://www.itsjustlunch.com/whattoexpect.aspx, "What to Expect," last viewed on March 26, 2009, attached hereto as Exhibit A.) (emphasis added.)

7.     This claim is patently false in every respect.  IJL Corporate does *not* "hand-select" its matches based on clients "desires, goals, [or] motivations."  In fact, despite promises to the contrary, IJL Franchises—at the direction of Riverside owned and controlled IJL Corporate and after being trained by IJL Corporate and using IJL

Corporate's sales scripts—almost completely ignore the client's stated preferences. Rather, the Company forces its IJL Franchises to makes matches which are driven entirely by monthly quota requirements, and which wholly and categorically disregard the client's stated "desires, goals, [and] motivations." (Id.)

8.     IJL Corporate further claims on its website that its staff members have "years of experience" in the field of matchmaking, and are expert matchmakers and first-date   specialists. (See   IJL   Corporate's   Website,   "Who   We   Are," www.itsjustlunch.com/whoweare.aspx, last viewed on March 26, 2009, attached hereto as Exhibit A.)

9.     This is another lie.   In truth, IJL Corporate routinely hires staff members who have no experience, training, or background whatsoever in the field of matchmaking.  These are not "insightful professional" employees.  They are individuals whose only training regards signing up clients, and who are motivated by a desperate need to meet monthly quotas in order to keep their jobs.

## The Lies During The Initial Interview

10.     IJL Corporate starts lying to prospective clients on the website and in their public relations campaign and advertising.   These lies continue when staff at IJL Franchises first speak to clients who make up the Class here.

11.     During   the   initial   in-person   interview,   staff   at   IJL   Franchises routinely make the following misrepresentations of fact consistent with IJL Corporate's training and sales scripts:

(i)  The staff already have several "perfect" matches in its database for the client,

when in fact no such matches exist;

(ii) The staff have thousands of available members in the client's city, when in fact there are only hundreds or even fewer members available in that city;

(iii) IJL Corporate has an equal percentage of men and women in its system, when in fact the number of women is grossly disproportionate to the number of men in the system;

(iv) IJL Corporate is "selective" over who it allows to become members, when in fact IJL Corporate accepts *any* and *all* persons who are willing to pay its fees; and

(v) IJL Corporate carefully matches its clients with other members, when in fact the matches are made *at random* and are often done by individuals who have never even met the client.

12.     Riverside controlled IJL Corporate and IJL Franchises' staff make these lies for a simple reason: to induce the client to enter into a contract with IJL Corporate. Toward this end, IJL Corporate instructs its IJL Franchises' employees regarding the *exact words and actions* which they must use during the interview to get the client to sign the contract.  IJL Corporate calls these instructions "control points" and directs that they be "said *verbatim* in an interview to establish control."   (See IJL Training Manual, "Taking Control in an Interview", attached as Exhibit B.) (emphasis added.) Specifically, IJL Corporate issues such directives as

- "Do not call it a 'contract' or 'agreement'.  It is called a 'this';

- "Remember, you are on stage, *play the part*";

- "Stop and flip over your clipboard" and say "Ok, so far I have 3-4 ideas

for your first date";

- "Lean toward the client" and say "I think I am going to start you with two people, so I need some dates for lunch or a drink next week too";

- "Reach over and grab your big stack of contracts on the clipboard. Do NOT EVER EVER let go of them"; and

- Get the client to sign by saying "OK, just fill out this top part here, sign right here and make your check out to IJL for $ ___".

 (Id.) (emphasis in caps in original.) (emphasis in italics added.)

13.      If the client does not sign the contract at the end of the interview – which IJL Corporate considers an "unusual event" which occurs only if its employees "have done something wrong in the interview," (See IJL Corporate Training manual, "What if the Client Says . . . .," annexed hereto as Exhibit C) – IJL Corporate instructs its employees to aggressively pursue clients in order to get them to change their minds. (Id.)

14.      These step-by-step guidelines include such directives as "Call them the next day!", "Assume they are joining", "Get dates of availability," and more.  (Id.)  In addition, IJL Corporate instructs IJL Franchises' staff to follow a precise script when trying to convince the client to join, including telling the client such lines as, "I have a lot of great women I want you to meet", "I already know the first two people I want you to meet". "Don't they sound great?  And I know Susie really wants to meet you!" etc.  (Id.)  These lies are intended "to create urgency" which will induce the client to change his or her mind and sign the contract with IJL.  (Id.)

## The Lies About The Qualifications of Prospective Matches

15.      Even after the contract is signed, staff at IJL Franchises continue to

lie.   For example, in setting up dates for its members, IJL Franchises routinely lie about the qualifications of its prospective "matches" for their members, lying about very important traits of the other member, including the prospective match's:

i)      marital status;

ii)     employment status;

iii)    *criminal background[1]*;

iv)     age;

v)      health status;

vi)     physical appearance;

vii)    religious convictions;

viii)   political convictions; and

ix)     recreational interests.

16.    IJL Franchises lies about the qualifications of other members in order to continue deceiving IJL Corporate clients into believing that they are being carefully "matched" with other members, when, in fact, IJL Franchises completely ignore the client's stated preferences.

### IJL Corporate's Violation of Consumer Fraud Protection Laws

17.    In addition to the lies detailed above, Defendants routinely violate consumer fraud laws which regulate dating services and protect the rights of

---

[1] Indeed, IJL Corporate and IJL Franchises do no background checks, criminal or otherwise.  In fact, an IJL Corporate client from the Nashville IJL Franchise—a man also known as the "Wooded Rapist"—was arrested on May 1, 2008, and charged with the rape of at least thirteen different women. (See Nashville Metro Police Press Release, attached hereto as Exhibit V.)

consumers who enter into contractual agreements with such dating services.

18.     For example, in the State of New York, IJL Corporate has repeatedly and systematically attempted to circumvent state laws which prohibit dating services from charging a client more than $1,000.00 per year.  IJL Corporate has done this by urging its clients to simultaneously execute two separate six month agreements (for $1,000.00 and $500.00, respectively), and then falsely telling the client that he or she is receiving a 50% "discount" by signing the second six month agreement.  This unlawful practice violates New York State General Business Law § 394-c(2), which expressly states "No contract for social referral shall require payment by the purchaser of such service of a cash price in excess of one thousand dollars."

19.     New York State Attorney General Andrew Cuomo, along with Assistant Attorney General Dennis Rosen, recently stopped this fraudulent conduct, extracting from the Company and several of its New York franchises a fine and a promise to stop breaking the law.  (See Assurance of Discontinuance Pursuant to Executive Law § 63(15), dated June 13, 2007, attached hereto as Exhibit D.)

**The Lies in IJL Corporate's Public Relations and Advertising Campaign**

20.     IJL Corporate continues to lie in its massive and sustained public relations campaign and advertising aimed at convincing busy, single professional clients throughout the country to join IJL Corporate, and thereby ensures the continued success of the fraudulent scheme outlined above.

21.     In this public relations campaign, IJL Corporate touts its "very high" success rate and boasts that its services have resulted in "thousands of marriages." **(See

IJL Corporate's website www.itsjustlunch.com/oursuccess.aspx , "Our Success", last viewed March 26, 2009, attached hereto as Exhibit A.)

22.     The simplest and most overwhelming proof of IJL's massive fraud is in results: the overwhelming majority of IJL Corporate's clients – almost 200,000 in total – have not had successful matches through IJL Corporate's services as confirmed by confidential informants, as detailed below. (See www.consumeraffairs. com/news04/2006/02/ijl.html, "*It's Just Lunch – Or Is It?*", February 13, 2006, last viewed on October 8, 2007, attached hereto as Exhibit E.)

### The Expansion of IJL Corporate's Fraud: Purchase and Promotion By Riverside Company

23.     After a period of significant due diligence and careful deliberation, Riverside Company ("Riverside"), under the direction of Schlachet, acquired IJL Corporate in September 2006 with the intent to expand IJL Corporate, its fraudulent scheme, and Riverside's revenues.  Riverside and Schlachet were successful.

24.     Riverside currently owns and operates IJL Corporate as part of its Micro-Cap Fund Portfolio ("RMCF") and controls the management of its operations by closely monitoring the Company's performance, setting Company goals, operating the Company's budgets, monitoring capital expenditures, and controlling its acquisitions. (See http://www.riversidecompany.com/investors/inv_pdeal.php, "*Managing the acquired company,*" last viewed on March 26, 2009.)

25.     Riverside is intimately involved in the management and growth of the companies that it purchases, including IJL Corporate.  In fact, Riverside's website

outlines the function of the RMCF, explaining that "Riverside has created a team that is 100% focused on buying and building micro-companies. *They partner with management teams* over a 7 to 10 year period to *take these businesses to the next level* where they will attract the attention of a buyer that has an eye for something substantially larger." (See http://www.riversidecompany.com/microcap/micro_size.php, "Micro-Cap Fund—Size Matters," last viewed on December 29, 2008.) (emphasis added.)

26.    The RMCF even boasts that its Operating Partners are "*hands-on* company managers" that "work one-on-one" with its companies and that its Centralized Chief Financial Officer "works *closely*" with its companies. (See "Transacting and Operating Team," http://www.riversidecompany.com/microcap/micro_team.php, last viewed on March 26, 2009, attached hereto as Exhibit R.) (emphasis added.)

### Schlachet's Special Attention to IJL Corporate

27.    Since the 2006 acquisition, Riverside placed two principals on the IJL Corporate board of directors—Schlachet and Alan Peyrat ("Peyrat")—to exercise control over the management and operation of IJL Corporate. (See http://www.riversidecompany.com/about/ab_bios.php#b110, "*About Riverside-Professionals*," last viewed on March 26, 2009.)

28.    Schlachet—one of only four managing partners at multi-billion dollar Riverside—is a Co-Manager of the RMCF which administers IJL Corporate. In this role, Schlachet "leads the transacting team in the acquisition, growth, and sale of portfolio companies." (See "Micro-Cap Team," http://www.riversidecompany. com/microcap/micro_dedicatedcrew.php, last viewed on March 24, 2009, attached

hereto as Exhibit N.) (See also *San Francisco Business Times* "With $250M, big private equity firm mines for gold in small biz," http://sanfrancisco.bizjournals.com/sanfrancisco/stories/2006/09/18/newscolumn4. html, last viewed on March 24, 2009 (stating that the RMCF's transaction activity is headed by Schlachet), attached hereto as Exhibit O.)

29.     But not only does Schlachet play an integral role in choosing the companies that Riverside purchases and, subsequently, closely manages and oversees, and not only does he run the Riverside fund which runs IJL Corporate, but the *only* RMCF-managed company on whose board of directors he serves is IJL Corporate.  IJL Corporate is special to Schlachet and to Riverside.

30.     In fact, Riverside's and Schlachet's control of IJL Corporate is confirmed by confidential informants who admitted to Plaintiffs' counsel that Riverside staff run IJL Corporate.

31.     Riverside and Schlachet have intentionally enhanced IJL Corporate's fraudulent scheme by working to expand IJL Corporate's customer base, continuing to offer fraudulent matchmaking services to consumers, and driving revenues to fraudulently fatten Riverside's bottom line.

## JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which some members of the Class are citizens of states different

11

than Defendants.  See 28 U.S.C. § 1332(d)(2)(A).

33.     This Court has personal jurisdiction over IJL Corporate and the New York IJL Franchises because these Defendants operate a franchise in the City and State of New York and derive substantial revenue from that franchise, and otherwise seek the legal benefits and protections afforded by the State of New York.

34.     This Court has personal jurisdiction over Defendants Schlachet and Riverside Company because Riverside's principal place of business is located in the City and State of New York.  Riverside and Schlachet derive substantial revenue from that place of business, and otherwise seek the legal benefits and protections afforded by the State of New York.

35.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in the Southern District of New York because Defendants reside in this District.

## PARTIES

36.     Plaintiff Brad Berkowitz is an individual residing in New York, New York.

37.     Plaintiff Lisa Bruno is an individual residing in Brooklyn, New York (Lisa Bruno and Brad Berkowitz, together, "the New York Plaintiffs").

38.     Plaintiff Janeen Cameroon is an individual residing in Denver, Colorado.

39.     Plaintiff Karen Malak is an individual residing in Chicago, Illinois.

40.     Plaintiff James Tortora is an individual residing in West Palm Beach, Florida.

41.     Defendant IJL Corporate is a Nevada limited liability company with its

principal place of business located at 75340 Gerald Ford Drive, Palm Desert, California 92211.

42.     IJL Corporate sells, supervises, and controls franchises that operate under the "It's Just Lunch" trade name, and that provide dating services to busy single professionals, the IJL Franchises.   IJL Corporate asserts direct control over all its franchises by means of training employees, developing client protocol, and by strict supervision whereby IJL Corporate covertly monitors each individual franchise's adherence to IJL Corporate's rules.

43.     IJL Corporate has eight franchises in the State of New York. These franchises are located in Albany, Buffalo, Kingston, Long Island, New York City, Poughkeepsie, Rochester, and Utica.

44.     Defendant It's Just Lunch, Inc. ("IJL Inc."), is a New York Corporation with its principal place of business located at 52 Vanderbilt Avenue, Suite 901, New York, New York 10017.  IJL Inc. previously owned the New York City franchise from on or about April 1993 until on or about February 2002.

45.     Defendant Harry and Sally, Inc. ("Harry & Sally"), d/b/a It's Just Lunch, is a New York Corporation with its principal place of business located at 52 Vanderbilt Avenue, Suite 901, New York, New York 10017.  Harry & Sally has owned the New York City franchise from until on or about February 2002 to the present time.

46.     Defendant IJL New York City Franchise is a franchise of IJL Corporate and is located in New York City, New York.

47.     Defendant IJL Orange County Franchise is a franchise of IJL Corporate

and is located in Orange County, California.

48.     Defendant IJL Chicago Franchise is a franchise of IJL Corporate and is located in Chicago, Illinois.

49.     Defendant IJL Palm Beach Franchise is a franchise of IJL Corporate and is located in Palm Beach, Florida.

50.     Defendant IJL Denver Franchise is a franchise of IJL Corporate and is located in Denver, Colorado.

51.     Defendant IJL Austin Franchise is a franchise of IJL Corporate and is located in Austin, Texas.

52.     Defendant IJL Los Angeles-Century City Franchise is a franchise of IJL Corporate and is located in Los-Angeles, California.

53.     Defendant Riverside Company ("Riverside") is a private equity firm and New York Corporation with its principal place of business located at 45 Rockefeller Plaza, Suite 2400, New York, New York 10111.  Defendant Riverside Company has owned It's Just Lunch from September 2006 to the present time.

54.     Defendant Schlachet is a managing partner at Riverside and also runs the RMCF, the Riverside fund that controls IJL Corporate.  As such, Schlachet is located at 45 Rockefeller Plaza, Suite 2400, New York, New York 10111.

## CLASS ACTION ALLEGATIONS

55.     Plaintiffs bring this action as a class action pursuant to Rules 23(a)(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all similarly situated IJL clients between 1993 and 2007. Plaintiffs and Class Members bring this

action seeking compensatory damages, punitive damages, attorney's fees, costs, and any further relief this Court deems just and proper.

56.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23 ("Rule 23") in their representative capacity on behalf of themselves and the Class of all persons similarly situated ("the Class"), defined as follows:

> All persons who were or are members of IJL who signed a contract with IJL during the period of 1993 to April 1, 2009 ("Class Period").

57.     This action meets the following prerequisites of Rule 23(a) by which Plaintiffs may bring this action on behalf of the Class:

A.     **Numerosity**.  Although the exact number of Class Members is presently unknown, Plaintiffs believe and allege that the Class will number over 200,000 consumers. Unquestionably, the members of the Class are so numerous that joinder of all members is impracticable.

B.     **Commonality**.  A substantial pool of questions of law and fact exists that is common to the Class.  Such common questions include, but are not limited to:

(i)      Did Defendants make false and misleading representations as to the nature and quality of dating services that IJL Corporate provided?

(ii)     Did Defendants systematically and deliberately overcharge its clients for services rendered?

(iii)    Did Defendants fraudulently induce its clients to enter into

contracts by affirmatively misrepresenting the quantity and/or quality of other members in its system?

(iv)     Did Defendants misrepresent and/or omit material information relating to alleged "matches" set up by IJL Franchises?

(v)     Did Defendants willfully misrepresent the level of matchmaking experience and/or qualifications of its employees?

(vi)     Did Defendants violate consumer fraud protection laws which regulate dating services and protect the rights of consumers who enter into contractual agreements with dating services?

C.     **Typicality**.   Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs are ordinary IJL Corporate clients who, along with all Class members, have been injured by the same wrongful acts and practices of Defendants as alleged herein.

D.     **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have no interests that are antagonistic to or in conflict with the interests of the Class as a whole, and Plaintiffs have engaged competent counsel experienced in the prosecution of complex and class litigation.

E.     **Superiority**.   A class action is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of evidence, effort, and expense that numerous individual

actions would engender. This action will result in the orderly and expeditious administration of Class claims. Uniformity of decisions will be assured, thereby avoiding the risk of inconsistent and varying determinations.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

F.    **Maintainability**.  This action is properly maintainable as a class action for the prior independent reasons and under the following portions of Rule 23:

a.    The individual amounts of restitution involved, while not insubstantial, are generally so small that individual actions or other individual remedies are impracticable and litigating individual actions would be too costly;

b.    Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation;

c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and

d.    Individual actions would unnecessarily burden the courts and waste judicial resources.

G.    **Predominance**.  Questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

Notice to the members of the Class may be accomplished inexpensively, efficiently, and in a manner best designed to protect the rights of all Class Members.

58.     New York, as the site of three IJL Franchises, is the center of gravity for this action such that it is appropriate and consistent with existing law to certify a nationwide class of consumers applying New York law.  Certification of a nationwide class under the laws of New York is appropriate because Defendants conduct substantial business in New York and a significant number of Class members reside in New York.

## STATEMENT OF FACTS

### IJL Corporate's Origins and Growth

59.     IJL Corporate, which touts itself as a "specialized dating service for busy professionals", was founded in 1991 in Chicago by a marketing executive named Andrea McGinty.  (See IJL website, www.itsjustlunch.com, *"Corporate Home" and* www.itsjustlunch.com/oursuccess.aspx *"Our Success"*, last viewed March 26, 2009, attached hereto as Exhibit A.)

60.     Since its formation in 1991, IJL Corporate has had "almost 200,000 clients", and is now "the fastest growing dating service in the world."     See www.counsumeraffairs.com/news04/2006/02/ijl.html, *"It's Just Lunch – Or Is It?"*, February 13, 2006, (See Statement of Daniel Dolan, CEO of IJL, at 11), last viewed on October 8, 2007, attached hereto as Exhibit E.)

61.     IJL currently has "30,000 members worldwide" and is "growing by

18

thousands each month." (See IJL website www.itsjustlunch.com/oursuccess.aspx," *Our Success*", last viewed March 26, 2009, attached hereto as Exhibit A.)

62.     IJL Corporate "arrange(s) 50,000 dates" each month and has set up "over 2 million" dates since its foundation in 1991.  (Id.)

63.     IJL Corporate has opened up offices throughout the United States, as well as in Canada and Asia.  (Id.)  The Company now has "100 locations all over the world" (Id.), and generates annual revenue in excess of $30,000,000.00 per year.  (See http://www.theglobeandmail.com/servlet/story/RTGAM.20050214.wxrlunchdate14/ BNStory/specialSmallBusiness/), "*Getting Dumped by Fiancé Inspired Launch of It's Just Lunch Matchmaker*", February 14, 2005, annexed hereto as Exhibit F.)

### IJL Corporate Franchises:  Staffing And Structure

64.     Each of IJL Corporate's 100 franchises is staffed by at least three individuals: the franchise owner, a sales "director", and a matchmaking "coordinator." There are often multiple "directors" and "coordinators" in larger metropolitan offices.

65.     The franchise owner is responsible for handling all aspects of business operations of the franchise.   The director is responsible for generating "sales," i.e., getting new clients to sign up with IJL Corporate, and is also responsible for making matches between existing IJL Corporate members. The coordinator is responsible for contacting IJL Corporate members and informing them of proposed matches, as well as handling all aspects of setting up the date.

### IJL Corporate's Control of Its Franchisees

66.     While IJL Corporate claims that each of its franchises is independently

owned and operated, IJL Corporate, in fact, exercises complete dominion and control over its franchises.

## Control: Training

67.    IJL Corporate accomplishes this first with a rigid and highly structured training program.  This training program, which IJL Corporate refers to as "First Date University", is held at corporate headquarters in Palm Desert, California and lasts for five days.  All IJL Corporate franchise owners and directors must attend this seminar.

68.    At this seminar, IJL Corporate methodically trains its franchise owners and directors to learn and strictly follow the unlawful and deceptive sales practices outlined above.

69.    The Company then compels all attendees to engage in extensive role-play scenarios, in which an IJL Corporate "professor" assumes the role of a potential IJL Corporate client, and the attendee must demonstrate a complete mastery of the above scripts and sales techniques when speaking to this potential "client."

70.    All of the training done at First Date University is geared toward teaching attendees *how to make a sale* to prospective IJL Corporate clients.  *None* of the training is focused upon teaching attendees about *how to make appropriate matches* between IJL Corporate clients who are already in the Company's database.

## Control: Sales Scripts

71.    This continues once the staff work at IJL Franchises.  IJL Corporate requires all attendees to memorize, *verbatim*, the sales scripts which must be followed during all phone calls and in-person interviews with each potential IJL Corporate client.

Further, the Company instructs its attendees on how to respond, *verbatim*, to each and every possible objection that a prospective IJL Corporate client might raise during the initial phone call and/or in-person interview.

### Control: Covert Monitoring

72.    The control does not end at the training stage.  After the training seminar is over, the Company systematically and covertly monitors its franchisees in order to ensure full compliance with its methods, procedures and practices for making sales.

73.    The Company does this by making "ghost calls" to each of its franchisees, in which the caller pretends to be a potential new client interested in learning more about IJL Corporate.  The Company then evaluates the performance of the employee based upon his/her adherence to IJL Corporate scripts and sales techniques. Employees who do not follow Company scripts are terminated.

74.    The Company also makes unannounced visits to its franchisees, sending a regional coordinator to monitor the local office and ensure that all scripts and sales techniques are being followed.  Franchise owners who do not scrupulously follow Company scripts are subject to penalties and/or termination of their franchise rights.

### Control: "All-or-Nothing" Quota System

75.    IJL Corporate exerts further dominion and control over its franchises by imposing an "all-or-nothing" monthly quota system for compensation of its sales directors.

76.    Under this system, IJL Franchise directors do not receive *any* commissions on their sales – regardless of how many sales they make in a given month – unless the

total number of sales equals or exceeds the monthly quota set by IJL Corporate.

77.     As a direct result of this "all-or-nothing" system, IJL Franchise directors are compelled to spend a disproportionate amount of their time each day attempting to make sales in order to meet the monthly quota, thereby spending little or no time on making successful matches for IJL Corporate clients.

78.     The IJL Corporate compensation system thus does not allow for "hand-selecting" matches for IJL Corporate clients – as the Company promises on its website (See IJL Corporate's website, www.itsjustlunch.com/whattoexpect.aspx, "*What to Expect.*" Last viewed March 26, 2009, attached hereto as Exhibit A) – as doing so would completely preclude IJL Franchise sales directors from meeting their monthly sales quotas.

### Control: Extraction of Monthly Payments From Its Franchisees

79.     The Company is interested in maintaining this control since its profits are directly linked to the profits generated by the franchisees.  The Company receives monthly royalty payments from each and every one of its 100 franchisees.  The amount of the royalty payment is dependent upon the number of sales generated by each franchisee in a given month.

80.     Specifically, IJL Corporate extracts a royalty fee of 9% of gross sales made by each franchisee every month. (See IJL Corporate's website, *Franchise Info/Franchise Kit/Investment Overview*, www.itsjustlunch.com/franchiseinformation.aspx, http://www.itsjustlunch.com/kit/kit.aspx, and http://www.itsjustlunch.com/kit/ kit.aspx?actiontype=investment, last viewed March 26, 2009, attached hereto as Exhibit

G.)   In the event that the franchisee does not generate a sufficient number of sales per month, IJL Corporate still requires payment of "a predetermined minimum monthly royalty", as by IJL Corporate. (Id.)   IJL Corporate also receives a "franchise fee" of $25,000.00 to $30,000.00 from each one of its franchises when the franchise is first started. (Id.)

## IJL Corporate's Massive Public Relations Campaign

81.    In order to continue its rapid expansion – and thus further increase its massive and fraudulently earned profits – IJL Corporate has systematically generated "world wide exposure through effective public relations campaigns." (See IJL Corporate's website, *Franchise Info/Franchise Kit/IJL In The News,* www.itsjustlunch.com/franchiseinformation.aspx,   http://www.itsjustlunch.com/kit/ kit.aspx  and  http://www.itsjustlunch.com/inthenews.aspx,  last  viewed  March  26, 2009, attached hereto as Exhibit G.)

82.    At  the  national  level,  IJL  Corporate  accomplishes  this  by  advertising heavily in business and airline magazines, as well as in upscale urban publications, touting its services in colorful advertisements, with photos of attractive young sales associates eager  to  help  busy  professionals  find  their  ideal  matches.  (See,  e.g., IJL Corporate ad from *New York Magazines*, dated July 2-9, 2007, October 1, 2007 and October 8, 2007, attached hereto as Exhibit K.)  This type of advertising is "designed to increase [IJL Corporate's] brand awareness" to potential IJL clients throughout the country. (See IJL Corporate's website, *Franchise Info/Franchise Kit/IJL In The News* www.itsjustlunch.com/franchiseinformation.aspx,   http://www.itsjustlunch.com/kit/

kit.aspx, and http://www.itsjustlunch.com/inthenews.aspx, last viewed March 26, 2009, attached hereto as Exhibit G.)

83.    At the local level, IJL Corporate supplies "a detailed marketing advertising and public relations program" for each one of its franchises." (Id.) Specifically, IJL Corporate provides its franchisees with "sample print ads, direct mail pieces, radio and TV ads." (Id.)

### IJL Corporate's Target Market: "Busy Professionals"

84.    All of the above advertising efforts are geared toward reaching a specific class of consumers, namely: "busy successful men and women who want to be in relationships but don't have time to meet people." (See IJL Corporate's website, *Franchise Info/Franchise Kit/Support and Training* (quoting Daniel Dolan, CEO of IJL, in the *Harvard Law Bulletin*), http://www.itsjustlunch.com/franchiseinformation.aspx, http://www.itsjustlunch.com/kit/kit.aspx   and   http://www.itsjustlunch.com/kit/kit.aspx?actiontype=support, last viewed March 26, 2009, attached hereto as Exhibit G).

85.    IJL Corporate targets this group because it represents  "a huge, untapped and ever-growing national and international market" and because such professionals earn a high enough income that the cost of an IJL Corporate membership is an "affordable indulgence" which "easily fits within their budgets" (See IJL Corporate's website, *"Franchise Info"*, http://www.itsjustlunch.com/franchiseinformation.aspx, attached hereto as Exhibit G).  It is for this reason that IJL Corporate promotes itself as "a dating service for busy professionals".   (See IJL Corporate's website www.itsjustlunch.com, *"Corporate Home"*, attached hereto as Exhibit A.)

86.    Plaintiffs are such "busy professional[s]" who entered into a contract with Defendants and spent between $1,000.00 and $1,500.00. Plaintiffs were induced to enter into this contract as a result of misrepresentations made by IJL Corporate on its website, in their advertisements, and in their interview with Plaintiffs. After being set up with several "matches," Plaintiffs realized that Defendants' services were grossly deficient and substandard in almost every aspect. More importantly, Plaintiffs realized that Defendants had blatantly misrepresented the nature and quality of the services that they provided, as well as the qualifications of other members in the system.

## Consumer Complaints Against IJL Corporate

87.    Notwithstanding IJL Corporate's massive public relations campaign, IJL Corporate has been the subject of a litany of complaints from a large number of dissatisfied members, who have complained to IJL Corporate about many of the unlawful and deceptive business practices set forth herein. (See, e.g., "Consumer Complaints About It's Just Lunch – Angry Women", attached hereto as Exhibit H.)

88.    IJL Corporate has also been the subject of a consumer-fraud investigation conducted by ConsumerAffairs.com – an independent Web-based consumer news and resource center – regarding IJL Corporate's fraudulent and misleading business practices. (See "*It's Just Lunch – Or Is It?*," http://www.consumeraffairs.com/news04/2006/02/ijl.html, February 13, 2006, attached hereto as Exhibit E.)

89.    The ConsumerAffairs.com investigation found that IJL Corporate has misled its clients by stating all of the following lies:

- Claiming to be experts at matching busy professionals with like-minded

busy professionals;

- Claiming to arrange dates based on clients' specific requirements;

- Claiming only to have professionals in its files;

- Claiming to have hundreds and in some cases thousands of clients in its files;

- Exaggerating age, profession and other characteristics of clients when arranging dates; and

- Refusing to give refunds when dates didn't meet clients' criteria.

90.    IJL Corporate employees are specifically instructed to respond to the complaints posted on Consumeraffairs.com by submitting false claims regarding their own allegedly successful experience with IJL Corporate—in order to counteract the negative publicity generated from the Consumeraffairs.com investigation—when, in fact, these employees never used IJL Corporate's services.

## Government Investigations Into IJL Corporate

91.    Even government agencies have felt compelled to investigate the Company.  For example, the New York State Attorney General's Office recently found that IJL Corporate was systematically violating New York State laws by forcing its clients to sign two six-month contracts at the same time – for a total of $1,500.00 – thus circumventing a state law that limits the amount a consumer may be charged for a social referral service to $1,000.00 per year. (See Assurance of Discontinuance Pursuant to Executive Law § 63(15), dated June 13, 2007, attached hereto as Exhibit D.)

92.    The Attorney General's Office further found that IJL Corporate violated

state laws by "prohibiting consumers from filing lawsuits against the company and by failing to provide many consumer-friendly provisions." (Id.)  (See *AG Cuomo Unhappy With Dating Service* http://www.legalnewsline.com/news/197685-ag-cuomo-unhappy-with-dating-service, July 27, 2007, last viewed March 26, 2009, attached hereto as Exhibit I.)

93.    IJL has also been the subject of multiple complaints with the Better Business Bureau.  For example, in New York City alone, the Better Business Bureau received eleven separate complaints from IJL New York clients over the last 12-36 months.  (See Better Business Bureau Statistics, IJL Corporate New York City Office, http://www.newyork.bbb.org/reports/PrintReport.aspx?id=38028&lang=en,       last viewed April 1, 2009, attached hereto as Exhibit J.

## Riverside: The Expansion of IJL Corporate's Fraud

94.    Leveraged buyout company Riverside currently owns and operates IJL as a part of the RMCF.  (See Riverside's website, "Riverside Micro-Cap Fund Portfolio," http://www.riversidecompany.com/microcap/micro_portfolio.php, last viewed on March 26, 2009, attached here as Exhibit L.)

95.    Schlachet shows his special interest in, and control of, IJL Corporate by sitting on IJL Corporate's board of directors, the only board of an RMCF Company on which he sits.

96.    After a period of due diligence and careful deliberation, which included studying IJL Corporate on paper, sending a team to meet with IJL Corporate's management, and speaking with IJL Corporate's customers, Riverside Company

acquired IJL Corporate in September 2006, under Schlachet's direction, with full knowledge of the Company's fraudulent scheme and with the intent to expand IJL Corporate through the scheme in order to drive revenue. (See Press Release "Riverside Hooks Up With Matchmaking/Dating Service," http://www.riversidecompany.com/news/n_p_ijl.php, last viewed March 26, 2009, attached hereto as Exhibit M.)

97.     Since the acquisition, Riverside placed one of its managing partners and one of its vice presidents on the IJL Corporate board of directors—Schlachet and Peyrat respectively—to exercise control over the management and operation of the Company. (See Riverside's website, "About Riverside-Professionals," http://www.riversidecompany.com/about/ab_bios.php, pages 1-7, last viewed on March 26, 2009, attached hereto as Exhibit N.)

98.     Schlachet is intricately involved both with IJL Corporate and Riverside. As noted, IJL Corporate is so special to Schlachet—one of only four managing partners at massive Riverside—that he does not sit on *any* other boards of companies owned by Riverside. (Id.)

99.     But not only does Schlachet serve on the IJL Corporate board of directors, he is also the Co-Manager of Riverside's Micro-Cap Fund ("RMCF")—the fund whose portfolio includes IJL Corporate. Specifically, Schlachet "leads the transacting team in the acquisition, growth, and sale of portfolio companies." (See Riverside's website, "Micro-Cap Team," http://www.riversidecompany.com/microcap/micro_dedicated crew. php, last viewed on March 26, 2009, attached hereto as Exhibit O.) (See also *San Francisco Business Times* "With $250M, big private equity firm mines for gold in small

biz,"         http://sanfrancisco.bizjournals.com/sanfrancisco/stories/2006/09/18/ newscolumn4.html, last viewed on March 26, 2009 (stating that the RMCF's transaction activity is headed by Schlachet), attached hereto as Exhibit P.)

100.    In a press release regarding the RMCF, Riverside touted Schlachet and Ron Sansom ("Sansom")—another Riverside managing partner—as the two senior professionals leading the RMCF.  Co-Chief Executive Officer of Riverside Stewart Kohl discussed Schlachet and Samson's role in RMCF.

> [Schlachet] has been with Riverside for over six years and is one of our most productive and accomplished partners. . . .  Bela [Szigethy, Riverside's Co-CEO] and I are both confident in the abilities of [Samson] and [Schlachet] to manage the strong team they have assembled, build an impressive portfolio and drive the development of RMCF's portfolio companies in an *extremely hands-on, operating intensive manner, thereby continuing Riverside's tradition of delivering consistently superior returns to its investors*.

(See Press Release "Riverside Closes First Micro-Cap Fund; Firm Plans to Magnify Investments with New Initiative," http://www.allbusiness.com/ print/5437958-1-22eeq.html, last viewed March 26, 2009, attached hereto as Exhibit Q.) (emphasis added.)

101.    Through his "hands on" involvement in Riverside's acquisition of IJL Corporate, as well as serving on the IJL Corporate board of directors, Schlachet and Riverside have intimate knowledge of the Company's fraudulent conduct.

102.    Riverside further controls the management of IJL Corporate's operations by closely monitoring the Company's performance, setting Company goals, operating the Company's budgets, monitoring capital expenditures, and controlling its acquisitions.

103.    Riverside has exercised virtually complete domination over IJL Corporate, as is consistent with its very particular buy-out-then-control-to-build strategy.  In fact, Riverside's website outlines the function of Schlachet's RMCF, explaining that:

> Riverside has created a team that is 100% focused on buying and *building* micro-companies.  They partner with management teams over a *7 to 10 year period* to take these businesses *to the next level* where they will attract the attention of a buyer that has an eye for something substantially larger.

(See   Riverside's   Website,   http://www.riversidecompany.com/microcap /micro_size.php, "Micro-Cap Fund—Size Matters, last viewed on April 1, 2009, attached hereto as Exhibit R.)(emphasis added.)

104.    The RMCF is expressly structured to be intimately involved with the operation of any company it acquires, as it has been with IJL Corporate since 2006. According to its website, the RMCF team has Operating Partners ("OP's") that "are not financial types, but proven, *hands-on* company managers who are an amazing source of expertise and guidance.  OP's work one-on-one with our companies' management teams to build the organizations together and to make a good business bigger and better—dare we say, great."   (See "Transacting and Operating Team," http://www.riversidecompany.com/microcap/micro_team.php, last viewed on March 26, 2009, attached hereto as Exhibit S.)

105.    The RMCF also boasts a Centralized Chief Financial Officer "who *works closely* with the micro-companies in which we invest to produce timely and accurate financial information, and then to make decisions based on it." (*Id.*) (emphasis added.)

106.    To be sure, IJL Corporate is exactly the type of company Riverside seeks to

acquire because, according to Schlachet, "We like franchises because they're good solid systems with predictable streams of royalty." (See BusinessWeek article "Extending the Front Lines of Franchising," http://www.businessweek.com/smallbiz/content/apr2005/sb20050412_7035.htm, last viewed on March 26, 2009, attached hereto as Exhibit T.)

107.    Additionally, Riverside specifically seeks to acquire companies where Riverside hopes it can drive the acquiring company's revenue. In an article about Riverside's acquisition of Profit System—a company that specializes in retain furniture sales strategies and produces furniture sales software—Schlachet said that Riverside "looks for companies that have earnings increases of at least ten percent annually and about $3 million in EBITDA—earnings before interest, taxes, depreciation and amortization." (See "Colorado Springs-based Profit System sells for $9.2M to private equity firm," http://www.allbusiness.com/information/publishing-industries/4076195-1.html, last viewed on April 1, 2009, attached hereto as Exhibit U.)

108.    Of course, in this case, IJL Corporate and IJL Franchises obtain revenue in one way: signing up new clients, *not* matching clients. Given Schlachet's admission above about what is important to him in business, it is completely unsurprising that he and his Riverside partners would push IJL to drive revenue—in other words, sign up clients—at any cost, including through fraud, without any concern about whether or not clients were matching. Matching clients does not make Riverside and Schlachet money. Signing up clients makes Riverside and Schlachet money.

## Informants Confirm: Riverside Controls IJL Corporate

109.     These many public admissions and behavior showing Riverside's and Schlachet's control of IJL Corporate are confirmed by informants who privately revealed details of Riverside's control to Plaintiffs' counsel as part of their now nearly two year long investigations.

110.     Defendants Riverside Company and Schlachet, through his RMCF, have been, and continue to be, closely involved with IJL Corporate—from its initial acquisition to its day-to-day operation.   As such, Riverside and Schlachet have intentionally enhanced IJL Corporate's fraudulent scheme by working to expand IJL Corporate's customer base and continuing to offer fraudulent matchmaking services to consumers.

## Plaintiffs' Counsel's Interviews of Confidential Informants

111.     During the more than two year long investigation of Defendants, Plaintiffs' counsel has spoken with at least five ex-IJL Corporate employees (the "informants").   During these discussions, the informants disclosed the following information to Plaintiffs' counsel:

  a.   IJL Corporate employees are specifically instructed to lie about the number of marriages which have come through IJL, including the following false statements:

  i.   "A number of my clients have gotten married by using IJL";

  ii.   "An IJL client of mine just recently got married";

  iii.   "I met my own spouse through IJL."

b. IJL Corporate employees are specifically instructed to create a "Marriage Wall" to show to prospective clients – which consists of photos of couples who allegedly met through IJL – when in fact, the couples shown in the photographs were *not* members of IJL.

c. IJL Corporate employees are specifically instructed to create "fake profiles" – consisting of IJL employees who are pretending to be IJL members – so as to allow for *real* IJL members, who cannot be matched with anyone, to go out on "dates", so as to satisfy IJL's contractual obligation of sending out the client on a minimum number of dates.

d. IJL Corporate employees are specifically instructed to "make up a number" when telling prospective members how many male/female IJL members that there are in that member's city, which in turn leads sales representatives to state that there are "thousands" of members in the given city – when in fact, there are often literally only a few hundred members in that City, many of whom have memberships which are "expired" or "on hold".

e. IJL Corporate employees are specifically instructed to *not* disclose to prospective members that they are reaching a <u>call center</u> in Florida – and *not* a "local" IJL office in that member's City – as IJL Corporate has taken over 45 franchises and has, in fact, shut down many of these offices throughout the United States.

f. IJL Corporate employees are specifically instructed to falsely create

internet postings which tout the highly successful experience that they
had with IJL Corporate, when, in fact, no such experiences ever occurred.

g.  IJL Corporate employees are specifically instructed to respond to the
complaints posted on Consumeraffairs.com (see ¶ 91 supra) by submitting
false claims regarding their own allegedly successful experience with IJL
Corporate—in order to counteract the negative publicity generated from
the Consumeraffairs.com investigation—when, in fact, these employees
never used IJL Corporate's services.

h.  IJL Corporate employees are specifically instructed *not* to set clients up on
dates within the first three days after they've signed their contracts, thus
preventing dissatisfied clients from exercising their right to rescind the
contract under applicable consumer law protections.

112.  In addition to the foregoing, informants have also disclosed to Plaintiffs'
counsel the following general deceptive business practices of IJL Corporate:

a.  IJL Corporate employees are often encouraged to lie; The script which IJL
Corporate disseminated and required all staff to use is patently false in
every regard;

b.  IJL Corporate employees believed that IJL Corporate often required them
to perform sales pitches which were morally compromising since IJL
Corporate management encouraged them to lie;

c.  IJL Corporate uses a computer-based quota system, which sets up
"matches" based solely on the amount of time that has lapsed since the

member's last date, and does *not* "hand-select" any matches;

d.   IJL Corporate is focused solely on making sales, *not* on making successful matches;

e.   IJL Corporate has even, at times, sent its *own employees* to pose as dates for clients;

f.   IJL Corporate managers are required to monitor staff to make certain that there is no deviation from the fraudulent sales script;

g.   Representatives from Riverside often meet with IJL Corporate executives to discuss how to increase profits;

h.   Riverside representatives, like IJL Corporate, are focused on sales above all else;

i.   Riverside representatives are consistently meeting with IJL Corporate executives to be kept abreast of everything that is going on with IJL Corporate and to direct IJL Corporate's growth.

<u>**The Necessity For This Class Action**</u>

113.   Despite being the target of a government inquiry, as well as the subject of a consumer-fraud investigation, IJL Corporate has thus far largely avoided liability for its fraudulent and deceptive business practices.  This is so because the majority of the Company's clients simply do not have the time, energy, or resources to start a lawsuit against IJL Corporate.  Indeed, the very nature of the class herein – busy, career-oriented professionals – virtually ensures that dissatisfied IJL Corporate clients will not take legal action against the Company, simply because the demands of their

professional lives preclude them from doing so.  Further, the amount of damages sustained by each IJL Corporate client is simply not large enough for these clients to justify their hiring an attorney to commence a lawsuit against IJL Corporate.  Finally, while IJL Corporate clients know that they have been defrauded, many undoubtedly feel  reluctant to admit that they have joined a dating service – much less that they have been duped by one – and this, too, acts as a strong deterrent against taking legal action against the Company.

114.    For all of these reasons, this class action has become necessary, as it is the only means by which to completely and permanently stop Defendants from continuing its massive scheme to defraud single professionals throughout the country.

### Lisa Bruno's Complaint Against IJL Corporate and Harry & Sally

115.    Plaintiff Lisa Bruno ("Bruno") first signed up at an IJL Franchise in New York, owned by Defendant Harry & Sally, on August 9, 2007.

116.    During her initial interview with a woman named Linda ("Linda"), Bruno outlined the specific qualities she was looking for in her potential dates.  Immediately, Linda told Bruno that she could already think of two men that would fit what she was looking for.

117.    In fact, Linda knew at the time she made this representation that she did *not* have two men that would fit what Bruno was looking for.

118.    Linda made this false and misleading representation according to the mandatory IJL Corporate script which she was required to follow.  (See ¶ 12 supra.)

119.    After seeing advertisements and relying on the script spoken by IJL

Franchise staff, Bruno decided to purchase IJL Corporate's services.

120.    Despite the fact that Linda had told Bruno that she already had two men in mind, Bruno was not set up on a single date in the first month.

121.    Finally, Bruno was set up on her first date with a man named Steve ("Steve").

122.    Linda told Bruno that Steve was 51, but "didn't look a day over 35." Linda also told Bruno that Steve was a snowboarder and in good shape physically.

123.    However, when Bruno went on the date, she met a man who looked every bit as old as 51 years, and who was overweight.

124.    Additionally, throughout the course of the date, Bruno found out that she did not even closely match the criteria that Steve had set forth for his dates through IJL.

125.    Upon information and belief, Bruno was set up on her first date based solely on the fact that Steve wanted to date women over the age of 40.

126.    Bruno's second date was with a man who was 54 years old, older than the express age criteria Bruno had set forth in her initial interview.

127.    Bruno's third date, with a man named Siu ("Siu), informed her that IJL considered him a "filler guy," meaning that they can send him out to meet many different types of women, without regard to their express criteria, because he was "personable" and "talkative."

128.    After this third date, Bruno reached out to the IJL Franchise to give them feedback from her first three dates.  Additionally, Bruno wanted to ascertain whether or not the IJL Franchise was even using her express criteria.

129.    Bruno's subsequent dates went as poorly, if not worse, than the initial three.  Bruno had little to nothing in common with them and, what is more, the IJL Franchise continued to ignore her express criteria regarding her dates.  At one point, Bruno was set up with a man who was 56 years old, clearly outside of the age parameters she had set forth in her initial interview.

130.    After each date, Bruno left her feedback with the IJL Franchise in hopes that it would affect the types of people she would be set up with on future dates.  It did not.

131.    To this day, Bruno has received neither a refund nor an apology from IJL, Harry & Sally, or the IJL Franchise.

**Brad Berkowitz's Complaint Against IJL Corporate and Harry & Sally**

132.    Plaintiff Brad Berkowitz ("Berkowitz") learned of It's Just Lunch from a magazine advertisement in or around January, 2006.

133.    He first went to IJL on March 17, 2006 ("March 17 Meeting").  Berkowitz signed a contract for a twelve-month membership and paid $1,300.00 for IJL Corporate's services at the New York City IJL Franchise ("New York Office"), a franchise owned by Defendant Harry & Sally.

134.    Berkowitz was told that he was receiving a "discount" by signing up for a twelve-month contract.

135.    In fact, Defendants were unlawfully overcharging Berkowitz by over 30%, in violation of New York General Business Law § 394(c)(2).

136.    At no point was he told by an IJL representative that he was not required

to pay more than $1,000.00 for a twelve-month contract with IJL.

137.    During the March 17 Meeting at the New York Office, Berkowitz outlined the specific qualities he was looking for in his prospective dates.

138.    Berkowitz told the IJL representative that he was looking for a woman who was, among other things, Jewish, taller than 5 foot, 5 inches, brunette, with no children, and within a specific age range.

139.    The IJL representative promised Berkowitz that she had at least two matches that were "perfect" for him.

140.    The IJL representative knew that this statement was false at the time that she made this representation.

141.    In fact, the IJL representative knew at the time she made this representation that IJL did not have two women that would fit what Berkowitz was looking for and, in fact, did not have *any* suitable matches for Berkowitz.

142.    The IJL representative made this false and misleading representation according to the mandatory IJL Corporate script which she was required to follow.  (See ¶ 12 supra.)

143.    After relying on the script spoken by the IJL representative, Berkowitz decided to purchase IJL Corporate's services.

144.    The first person with whom Berkowitz was matched by IJL was scheduled to meet him for lunch at a steak place in Manhattan, but the match never showed up.

145.    The date was rescheduled by IJL for the following day, and not only was the woman blonde, but she told Berkowitz that the reason she missed the previous

day's lunch was because IJL failed to confirm the time and place with her.

146.   Another IJL-arranged date Berkowitz went on matched him with a woman who was not Jewish and had two kids.

147.   Two of the matches IJL made for Berkowitz were with women who were approximately 5 foot, 1 inch and 5 foot, 2 inches.

148.   After going out on several dates, it became clear to Berkowitz that IJL not only did not have the two matches that had been promised during the March 17 meeting, but in fact, IJL did not have any suitable matches for him at all.

149.   Berkowitz called IJL after every date, often times to express his frustration with the match, but IJL continued to send him on dates that completely disregarded the preferences he stated to the IJL representative in the March 17 Meeting.

150.   Berkowitz did not go on any second dates.

151.   Although IJL sent Berkowitz on numerous dates – to the point where he felt as if he was being "serial-dated" – IJL consistently failed to provide him with the matches he was looking for and, thus, the matches he was promised.

### Karen Malak's Complaint Against IJL Corporate and IJL Chicago Franchise

152.   Plaintiff Karen Malak ("Malak") first learned of IJL Corporate when she saw an advertisement on the back of an airplane magazine.

153.   Interested in the services that IJL Corporate claimed it could offer, Malak went to an IJL Franchise in Chicago to have a discussion with an IJL representative.

154.   During her initial interview at the IJL Chicago Office with a woman by the name of Libby ("Libby"), Malak outlined the specific qualities she was looking for in

her dates.  Right away, Libby told Malak that she had two or three people she had in mind for Malak already.

155.   In fact, Linda knew at the time she made this representation that she did *not* have two or three men that would fit what Malak was looking for and, in fact, did not have any suitable matches for Malak.

156.   Libby made this false and misleading representation according to the mandatory IJL Corporate script which she was required to follow.  (See ¶ 12 supra.)

157.   Additionally, during this interview, Libby told Malak that 99%-100% of the IJL clients in the database had undergraduate degrees and that 50% had masters degrees or higher.

158.   After seeing advertisements and relying on the script spoken by IJL Franchise staff, Malak decided to purchase IJL Corporate's services.  As part of a "summer promotion," Malak received a $200 discount and paid IJL Corporate a total of $1300.

159.   After a few dates, however, Malak became frustrated.  None of her dates had matched the express criteria she had set out during her initial interview.

160.   Specifically, Malak's third date was with a sheet metal worker who didn't even have an undergraduate degree.

161.   Malak attempted to contact the IJL Franchise, but no IJL representatives would return her calls.

162.   Finally, after several days and numerous telephone calls, Malak spoke with a director, Lindsay ("Lindsay").

163.    Lindsay told Malak that the first few dates was considered the "learning process" during which IJL Corporate clients were exposed to a broad range of people to help them realize "what else is out there."   Upon information and belief, this statement was simply an excuse for the IJL Franchise's poor matchmaking services.

164.    Malak was set up on another date but had to decline because—in another example of the IJL Franchise neglecting to consider its clients' interests—the date was with a professor from her school.

165.    Soon thereafter, Malak moved from Chicago.  In her contract, there was a clause that stated a partial refund could be given to clients who move more than 50 miles away from an IJL Franchise.

166.    Malak's new location was, in fact, over 50 miles from the nearest IJL Franchise and, as such, she tried getting a partial refund from IJL Corporate.

167.    Malak sent numerous letters via registered mail, but all of them were returned to her because IJL Corporate had refused to accept them.

168.    To this day, IJL Corporate and the IJL Franchise have neither refunded Malak any of her money nor apologized for the poor quality of services provided.

**James Tortora's Complaint Against IJL Corporate and IJL Palm Beach Franchise**

169.    Plaintiff James Tortora ("Tortora") signed up for IJL Corporate's services through the IJL Palm Beach Franchise in Florida (the "Palm Beach Office").

170.    When Tortora went to the Palm Beach Office, he met with an IJL representative to go over his criteria for potential dates.

171.    The IJL representative told Tortora that his criteria would be used to

expertly match him with other professionals in the IJL Corporate database.

172.    During his initial interview at the IJL Palm Beach Franchise, Tortora outlined the specific qualities he was looking for in his dates.  Right away, the IJL Palm Beach Franchise representative told Tortora that there were two or three people that perfectly matched his criteria.

173.    In fact, the IJL Palm Beach Franchise did not have any suitable matches for Tortora at the time this representation was made.

174.    The IJL Palm Beach Franchise representative made this false and misleading representation according to the mandatory IJL Corporate script which it was required to follow.  (See ¶ 12 supra.)

175.    After seeing advertisements and relying on the script spoken by IJL Franchise staff, Tortora decided to purchase IJL Corporate's services.

176.    Contrary to the Palm Beach Office's representations otherwise, Tortora was set up with women with whom he had little to nothing in common with.  In setting him up with other IJL Corporate clients, Tortora believed that his initial criteria had been neglected completely.

177.    In response, Tortora's family sent multiple written complaints to IJL Corporate's office.  However, they never received a single response from their complaints.

178.    To this day, Tortora has received neither an apology from the Palm Beach Office nor a refund for its insufficient services.

**Janeen Cameron's Complaint Against IJL Corporate and IJL Denver Franchise**

179.    Plaintiff Janeen Cameron ("Cameron") first signed up with IJL Corporate at the Denver, Colorado IJL Franchise on September 4, 2007.

180.    Cameron met with the director, Leslie Kwiatkowski ("Kwiatkowski"), and had a one hour interview to go over Cameron's criteria for potential dates.

181.    Cameron is an avid hiker and, as such, clearly expressed to Kwiatkowski that any potential dates must also have a strong interest in hiking.  In other cities, this criterion may have been a problem but Kwiatkowski assured Cameron that, since they lived in Denver, she would certainly be able to set Cameron up with numerous men who loved hiking as much as she did.

182.    What is more, during the course of the interview, Kwiatkowski told Cameron that she already had two men in mind that she wanted to set Cameron up with.

183.    In fact, Kwiatkowski knew at the time she made this representation that she did *not* have any people in the database that would be matches for her.

184.    Kwiatkowski made this false and misleading representation according to the mandatory IJL Corporate script which it was required to follow.  (See ¶ 12 supra.)

185.    In terms of age, Cameron told Kwiatkowski that her dates should be between 32 and 42 years of age.  However, Kwiatkowski urged Cameron to expand this age range to 44 years of age to accommodate a date that she already had in mind.  Trusting Kwiatkowski's abilities as a "matchmaking expert," Cameron complied.

186.    After seeing advertisements and relying on the script spoken by IJL Franchise staff, Cameron decided to purchase IJL Corporate's for $1600.

187.    Cameron's first date, on September 18, 2007, was with a man named Mark ("Mark").  Not only did Cameron and Mark have almost nothing in common, but Mark did not hike, one of the most important criteria that Cameron expressed to Kwiatkowski.  Cameron left a voicemail for Kwiatkowski the next day to let her know that her match was off-base, hoping this would help Kwiatkowski make better matches for Cameron's future dates.

188.    Cameron's second date, on September 24, 2007, while slightly more enjoyable, did not meet Cameron's criteria much better.   Although her date, Scott ("Scott"), was more personable, the two, again, did not have much in common.  More importantly, however, was that Scott did not hike.

189.    The following day, as before, Cameron called Kwiatkowski and left her a voicemail expressing her concern over the dates she was being put on.

190.    Cameron's third date, with a man named Brian ("Brian"), was completely off the mark.  The IJL Franchise had told Cameron that Brian was "athletic" and enjoyed "hiking."   However, when Cameron arrived at the date on October 9, 2007, she discovered that she had been lied to.   Contrary to what she was told, Brian was overweight and did not hike.

191.    Once again, Cameron called Kwiatkowski to try and fix the apparent misunderstanding.   Cameron left Kwiatkowski a voicemail and asked that she return her call.

192.    Cameron's fourth date, which occurred on November 1, 2007, was with a man named Peter ("Peter").   The IJL Franchise told Cameron that Peter was into

45

"fitness" and enjoyed hiking.  Once again, however, Cameron discovered that Peter was *extremely overweight* and *did not hike*.

193.    Yet again, Cameron called Kwiatkowski and left a voicemail regarding the clear lack of attention paid to Cameron's initial criteria in setting up her dates.

194.    To this day, Kwiatkowski has not returned any of Cameron's phone calls.

195.    Cameron's fifth and final date on November 26, 2007, was with another man named Mark ("Mark").  The IJL Franchise told Cameron that Mark was 44 years old and enjoyed hiking.  Throughout the course of the date, however, Cameron found out that Mark was actually *49 years old* and *did not hike*.

196.    Fed up and frustrated with IJL's inadequate services, Cameron wrote a letter to the IJL Franchise on December 3, 2007, expressing her deep disappointment and anger with IJL's complete inability to adequately perform its services.

197.    To this day, Cameron has received only a partial refund, but no apology from IJL Corporate or the IJL Denver Franchise.

<u>Specific Allegations of Fraud Against Defendants</u>

**I.      Who Made the Fraudulent Statement or Fraudulently Omitted to Speak?**

198.    IJL Corporate makes false statements and representations by repeatedly advertising, both on its website and through a national advertising campaign, that it provides top-rate matchmaking services, makes thoughtful, client-specific matches, and employs matchmaking professionals when, in fact, it does none of these things.

199.    Riverside—since its acquisition of IJL Corporate in 2006—has closely managed and operated IJL Corporate.  More specifically, IJL Corporate is managed by

Schlachet under the RMCF.  As such, through IJL Corporate, Riverside and Schlachet have made, and continue to make, false statements and representations by repeatedly advertising, both on IJL Corporate's website and through a national advertising campaign, that it provides top-rate matchmaking services, makes thoughtful, client-specific matches, and employs matchmaking professionals when, in fact, it does none of these things.

200.    IJL Franchises made false statements and representations by repeatedly representing to clients—through its Franchises named here, as well as Does 1-136—that it would expertly match clients with other professionals based on a strict criteria provided by the client during the initial interview when it did not do this, and that the clients constituted a particular makeup (including ration of men to women) when these statements were actually lies.

**II.    What is the Fraudulent Statement or Omission?**

201.    IJL Corporate's false statements include, but are not limited to:

- Claiming to be experts at matching busy professionals with like-minded busy professionals, but not being this;

- Claiming to arrange dates based on clients' specific requirements, but not doing this;

- Claiming only to have professionals in its files, but having non-professionals in its files;

- Claiming to have hundreds and in some cases thousands of clients in its files, but having far less clients in its files;

- Claiming that the number of men versus women in the client database was equivalent, when this was not the case;

- Stating that the age, profession and other characteristics of clients when

arranging dates were certain ages, professions, and characteristics when they, in fact, were not such things.

202.   At all times from their acquisition of IJL Corporate in 2006, Riverside and Schlachet facilitated the false statements from IJL Corporate as fully set forth above.

203.   IJL Franchises' false statements included, but are not limited to:

- Claiming to be experts at matching busy professionals with like-minded busy professionals, but not being this;

- Claiming to arrange dates based on clients' specific requirements, but not doing this;

- Claiming only to have professionals in its files, but having non-professionals in its files;

- Claiming to have hundreds and in some cases thousands of clients in its files, but having far less clients in its files;

- Claiming that the number of men versus women in the client database was equivalent, when this was not the case;

- Stating the age, profession and other characteristics of clients when arranging dates were certain ages, professions, and characteristics when they, in fact, were not such things;

- Claiming to professionally match clients based on the criteria clients set forth in the initial interview, when, in fact, they did not do this.

**III.   When and Where did the Speaker Make the Fraudulent Statement or Omit to Speak**

204.   IJL Corporate made, and continues to make, these fraudulent statements on its website and through its nationwide marketing campaign targeted at "busy professionals."   These fraudulent statements have been made from 1993 until the present time.

205.   Since 2006, Riverside and Schlachet—through their ownership and management of IJL Corporate—have made these fraudulent statements through IJL

Corporate's national marketing campaign targeted at "busy professionals."

206.   IJL Franchises made these fraudulent statements through its staff.  More specifically, these fraudulent statements were made to IJL Corporate clients during their initial interviews with IJL staff at said Franchises.   Additionally, these fraudulent statements were made consistently throughout Class members' time as clients of IJL Corporate during any interactions IJL Inc. staff had with Class members.

**IV.   To Whom did the Speaker Make Fraudulent Statements or Omit to Speak**

207.   In its misrepresentations, IJL Corporate addressed, and continues to address, all of its website viewers, as well as any person who saw an IJL Corporate advertisement.  Specifically, IJL Corporate directs these falsehoods at to individuals, including Plaintiffs and Class members, who are considering purchasing IJL Corporate's matchmaking services or who have purchased the worthless services.

208.   In its misrepresentations, Riverside and Schlachet—through their ownership and close management of IJL Corporate—address all of IJL Corporate's website viewers, as well as any person who saw an IJL Corporate advertisement. Specifically, these falsehoods are directed at individuals, including Plaintiffs and Class members, who are considering purchasing IJL Corporate's matchmaking services or who have purchased the worthless service.

209.   IJL Franchises made these misrepresentations to all IJL Corporate clients who purchased IJL Corporate matchmaking services through any of the IJL Franchises.

**V.   Why the Statements or Omissions were Misleading or False**

210.   IJL Corporate's statements were, and still are, misleading because:

- IJL Corporate employees are not experts at matching busy professionals with like-minded busy professionals;

- Its Franchises do not arrange dates on clients' specific requirements;

- IJL Corporate has people in its database who are not professionals;

- IJL Corporate has less clients in its files than it represents to potential clients;

- The number of men versus women in IJL Corporate's database is grossly disproportionate;

- IJL Corporate misrepresents the age, profession, and other characteristics of clients when arranging dates.

211. At all times from their acquisition of IJL Corporate in 2006, Riverside and Schlachet facilitated the false statements from IJL Corporate as fully set forth above.

212. IJL Franchises' statements were misleading because:

- IJL Inc.'s employees were not experts at matching busy professionals with like-minded busy professionals;

- IJL Inc. did not arrange dates on clients' specific requirements;

- IJL Corporate had people in its database who were not professionals;

- IJL Inc. had less clients in its files than it represented to potential clients;

- The number of men versus women in IJL Corporate's database was, and still is, grossly disproportionate;

- IJL Inc. misrepresented the age, profession, and other characteristics of clients when arranging dates.

- IJL Inc. did not use clients' criteria from the "initial interview" to expertly match them with other professionals in the IJL Corporate database.

## VI. Why it Was Reasonable for Class Members to Believe the Fraudulent Statements or to Not Question the Omissions

213. IJL Corporate is a corporation that touts itself as an expert in the

Matchmaking Industry.   To a reasonable consumer of IJL Corporate's services, it appeared that, by all accounts, IJL Corporate was, in fact, telling the truth.   Accordingly, it was reasonable for Plaintiffs and Class members to rely IJL Corporate's statements, in particular, those concerning the level of service that IJL would provide.

214.   Riverside is a nationally recognized private equity firm and Schlachet is not only a managing partner at Riverside, but also runs the RMCF and sits on the IJL Corporate board of directors.   To a reasonable consumer using IJL Corporate's services, it appeared by all accounts that Riverside and Schlachet, through IJL Corporate, were, in fact, telling the truth.   Accordingly, it was reasonable for Class members to rely on IJL Corporate's statements—made under the ownership and management of Riverside and Schlachet—in particular, those concerning the lever of services that IJL would provide.

215.   Through IJL Corporate, IJL Franchises also touted themselves as experts in the Matchmaking Industry.   To a reasonable consumer using IJL Corporate's services through IJL Franchises., it appeared by all accounts that Franchises all were, in fact, telling the truth, as they spoke face to face with Plaintiffs and Class members. Accordingly, it was reasonable for Class members to rely on IJL Franchises' statements, in particular, those concerning the level and type of service that IJL Franchises would provide.

## VII.   The Common Course of Conduct of Fraud and Reliance Upon It

216.   IJL Corporate has engaged in a common course conduct of fraud through its consistent scheme of misrepresentation: it has continually made fraudulent statements to consumers concerning the quality of its matchmaking services, both on its

website and through extensive advertising.  It also has promoted a common scheme through the training and sales scripts.  For that reason, countless consumers of IJL Corporate's services have reasonably relied on these falsehoods.

217.    From their acquisition of IJL Corporate in 2006 to the present time, Riverside and Schlachet have engaged in a common course of fraud through their scheme of misrepresentation through IJL Corporate: it has continually made fraudulent statements to consumers concerning the quality of IJL Corporate's matchmaking services, both on IJL Corporate's website and through its extensive advertising.  For that reason, countless consumers of IJL Corporate's services have reasonably relied on these falsehoods.

218.    IJL Franchises engaged in a common course conduct of fraud through its scheme of misrepresentations: it continually made fraudulent statements to consumers concerning the quality of its matchmaking services.   For that reason, countless consumers of IJL Corporate's services, received through IJL Inc., have reasonably relied on these falsehoods.

**VIII.   Fraudulent Intent: Motive and Opportunity, and Conscious Misbehavior**

219.    Riverside, under Schlachet's direction, controlled IJL Corporate and its IJL Franchises which intended to perpetrate fraud.

    a.  **Motive**

        i.  Both IJL Corporate and IJL Franchises had a motive to perpetrate fraud: by lying to Plaintiffs and Class members about the actual services provided, Riverside and Schlachet controlled IJL Corporate

and IJL Franchises made more money.  IJL Corporate's and IJL Franchises' lies resulted in greater profits for them and, in turn, for Riverside and Schlachet.

b. **Opportunity**

i. Moreover, IJL Corporate and IJL Franchises had the opportunity to commit fraud.  Plaintiffs and Class members can and did rely on IJL Corporate's and IJL Franchises' fraudulent statements, including in IJL Corporate's website, IJL Corporate's public relations campaign, and IJL Franchises' staff's lies to Plaintiffs and Class members (such lies being directed by IJL Corporate's training and sales scripts, with IJL Corporate at all times being under the control of Schlachet and Riverside).

i. But Plaintiffs and Class members could not know that these many fraudulent statements were, in fact, fraudulent and deceitful since the fraudulent statements regarded promises to act a certain way in private, away from clients (e.g., to make thoughtful matches based on a client's preferences) or discussed certain private information which the clients could not have but which IJL Corporate and IJL Franchises said they had (e.g., the male-female breakdown of a given IJL Franchises' client base).

ii. However, IJL Corporate promoted these private fraudulent acts, and IJL Franchises' staff actually performed these private

fraudulent acts.  Since these acts were known to IJL Corporate and IJL Franchises, but not known to Plaintiffs and the Class, IJL Corporate and IJL Franchises had the opportunity to perpetrate the fraud complained of here.

c. **Conscious Misbehavior**

i. IJL Corporate and IJL Franchises not only had this motive to perpetrate fraud (making more money) and these opportunities to perpetrate fraud (engaging in certain private acts or relying on certain private information), but consciously engaged in fraud.  IJL Corporate and IJL Franchises knew exactly what they were doing, and Riverside, which claims to be a careful manager, and Schlachet, which sits on IJL Corporate's board, knew about this fraud, too.

i. Additionally, confidential informants who once worked for IJL Corporate confirmed to Plaintiffs' counsel that, in fact, Riverside and Schlachet controlled IJL Corporate and IJL Franchises' staff recognized that IJL Corporate's and IJL Franchises' representations were fraudulent misrepresentations.

220.   IJL Corporate and IJL Franchises, under the control of Schlachet, managing partner of Riverside, had the motive and opportunity to commit fraud, and consciously sought to commit fraud, damaging their client Class members but making more money for themselves.

221.   Defendants never intended for IJL Corporate or IJL Franchises ever to

fulfill their many promises.  All Defendants intended to do was make money.

## DEFENDANTS' MISCONDUCT OCCURRED IN NEW YORK

222.    Defendants IJL Corporate, IJL Inc., Harry & Sally, Riverside, and Schlachet performed the misconduct described above within the state of New York.

223.    Specifically, IJL Corporate solicited its faulty services to consumers within the State of New York.  For example, IJL Corporate took out advertisements in such prominent New York publications as the *New York Magazine*. (See, e.g., IJL Corporate ad from *New York Magazines*, dated July 2-9, 2007, October 1, 2007 and October 8, 2007, attached hereto as Exhibit K.)

224.    What is more, riverside and Schlachet controlled IJL Inc., Harry & Sally, and all other IJL New York Franchises made the material misrepresentations outlined above within the State of New York to the New York Plaintiffs and all Class members who reside in New York or who received IJL Corporate's services through any IJL New York Franchise (the "New York Class members").

225.    The New York Plaintiffs, as well as the New York Class members, read and relied upon these advertisements, signed up for IJL Corporate's services, and were subsequently damaged.

## CLAIMS FOR RELIEF AGAINST IJL CORPORATE, IJL INC., HARRY & SALLY, RIVERSIDE, AND SCHLACHET

### FIRST CLAIM FOR RELIEF

### Deceptive Acts or Practices under NY Gen. Bus. Law § 349

226.    The New York Plaintiffs repeat and reallege each allegation of paragraphs

1 through 225 above as if fully set forth herein.

227.   Defendants knowingly made material misrepresentations on their website, in their advertisements and in their interviews with the New York Plaintiffs and Class members who reside in New York and/or who became clients of any of the IJL Franchises in New York ("the New York Class Members").

228.   Defendants' material misrepresentations were intended to deceive, and did in fact deceive, Plaintiffs and Class members regarding the rights and protections available to consumers, as well as the services provided by Defendants.

229.   Additionally, as discussed above, Defendants engaged in the fraudulent practice of having clients sign two separate contracts in order to circumvent New York State law concerning the amount that a social service could charge its clients

230.   Defendants' actions constituted a violation of NY Gen. Bus. Law § 349.

231.   The New York Plaintiffs and the New York Class members suffered monetary damages and other losses as a result of Defendants' violation of NY Gen. Bus. Law § 349.

## CLAIMS FOR RELIEF AGAINST ALL DEFENDANTS

### SECOND CLAIM FOR RELIEF

#### Fraudulent Inducement and Misrepresentation

232.   Plaintiffs repeat and reallege each allegation of paragraphs 1 through 231 above as if fully set forth herein.

233.   As alleged above, IJL Corporate and IJL Franchises knowingly made material misrepresentations on their website, in their advertisements and in their

interviews.

234.    IJL Corporate and IJL Franchises made such material misrepresentations in order to induce Plaintiffs and Class members to enter into a contract with IJL.

235.    Plaintiffs and Class members relied upon IJL Corporate's and IJL Franchises' material misrepresentations to their detriment, and entered in to a contract with IJL Corporate, through the IJL Franchises.

236.    IJL Corporate and IJL Franchises did all of this under the direction and control of Riverside, which owns IJL Corporate (which, in turn, controls IJL Franchises), and IJL Corporate Board Member Schlachet, whose Riverside fund controls IJL Corporate.

237.    As a result of all Defendants' fraudulent conduct, Plaintiffs and Class members suffered monetary damages and other losses.

### THIRD CLAIM FOR RELIEF

### Unjust Enrichment

238.    Plaintiffs repeat and reallege each allegation of paragraphs 1 through 237 above as if fully set forth herein.

239.    Considerations of justice and good conscience preclude allowing Defendants to retain any fees paid to them from any Class members.  These class members were fraudulently induced to enter into a contract with Defendants, and, in turn, pay fees, and the fees paid far exceed the reasonable value of the services rendered by Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that this Court enter judgment against Defendants as follows:

1. an order certifying the Class, and appointing Plaintiffs and their undersigned counsel of record to represent the Class;

2. a permanent injunction enjoining Defendants, their partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under or in concert with them, directly or indirectly, or in any manner, from in any way engaging in the practices set forth herein;

3. a permanent injunction enjoining Defendants, their partners, joint ventures, subsidiaries, agents, servants, and employees, and all persons acting under, in concert with them directly or indirectly, or in any manner, from utilizing any monies acquired by Defendants' unfair business practices, including all profits, revenues, and proceeds both direct and indirect;

4. imposition of a constructive trust upon all monies and assets Defendants have acquired as a result of their unfair practices;

5. compensatory damages and full restitution of all funds acquired from Defendants' unfair business practices, including disgorgement of profits and actual damages suffered by Plaintiffs and Class members;

6. punitive damages, to be awarded to Plaintiffs and each Class member;

7. trebling of all damages awarded under 18 U.S.C. § 1962;

8. costs of suit herein;

9.  investigative costs;

10. both pre- and post-judgment interest on any amounts awarded;

11. payment of reasonable attorneys' fees;

12. declaratory relief; and

13. such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated: New York, New York
      April 29, 2013

By: _____

    John G. Balestriere (JB2900)
    Jon L. Norinsberg (JN2133)
    **BALESTRIERE FARIELLO**
    225 Broadway, Suite 2900
    New York, NY 10007
    Telephone 212-374-5401
    Fax: 212-208-2613
    john.balestriere@balestrierefariello.com
    norinsberg@aol.com
    *Attorneys for Plaintiffs and Putative Class*