John G. Balestriere
Jon L. Norinsberg
**BALESTRIERE FARIELLO**
225 Broadway, Suite 2900
New York, NY 10007
Telephone: 212-374-5401
Fax: 212-208-2613
john.balestriere@balestrierefariello.com
jon.norinsberg@balestrierefariello.com
*Attorneys for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**CHRISTINE RODRIGUEZ, SANDRA BURGA, KAREN MALAK, JAMES TORTORA, LISA BRUNO, JANEEN CAMERON, KAREN McBRIDE, ANDREW WOOLF, and BRAD BERKOWITZ,** Individually, and for all others similarly situated,

Plaintiffs,

- against –

**IT'S JUST LUNCH INTERNATIONAL, IT'S JUST LUNCH, INC., HARRY and SALLY, INC, RIVERSIDE COMPANY, LOREN SCHLACHET, IJL NEW YORK CITY FRANCHISE, IJL ORANGE COUNTY FRANCHISE, IJL CHICAGO FRANCHISE, IJL PALM BEACH FRANCHISE, IJL DENVER FRANCHISE, IJL AUSTIN FRANCHISE, IJL LOS ANGELES-CENTURY CITY FRANCHISE, and DOES 1-136**,

Defendants.

Index No.: 07-CV-9227 (SHS)(KNF)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION FOR APPOINTMENT OF REPRESENTATIVE AND CLASS COUNSEL**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ......................................................................................... 4

    I.    IJL Misrepresented the Services They Purported to Provide ......................... 4

    II.   The Fraudulent and Deceptive Tactics Used Systematically By IJL .............. 5

    III.  The Nature of the Fraud Claims In This Action ............................................. 10

    IV.  The Uniform Overcharging in New York In Violation of Statute ................ 10

APPLICABLE RULES AND STANDARDS ........................................................... 11

ARGUMENT ........................................................................................................... 12

I.    A NEW YORK SUBCLASS SHOULD BE CERTIFIED UNDER RULE 23 FOR ALL NEW YORK CITIZENS WHO WERE DEFRAUDED IN VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW ................................................................. 12

    A.   The New York Subclass Satisfies the Requirements of Rule 23(a) .............. 14

        1.  Numerosity: There Are Thousands of New York Class Members Who Were Overcharged by IJL in Violation of GBL § 394-c ................ 14

        2.  Commonality: The Entire Class was Overcharged in a Similar Manner .................................................................................................... 15

        3.  Typicality: Subclass Lead Plaintiff's Claims Are Like Those Shared By All Class Members ..................................................................... 16

        4.  Adequacy: Subclass Lead Plaintiff Shares the Same Incentives and Has No Individual Defenses From the Rest of the Class, and Balestriere Fariello is Suitable to Represent the Class as Counsel ........ 17

    B.   The Plaintiffs' Putative Subclass Satisfies the Requirements of Rule 23(b)(3) .......................................................................................................... 19

        1.  Predominance: Defendants' Systematic Overcharging of New York Clients in Violation of GBL § 394-c Predominates Over Individual Issues ........................................................................................ 19

2. Superiority: A Class Action is the Only Reasonable Way for the Thousands of New York Class Members to Seek Relief ....................... 20

3. A Subclass for Unjust Enrichment Should Be Certified For All New York Citizens Who Were Overcharged For Any Time Period Which the Court Finds Outside a Limitations Period for the General Business Law ....................................................................... 22

II.    A NATIONAL CLASS SHOULD BE CERTIFIED UNDER RULE 23 ................... 24

A.    The Putative Class Satisfies the Requirements of Rule 23(a)........................ 24

1. Numerosity: There Are Many Class Members Spread Across the Nation ................................................................................................. 24

2. Commonality: The Entire Class was Fraudulently Induced to Join IJL By Defendants' Misrepresentations ............................................. 25

3. Typicality: Lead Plaintiffs' Claims Are Like Those Shared By All Class Members ........................................................................ 26

4. Adequacy: Lead Plaintiffs' Share Same Incentives and Have No Individual Defenses From the Rest of the Class and Balestriere Fariello is Suitable to Represent the Class as Counsel............................ 27

B.    The Putative Class Satisfies the Requirements of Rule 23(b)(3) ................... 27

1. Predominance: Defendants' Fraudulent Misrepresentations Resulting in Plaintiffs' Losses Predominate Over Individual Issues................................................................................................. 27

(a) IJL's Fraudulent Misrepresentation Can Be Established by Generalized Proof Through Uniform Scripts and Centralized Training of Sales Representatives....................................... 28

(b) The Question of IJL's Unjust Enrichment Predominates.................. 31

(c) Damages Resulting from IJL's Fraudulent Misrepresentation Predominate Over Individual Damages............................. 31

2. Superiority: A Class Action is the Only Reasonable Way for the Tens of Thousands of Class Members Nationwide to Seek Relief........ 32

CONCLUSION ................................................................................................. 35

## TABLE OF AUTHORITIES

### Cases

*Ackerman v. Price Waterhouse,*
    252 A.D.2d 179 (1st Dept. 1998) ........................................................................... 35

*Briarpatch Ltd. v. Phoenix Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004) ................................................................................. 23

*Brown v. Kelly,*
    609 F.3d 467 (2d Cir. 2010) ................................................................................. 16

*Burley v. City of New York,*
    2005 WL 668789 (S.D.N.Y. 2005). ....................................................................... 30

*Central States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.,*
    504 F.3d 229 (2d Cir. 2007) ................................................................................. 15

*Chisolm v. TranSouth Fin. Corp.,*
    194 F.R.D. 538 (E.D. Va. 2000) ............................................................................ 34

*Clark v. Astrue,*
    274 F.R.D. 462 (S.D.N.Y. 2011) ........................................................................... 33

*Cohen v. JP Morgan Chase & Co.,*
    498 F.3d 111 (2d Cir. 2007) ................................................................................. 13

*Consolidated Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1995) ................................................................................... 15

*Cordes & Co. Fin. Serv. v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007) ................................................................................... 32

*Deary v. Guardian Loan Co., Inc.,*
    534 F. Supp. 1178 (S.D.N.Y. 1982) ...................................................................... 15

*Denney v. Deutsche Bank,*
    443 F.3d 253 (2d Cir. 2006) ................................................................................. 18

*Dupler v. Costco Wholesale Corp.,*
    249 F.R.D. 29 (S.D.N.Y. 2008) ............................................................. 13, 20, 21, 22

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.,*
    270 F.R.D. 150 (S.D.N.Y. 2010) ........................................................................... 15

*Golden Pacific Bancorp v. F.D.I.C.,*
    273 F.3d 509 (2d Cir. 2001). ................................................................................ 23

*Green v. Wolf,*
    406 F.2d 291 (2d Cir. 1968) ................................................................................. 34

*In re Blech Sec. Litig.,*
    187 F.R.D. 97 (S.D.N.Y. 1999) ............................................................................ 12

*In re Deutsche Telekom Ag Sec. Litig.,*
    229 F. Supp. 2d 277 (S.D.N.Y. 2002) .............................................................. 25, 27

*In re Drexel Burnham Labbert Group, Inc.,*
    960 F.2d 285 (2d Cir. 1992) ................................................................................. 17

*In re Flag Telecom Holdings Ltd. Sec. Litig.,*
    245 F.R.D. 147 (S.D.N.Y. 2007) .......................................................................... 21

*In re LifeUSA Holding, Inc.,*
    242 F.3d 136 (3d Cir. 2001) ................................................................................. 31

*In re Nassau County Strip Search Cases,*
    461 F.3d 219 (2d Cir. 2006) ................................................................................. 30

*In re Oxford Health Plans, Inc. Sec. Litig.,*
    199 F.R.D. 119 (S.D.N.Y. 2001) .......................................................................... 27

*In re Veeco Instruments, Inc., Sec. Litig.,*
    235 F.R.D. 220 (S.D.N.Y. 2006) .......................................................................... 12

*In re Visa Check/Mastermoney Antitrust Litig.,*
    280 F.3d 124 (2d Cir. 2001) ................................................................................. 30

*Jermyn v. Best Buy Co.,*
    256 F.R.D. 418 (S.D.N.Y. 2009) ........................................................... 13, 15, 16, 24

*Klay v. Humana, Inc.,*
    382 F.3d 1241 (11th Cir. Fla. 2004) ..................................................................... 33

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997) ........................................................................ 15, 17, 18

iv

*Monaco v. Stone,*
    187 F.R.D. 50 (E.D.N.Y. 1999) ............................................................................. 16

*Moore v. PaineWebber, Inc.,*
    306 F.3d 1247 (2d Cir. 2002) ................................................................... 17, 29, 31

*Pelman ex rel. Pelman v. McDonald's Corp.,*
    396 F.3d 508 (2d Cir. 2005) ................................................................................. 13

*Reese v. Arrow Financial services, LLC,*
    202 F.R.D. 83 (D.Conn. 2001) ............................................................................. 15

*Remy Dauphin v. Chestnut Ridge Transportation, Inc.,*
    2009 WL 2596636 (S.D.N.Y. Aug. 20, 2009) ................................................. 18, 28

*Robidoux v. Celani,*
    987 F.2d 931 (2d Cir. 1993) ................................................................................. 25

*Seekamp v. It's Huge, Inc.,*
    2012 WL 860364 (N.D.N.Y. 2012) ................................................................. 17, 23

*Spencer v. Hartford Fin. Servs.,*
    256 F.R.D. 284 (D. Conn., 2009) ......................................................................... 16

*Stellama v. Vantage Press, Inc.,*
    109 A.D.2d 423 (1st Dept. 1985) ......................................................................... 34

*Stutman v. Chemical Bank,*
    95 N.Y.2d 24 (2000) ............................................................................................. 13

*Toppell v. Marriot Int'l, Inc.,*
    2006 WL 2466247 (S.D.N.Y. Aug 24, 2006) .......................................................... 7

*Vaughn v. Columbia Sussex Corp.,*
    1992 WL 18843 (S.D.N.Y. Jan. 28, 1992) ............................................................... 7

*Weinberg v. Hertz,*
    499 N.Y.S.2d 693 (1st Dept. 1986) ..................................................................... 34

**Statutes**

New York State General Business Law § 349.................................................. 3, 13, 21, 24, 25

New York State General Business Law § 394.............................. 11, 12, 14, 15, 17, 19, 20, 21

**Rules**

Fed. R. Civ. P. 23.................................................................................................passim

## PRELIMINARY STATEMENT

Defendants perpetrated fraud for years, following a specific scheme, implemented on a national scale, relying on a sales script and uniform training, to dupe tens of thousands of professionals into each paying a thousand dollars or more for what proved to be a valueless social matchmaking service.   And Defendants' simple overcharging of many thousands of New Yorkers constitutes its own scheme that would be worthy of its own lawsuit and warranting a substantial sub-class prosecution.

Plaintiffs seek to represent individuals (collectively, the "Class") who were fraudulently induced to sign a contract and purchase the services of Defendants, It's Just Lunch ("IJL") International ("IJL Corporate" or "the Company"), It's Just Lunch, Inc. ("IJL Inc."), Harry and Sally, Inc. ("Harry and Sally"), and non-New York Defendants IJL Orange County Franchise, IJL Denver Franchise, IJL Austin Franchise, in addition to all other IJL Corporate Franchises in the United States during the period of October 15, 2001, through the present ("Class Period"), defined herein as Does 1-136 (together, all franchises are "IJL Franchises").

The Class includes all persons within the United States who were fraudulently induced to sign a contract and purchase the services of IJL, thereby unjustly enriching IJL.  The New York Subclass includes all New York residents who are members of this Class who can additionally avail themselves of a General Business Law statute or an unjust enrichment claim, which protects them from overcharging for the service which IJL purported it provided.

Plaintiffs seek an order from this Court certifying this action to proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure appointing Brad Berkowitz ("Berkowitz") as Lead Plaintiff for the New York Subclass, and Lisa Bruno ("Bruno"), Janeen Cameron ("Cameron"), James Tortora ("Tortora") and Karen Malak ("Malak") ("Lead Plaintiffs") as Lead Plaintiffs for the national class, and approving Plaintiffs' selection of Balestriere Fariello as Lead Counsel pursuant to Rule 23(g).

During the Class Period, IJL engaged in a categorical fraud on a grand scale. IJL engaged in a highly organized scheme whereby IJL misrepresented its services in the same way to each and every IJL prospective customer in order to induce those individuals to sign up with IJL. The testimonies of three former IJL employees support Plaintiffs' claims: IJL routinely misrepresented itself as a personalized and luxury matchmaking service for busy professionals when, in fact, it provided hardly any services at all, and routinely told the *same* lies to *all* prospective clients to get them to sign up for Defendants' valueless service. These employees have testified that:

- The majority of the script IJL uniformly used with prospective clients was "patently false". Deposition of Michelle Le Page ("Le Page Dep."), Declaration of John G. Balestriere ("Balestriere Decl."), Exhibit 1, at 120;

- IJL lied to clients "[a]ll the time" by telling them that they had prospective and current matches when in fact, they didn't. Deposition of Angel Velasquez ("Velasquez Dep."), Balestriere Decl., Exhibit. 2, at 59-60, 77;

- IJL instructed its employees to simply "[m]ake up" a number when describing the number of members in a city. Velasquez Dep., Balestriere Decl., Ex. 2, at 64;

2

- IJL instructed its employees to tell prospective members that they met "[their] spouse through It's Just Lunch," which "was a lie". Velasquez Dep., Balestriere Decl., Ex. 2, at 70-80; and

- IJL employees were specifically instructed to lie when describing prospective matches. Le Page Dep., Balestriere Decl., Ex. 1, at 123.

Through IJL's false advertising and initial interview script read to *every potential customer* immediately prior to the customer paying for IJL's services, IJL categorically misrepresented itself to be a "personalized, sophisticated, thoughtful matchmaking service provided by highly trained experts." Third Amended Complaint ("TAC"), Dkt. No. 169, ¶ 1. In fact, IJL had no experts, and did not do any personalized matchmaking at all. As its former managers admit, the entire company is a complete fraud, which even overcharges New Yorkers for its valueless service.

This action warrants Subclass certification for New York members who seek relief under Sections 349 and 394 of the New York General Business Law ("GBL"). It also warrants national certification because it involves thousands of geographically dispersed former clients of IJL, and common questions predominate in all Class member claims, including whether IJL materially misrepresented its services, thus deceiving Class members to spend a thousand dollars or more for services which they never received. To conserve judicial resources and to protect the interests of absent Class members whose damages are too small to pursue economically as individual claims, the Court should certify this as a class action, appointing Berkowitz to represent the New York Subclass, and Bruno, Cameron, Tortora, and Malak to represent the

national Class.   Finally Plaintiffs respectfully request that the firm which began investigating IJL's misconduct over six years ago, and has been the sole firm to prosecute the claims here ever since, be appointed Class Counsel.

## STATEMENT OF FACTS

During the Class Period, IJL[1] billed itself as the premier dating service in an industry which offers to connect individuals interested in romantic or personal relationships.   The Company claimed it offered personalized, sophisticated, thoughtful matchmaking services provided by highly trained experts.   None of this was true.   More significantly for the purposes of this Motion for Class Certification for Appointment of Representative and Class Counsel ("The Motion"), Defendants perpetrated their untruths in a uniform way, and uniformly overcharged for their service.

### I.   IJL Misrepresented the Services They Purported to Provide

IJL misrepresented their services to charge prices of up to $1,500.00 per person per year.   TAC ¶ 86.   On its website, IJL proclaimed that its "service isn't about video or computer dating; it's about an insightful, professional IJL staff member hand-selecting appropriate matches based upon your desires, goals, motivations and our instincts." TAC,   ¶   6-9;   It's   Just   Lunch   -   Who   We   Are, http://www.itsjustlunch.com/whattoexpect.aspx (last visited March 26, 2009).[2]   IJL's claims were patently false in every respect.   IJL did *not* hand-select its matches based on

---

[1] For purposes of this motion, the term "IJL" shall refer to both IJL corporate and the various franchises that have been named as defendants in this action.

[2] The URL in question is no longer active.   However, IJL has a similar page at http://www.itsjustlunch.com/our-process/ (Last visited June 26, 2013).

a client's "desires, goals, [or] motivations."  TAC, ¶ 6-7, 9.  Rather, IJL arbitrarily made matches driven entirely by monthly quota requirements, downright disregarding the client's stated "desires, goals, [and] motivations."  TAC, ¶ 7.

IJL further claimed that its staff members had "years of experience" in the field of matchmaking as expert matchmakers and first-date specialists.  TAC, ¶ 8; It's Just Lunch - Who We Are http://www.itsjustlunch.com/whoweare.aspx (last visited March 26, 2009).[3]  This is false too.  Contrary to these claims, IJL routinely hired staff members with no experience, training, or background in the field of matchmaking.  TAC, ¶ 9. The IJL staff members were not "insightful professional" employees; they were inexperienced, young employees motivated by a desperate need to meet their monthly quotas in order to maintain employment.  *Id.* ¶ 6, 9.

## II.  The Fraudulent and Deceptive Tactics Used Systematically By IJL

In each and every interview with any prospective client, an IJL employee recited the *same* IJL script, which was filled with misrepresentations of IJL's services.  TAC, ¶ 9-10, 112, 118, 142.  IJL even admitted that they "trained sales directors *with the assistance of a sales script.*"  IJL Answer and Affirmative Defenses to Original Complaint, Docket No. 8, Balestriere Decl., Ex. 4, ¶ 10, 12, 44 (emphasis added).  This script contained the *exact same* words and actions which employees were to use during the interview.  *Id.* This script was packed with misrepresentations including misstatements to each prospective client involving:

- the number of IJL's available members in the client's city;

---

[3]  The URL in question is no longer active.  However, IJL has a similar page at http://www.itsjustlunch.com/about-ijl/ (Last visited June 26, 2013).

- statements that IJL had an equal percentage of men and women in its system, when the number of women was grossly disproportionate to that of men;
- statements that IJL was "selective" over who it allowed to become members, when in fact IJL accepted *any* and *all* persons who were willing to pay its fees;
- statements that IJL carefully matched its clients with other members, when the matches were actually made *at random* and were often done by individuals who had never even met the client.

(TAC, ¶ 11).

But it was not only Class Counsel's extensive investigation which uncovered this fraud prior to filing suit.  During this litigation former *IJL managers admitted* to this scheme.   IJL Training Sales Manager Angel Velasquez ("Velasquez"), IJL Senior Coordinator Michelle Le Page ("Le Page"), and IJL Director Camilla Craig ("Craig"), each testified extensively about the fraudulent and deceptive tactics IJL used. Amongst other things, they admitted the following:[4]

    i.   The majority of the script IJL used was "patently false" Le Page Dep., Balestriere Decl., Ex. 1, at 120.

    ii.   IJL lied to clients "[a]ll the time" by telling them that they had matches, when in fact, they did not Velasquez Dep., Ex. 2, at 59-60, Le Page Dep., Balestriere Decl., Ex. 1, at 77, 91, 92;

    iii.   IJL told its employees to simply "make up" a number when

---

[4]  Angel Velasquez was at IJL's Florida Call Center where he personally trained and supervised the entire sales team there.  Velasquez Dep., Balestriere Decl., Ex. 2, at 42-43, 68, 73.  Velasquez was himself trained by current President of IJL, Melissa Brown.  *Id.* at 43-44, 60-61, 79-80.  Michelle Le Page was at the Florida Call Center where she personally trained and supervised the coordinators there, and also handled complaints from customers.  Le Page Dep., Balestriere Decl., Ex. 1, at. 61, 64, 66.  Prior to that, Le Page had worked in sales at IJL, but "left sales before because [she] could not deal with the deception."  *Id.* at 48.  Camilla Craig was a full-time Director at the IJL office in Tennessee, and worked there for approximately one year before leaving IJL because she believed it to be a "terrible company" that "people were suckered out of a lot of money . . . ."  Craig Dep., Balestriere Decl., Ex. 3, at 147, 357.

describing the number of members in a city Velasquez Dep., Balestriere Decl., Ex. 2, at 64;

iv.  IJL told its employees to tell prospective members that they met "[their] spouse through It's Just Lunch", which "was a lie." Velasquez Dep., Balestriere Decl., Ex. 2, at 79-80; and

v.  IJL employees were specifically instructed to "lie" when describing prospective matches.  Le Page Dep., Balestriere Decl., Ex. 1, at 123.

These former employees recalled "practices that were going on [at IJL] that were fraudulent, deceptive, [and] were lies."  Le Page Dep., Balestriere Decl., Ex. 1, at 124. These lies included "[t]elling people [IJL had] matches for them when [it didn't] and taking their money.  *Id.*, at 77, 91-92.  The lies were not isolated but rather were told to "[e]*very single one*" of the prospective members.  Velasquez Dep., Balestriere Decl., Ex. 2, at 60 (emphasis added).  Le Page testified that as long as a sale was made, "[i]t didn't matter.  It didn't matter.  You were to sell to anybody.  Bottom line.  Take the deal, close it, sell it, get the money . . . ." Le Page Dep., Balestriere Decl., Ex. 1, at 47.  Thus, IJL was "a hoax" and "not what it proclaim[ed] to be."  Deposition of Camilia Craig ("Craig Dep."), Balestriere Decl., Ex. 3, at 312.  In fact, a person had "a better chance walking down the street . . . and running into somebody, a complete stranger," than meeting someone through IJL.  *Id.*[5]

---

[5] As set forth in detail in the Supplemental Declaration of Jon L. Norinsberg ("Norinsberg Decl."), previously filed on April 4, 2011, Docket No. 149, but also attached to the Balestriere Decl., Exhibit 15, ¶40-45, the deceptive sales tactics that were used by the individual franchises were expressly taught, implemented, and enforced by IJL Corporate, thus making the various defendants indistinguishable for purposes of this motion.  *See Toppell v. Marriot Int'l, Inc.*, 2006 WL 2466247 (S.D.N.Y. Aug 24, 2006); *Vaughn v. Columbia Sussex Corp.*, 1992 WL 18843 (S.D.N.Y. Jan. 28, 1992).

The most audacious commonly told lie told by IJL was "[t]elling people [it had] matches for them when [it didn't]" in order to secure a sale. Le Page Dep., Balestriere Decl., Ex. 1, at 91. IJL sales representatives were specifically trained to tell *all* clients that IJL already had at least two members in mind who were good matches for them, even though this script was "patently false." *Id.*, at 120 (emphasis added). This uniform fabrication was designed to induce sales, as explained by a former IJL Director:

> [T]hat was part of the script. We *had* to tell them that we had two or three matches in mind for them - like "I already have" - and we had to be enthusiastic. "Oh my gosh, I already have two or three matches in mind for you", and we'd flip the chart over . . . .

Craig Dep., Balestriere Decl., Ex. 3, at 225 (emphasis added).

Indeed, IJL sales reps "were taught to say, hey, you know, I've got three individuals off the top of my head, you know, that I'm thinking are a great match for you." Velasquez Dep., Balestriere Decl., Ex. 2, at 106; *see also id.* at 73 ("by the way, I've got three people that I'm thinking for you just off the top of my head."); *see also id.* at 131 ("yes, I've got three people off the top of my head that would fit someone . . . .").

IJL trained its sales reps to make this statement immediately after reviewing the client's profile – flipping over the clipboard for emphasis – thereby creating the impression that the "two or three matches in mind" were tailored to what the client had just told IJL. As the same former IJL Director explained in more detail:

> And then we'd flip the clipboard over, and then we'd tell them "Oh my gosh, I have somebody in mind for you", and we'd have to be really excited and we're like, "You know what? I've got two matches for you. I cannot wait, you're

> gonna love this person.  They're great.  I want to tell you all
> about them."

Craig Dep., Balestriere Decl., Ex. 3, at 223-224; *see also id.* at 287 ("[W]hen you flip the

clipboard over it says, 'I already have three matches in mind for you' and that's what it

says at that point.[6]  It's a star - it has three stars by it.").

IJL sales reps were lying when they told *each* client that they had two or three

matches in mind for them (*see* Craig Dep., Balestriere Decl., Ex. 3, at 223-225) because

the sales rep had "no way of knowing . . . whether or not there were people in that

city."  Le Page Dep., Balestriere Decl., Ex. 1, at 47, 91; *see also id.* at 92 ("you're telling

people that you already have two matches for them, [but] you don't even know if you

have two matches for them.").  Indeed, this same statement was made to everyone -

since anyone who was willing to pay was accepted by IJL.  Velasquez Dep., Balestriere

Decl., Ex. 2, at 75 ("We accept all members.");  Craig Dep., Balestriere Decl., Ex. 3, at 147,

196, 226, 260, 261, 262 ("We take everybody") ("[w]e were told at the corporate office at

training and also by the franchisees that we take everyone . . . .");  Le Page Dep.,

Balestriere Decl., Ex. 1, at 63 ("they just took everybody").  These "lies" were uniform

and systematic, no matter where the IJL office was located.  IJL fraudulently induced

sales from all members of the Class.  *See also* Norinsberg Decl., Dkt. No. 149, Balestriere

Decl. Ex. 15.

---

[6] Craig is referring to the uniformly used "Control Point 2", which instructed IJL sales directors to "Stop
and flip over your clipboard", and then say, "OK, so far I have 3-4 ideas for your first date." Sales Script,
Balestriere Decl., Ex. 12, at 13.

### III. The Nature of the Fraud Claims In This Action

This case is not about former IJL members who are bitter and disgruntled because they did not find love, marriage or a successful relationship.[7]  Rather, "[t]his suit is about exposing It's Just Lunch" as a "fraudulent company."  Deposition of James Tortora ("Tortora Dep."), Balestriere Decl., Ex. 6, at 172.  Indeed, Plaintiffs have brought this lawsuit because they – and tens of thousands of others similarly situated – were defrauded by IJL through Defendants' uniform and systematic deceptive sales tactics. *Id*. ("[T]hey sold me a bill of goods here.  I believe they are promising one thing, giving you another thing . . . ."); Deposition of Lisa Bruno ("Bruno Dep."), Balestriere Decl., Ex. 7, at 159 ("[I]t's kind of a bait-and-switch.  It's like they promised me one thing and they sold it to me, and then the product that I, actually, got was not at all what they represented it to be."); Deposition of Janeen Cameron ("Cameron Dep."), Balestriere Decl., Ex. 8, at  107.  As Lisa Bruno testified, "I don't think [IJL] should be in business anymore."  Bruno Dep., Balestriere Decl., Ex. 7, at 171.[8]

### IV. The Uniform Overcharging in New York In Violation of Statute

In addition to the lies detailed above, in the State of New York, IJL has repeatedly circumvented state laws which prohibit dating services from charging a client more than $1,000.00 per year.  TAC, ¶ 18, 91, 229.  IJL knew that there was a specific statute outlawing this, so it tried to hide its uniform violation of the GBL by

---

[7]  Most plaintiffs are either involved in long-term relationships (Tortora, Bruno) or married with children (Malak), thus dispelling the myth that Plaintiffs are "bitter" because they did not find love through IJL. *See* Bruno Dep., Balestriere Decl., Ex. 7, at 6, 140; Tortora Dep., Balestriere Decl., Ex. 6, at 8.

[8]  IJL's employees have expressed similar sentiments.  *See* Craig Dep., Balestriere Decl., Ex. 3, at 357 ("I believe it is a terrible company.  (I mean I think) what they've done to a lot of women is really bad and a lot of men is really bad.") *Id*. at 147;  ("[P]eople were suckered out of a lot of money . . . .") *Id*.

urging its clients to execute simultaneously two separate six month agreements (for $1,000.00 and $500.00, respectively), and then mislead the client to believe that he or she received a 50% "discount" by signing the second six month agreement.  *Id.*  This unlawful practice violates GBL § 394-c(2), which expressly states "[n]o contract for social referral shall require payment by the purchaser of such service of a cash price in excess of one thousand dollars."  *Id.*  The New York State Attorney General eventually stopped this fraud, extracting from the Company and its New York franchise on July 6, 2007, a fine and a promise to stop breaking the law.  TAC, ¶ 19; Attorney General's It's Just Lunch Press Release ("AG's IJL Report"), Balestriere Decl., Exhibit 13.

## APPLICABLE RULES AND STANDARDS

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  A party seeking class certification must first show that the class action satisfies the following four requirements:

> (1) the class is so *numerous* that joinder of all members is impracticable; (2) there are questions of law or fact *common* to the class; (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and (4) the representative parties will fairly and *adequately* protect the interest of the class.

Fed. R. Civ. P. 23(a) (emphasis added).  The party seeking class certification must also satisfy one of the categories set forth in Rule 23(b).  Here, certification is sought through Rule 23(b)(3), requiring that:

> the court finds that the questions of law or fact common to the class members *predominate* over any questions affecting only individual members, and that a class action is *superior*

> to other available methods for fairly and efficiently
> adjudicating of the controversy.

Fed. R. Civ. P. 23(b)(3) (emphasis added).

Because the court can alter or amend a class certification order at any time before final judgment, "when a court is in doubt as to whether or not to certify a class action, *the court should err in favor of allowing the class to go forward.*"  *In re Veeco Instruments, Inc., Sec. Litig.,* 235 F.R.D. 220, 237 (S.D.N.Y. 2006) (quoting *In re Blech Sec. Litig.,* 187 F.R.D. 97, 102 (S.D.N.Y. 1999) (emphasis added) (granting motion for class certification).

Further, Rule 23(c)(5) of the Fed. R. Civ. P. provides, "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule."  A subclass should be certified for all New York citizens because they have a GBL § 349 and/or unjust enrichment claim in violation of GBL § 394-c(2), which provides that there cannot be a social referral contract that requires payment of such service of in excess of $1,000.00.

## ARGUMENT

## I.    A NEW YORK SUBCLASS SHOULD BE CERTIFIED UNDER RULE 23 FOR ALL NEW YORK CITIZENS WHO WERE DEFRAUDED IN VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW

GBL Section 349 makes unlawful any "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . . ."  N.Y. Gen. Bus. Law § 349(a)  To state a claim under § 349, a plaintiff must allege that: "(1) the defendants' challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff sustained injury as a result."  *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126

(2d Cir. 2007). "Deceptive acts are defined objectively, as acts likely to mislead a reasonable consumer acting reasonably under the circumstances." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (S.D.N.Y. 2008) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995) (internal quotation marks omitted)).  "Courts have repeatedly held that Section 349 claims based upon omissions, non-disclosures and deceptive corporate policy are well suited for class certification." *Jermyn v. Best Buy Co.*, 256 F.R.D. 418, 437 (S.D.N.Y. 2009).  Moreover, "a private action brought under 349 does *not* require proof of actual reliance," *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (emphasis supplied).  *See also Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000) ("[A]s we have repeatedly stated, reliance is not an element of a Section 349 claim.")

Defendants – specifically the co-owner of the New York IJL Franchise, Robert Vandor –  have admitted that they did, in fact, have a "policy and procedure" of charging New York plaintiffs $1,500.00 for one year of dating services, resulting in a 50% increase in fees above the statutorily prescribed limit of $1,000.  See Affidavit of Robert Vandor ("Vandor Aff."), Balestriere Decl., Ex. 9, at ¶ 8.  This "policy" remained in effect for over four years, "from February 2002 through November 29, 2006." *Id.*

Then New York State Attorney General Andrew Cuomo and Assistant Attorney General Dennis Rosen found that this "policy and procedure" violated GBL § 394-c(2).  Specifically, "[t]he Attorney General found that employees of [defendants] requested that consumers of their social referral services sign more than one contract at the inception of their relationship, for an aggregate fee for services in excess of $1,000.00, in

violation of GBL § 394-c(2), which prohibits a social referral services from requiring a purchaser of its services to pay a cash price in excess of $1,000.00."   Report and Recommendation, Docket No. 156, at 5-6.   Without question, Defendants' unlawful policy of overcharging its New York clients caused significant financial damages to its many thousands of New York consumers, who paid $500.00 more for Defendants' services than they should have paid under New York law.

**A. The New York Subclass Satisfies the Requirements of Rule 23(a)**

**1.    Numerosity: There Are Thousands of New York Class Members Who Were Overcharged by IJL in Violation of GBL § 394-c**

The New York Subclass surpasses the numerosity requirement, as the class is sufficiently "numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   Numerosity does not require a showing that joinder is impossible, but only that "the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."   *Central States Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007).   In fact, "a level of 40 [class] members" satisfies the numerosity requirement in the Second Circuit. *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).   Furthermore, "plaintiffs need not demonstrate with precision the number of persons in the purported class to satisfy the requirement that joinder be impracticable where such a conclusion is clear from reasonable estimates."   *Deary v. Guardian Loan Co., Inc.*, 534 F. Supp. 1178, 1190 (S.D.N.Y. 1982) (certifying class); *see also Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 155 (S.D.N.Y. 2010) ("The certification of a class may proceed on estimates . . . .").

14

The New York Subclass plaintiffs "easily surpass[] the numerosity hurdle", as they "allege[] that thousands of customers were damaged" when they were systematically overcharged for one year's worth of dating service, in violation of GBL § 394-c. *Jermyn*, 256 F.R.D. at 429. This estimate certainly surpasses the Second Circuit's presumptive threshold of forty members.

### 2.       Commonality: The Entire Class was Overcharged in a Similar Manner

Rule 23(a)(2) requires that there be questions of law or fact common to the class. "The commonality requirement is met if plaintiffs' grievances share a common question of law or fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (citation omitted). But "[i]t does not require that all questions of law or fact raised be common." *Reese v. Arrow Financial services, LLC*, 202 F.R.D. 83, 91 (D.Conn. 2001) (citations omitted). Rather, "[a] single common issue of law will satisfy the commonality requirement." *Dupler*, 249 F.R.D. at 37 (citing *Monaco v. Stone*, 187 F.R.D. 50, 61 (E.D.N.Y. 1999)). Where the question of law involves, as here, "standardized conduct of the defendant toward members of the proposed class . . . the commonality requirement of Rule 23(a)(2) is usually met." *Spencer v. Hartford Fin. Servs.*, 256 F.R.D. 284, 290 (D. Conn. 2009) (citation omitted). Thus, "where plaintiffs were 'allegedly aggrieved by a single policy of defendants', and there is 'strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited.'" *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010) (internal citations omitted).

The New York Subclass satisfies the commonality requirement, as Defendants systematically overcharged *all* New York Class members by $500 for at least the four

year period from 2002 until 2006.  Vandor Aff., Balestriere Decl., Ex. 9, ¶ 8.  This policy was used by *all* IJL franchises located within New York State.  TAC, ¶ 18.  *See also Jermyn*, 256 F.R.D. at 430 ("In this case, the class shares a number of common questions of law and fact sufficient to form a 'unifying thread'"); *Dupler* 249 F.R.D. at 37 (noting that commonality is often satisfied when the defendants are alleged to have directed standardized conduct toward putative class members).  The commonality requirement is satisfied.

### 3.    Typicality: Subclass Lead Plaintiff's Claims Are Like Those Shared By All Class Members

Rule 23(a)(3)'s typicality requirement is satisfied, as here, when a plaintiff shows that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Marisol A.*, 126 F.3d at 376 (citing *In re Drexel Burnham Labbert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)) (internal citations omitted) (typically met when all plaintiffs' claim were for defendant's violations of same laws).  Similar to commonality, typicality does not require that the situations of the Lead Plaintiffs and all Class members be identical. "[W]here misrepresentations are materially uniform, an individual plaintiff's receipt of and reliance upon the misrepresentation may then be simpler matters to determine." *Spencer*, 256 F.R.D. at 303 (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255 (2d Cir. 2002)).

The New York Subclass satisfies the typicality requirement as *all* members of the New York Class were overcharged by Defendants in violation of GBL § 394-c(2).  "The commonality and typicality requirements tend to merge into one another, as both seek

to ensure that the named plaintiffs' claims are closely interrelated to those of the class." *Seekamp v. It's Huge, Inc.*, 2012 WL 860364, at *3 (N.D.N.Y. 2012) citing *Marisol A.*, 126 F.3d at 376. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-7 (2d Cir. 1993). Typicality exists here such that the Motion should be granted.

### 4.   Adequacy: Subclass Lead Plaintiff Shares the Same Incentives and Has No Individual Defenses From the Rest of the Class, and Balestriere Fariello is Suitable to Represent the Class as Counsel

The last prerequisite "requires that plaintiffs demonstrate that class counsel is qualified, experienced, and generally able to conduct the litigation" and that "there is no conflict of interest between the named plaintiffs and other members of the plaintiff class." *Marisol A.*, 126 F.3d at 378 (internal quotations omitted). Courts have determined that named plaintiffs "will fairly and adequately protect the interests of the class" where the plaintiffs are found to have "an interest in vigorously pursuing the claims of the class" and "no interests antagonistic to the interests of other class members." *Denney v. Deutsche Bank*, 443 F.3d 253, 268 (2d Cir. 2006).

Here, Lead Plaintiff Brad Berkowitz has "no antagonistic or conflicting interests" with the proposed class members, "and the record is devoid of an indication of extant conflicts of interest." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 243 (E.D.N.Y. 1998). To the contrary, he suffered the same injury and damages as other New York subclass members: he paid more than $1,000.00 for one year of dating services, in

violation of GBL § 394-c.  Further, Berkowitz has remained ready and willing to actively participate in this litigation and fulfill his responsibilities as a class representative. Lastly, Berkowitz does not have any unique defenses that threaten "to become the focus of this litigation" or "prejudice absent class members who may have stronger [claims]." *Remy Dauphin v. Chestnut Ridge Transportation, Inc.*, 2009 WL 2596636, at *3 (S.D.N.Y. Aug. 20, 2009).   There is every reason to believe that Berkowitz "will fairly and adequately protect the interests of the class," known as the adequacy requirement.  Fed. R. Civ. P. 23(a)(4).

Berkowitz and Lead Plaintiffs have chosen attorneys who have significant litigation and class action experience.  Balestriere Fariello Class Action Matters List, Balestriere Decl., Ex. 10, and Balestriere Fariello's Firm Biography, Balestriere Decl., Ex. 11.  Rule 23(g)  provides that "[u]nless a statute provides otherwise, a court that certifies a class must appoint class counsel." Rule 23(g)(1).  There are four factors the Court must consider when appointing counsel:

> (i) [T]he work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).  In addition, Rule 23(g)(4) requires that "[c]lass counsel must fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(4).

Balestriere Fariello meets all of the requirements of Rule 23(g) and should be appointed Lead Counsel because it spearheaded the investigation and is the sole

representative of Plaintiffs *ab initio*.   Balestriere Fariello conducted a considerable investigation into IJL, which began well over six years ago, and months prior to filing the first complaint in October 2007.   No other firm has as detailed knowledge of the facts or has invested as much time and energy in the case.   Indeed, no other law firm is presently representing any similarly situated potential plaintiffs.   Due to the time and energy already devoted to this case for over a half decade, Balestriere Fariello has well established that it will fairly and adequately represent the interests of all Class members.   Balestriere Fariello respectfully is the clear and, in fact, only choice for Lead Counsel.

## B.  The Plaintiffs' Putative Subclass Satisfies the Requirements of Rule 23(b)(3)

Besides satisfying the four requirements of Rule 23(a), the New York Subclass also falls within one of the subdivisions of Rule 23(b), as the predominance and superiority requirements are met.

### 1.   Predominance: Defendants' Systematic Overcharging of New York Clients in Violation of GBL § 394-c Predominates Over Individual Issues

Rule 23(b)(3) certification is appropriate "if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *Brown*, 609 F.3d at 483.

There can be no doubt here that Subclass wide issues predominate over individual ones.  The overriding and really only question is whether or not Defendants charged Plaintiffs in excess of $1,000.00 for one year's worth of social referral services,

in violation of GBL § 394-c.  Moreover, "under New York law, the Court of Appeals has been clear that a plaintiff *need not show* that s/he *relied* on the misrepresentations in order to have a claim under  GBL § 349." *Dupler,* 249 F.R.D. at 43 (internal quotation marks and citation omitted) (emphasis in original).  IJL has admitted to the practice of charging New York Clients more than $1,000.00, but denied violating § 394-c.  Vandor Aff., Balestriere Decl., Ex. 9, at ¶ 8.  Regardless, the New York Attorney General found a violation of this statute, and this decision was further cited by Magistrate Judge Fox. AG's IJL Report, Balestriere Decl., Exhibit 13; Judge Kevin N. Fox's Report & Recommendation, issued on April 06, 2012, Docket No. 156, at 5-6**.** *See also Jermyn,* 256 F.R.D. at 435 ("[I]t is abundantly clear that common issues "predominate" over any individual issues with respect to the section 349 claim.").   The predominance requirement is satisfied.

### 2. Superiority: A Class Action is the Only Reasonable Way for the Thousands of New York Class Members to Seek Relief

Finally, Berkowitz also satisfies the second prong of Rule 23(b)(3).  A class action is not only the superior but really the only method of adjudicating this controversy. Rule 23(b)(3) sets four factors that the Court should consider when determining whether a class action is superior to other methods of adjudicating an action:

> (A) The class member's interests *individually controlling the prosecution* or defense of separate actions; (B) the extent and nature of *any litigation* concerning the controversy *already begun* by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in *the particular forum*; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D) (emphasis added).

Courts generally consider the individual plaintiffs' financial stake in the litigation, as reflected by their individual and economic damages. *See, e.g., In re Flag Telecom Holdings Ltd. Sec. Litig.,* 245 F.R.D. 147 (S.D.N.Y. 2007). Typically, the smaller the financial stake in the litigation, the less incentive for a plaintiff to pursue their own claim individually. *See Dupler,* 249 F.R.D. at 47 ("[f]ew individuals could even contemplate . . . litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail" where the financial stake is small). As in *Dupler,* the individual amounts of restitution involved, while not insubstantial, are generally so small here that individual actions or other individual remedies are impracticable, and litigating individual actions would be too costly. Indeed, Plaintiffs' financial damages do not generally exceed $1,800—high for a class action, but still dwarfed by the costs of pursuing individual litigation.

Given the sheer number of potential New York Subclass members, a class action is not just superior to other methods of adjudication; it is the *only* reasonable method. The relatively modest amount of damages recoverable by each individual plaintiff ($500.00) further necessitates certification of the class. *See Rios v. Marshall*, 100 F. R. D. 395, 409 (S.D.N.Y. 1983) ("the relatively small amount likely in any individual recovery, the availability of treble damages notwithstanding, renders certification of a plaintiff class in this action particularly appropriate."); *In re Master Key Antitrust Litig.*, 528 F.2d 5, 10 (2d Cir. 1975) ("[C]lass action determination is fundamental when the individual damage claim of the class representative is insubstantial and the suit would unlikely be continued as a private action."). Finally, class certification will permit the resolution of

thousands of claims in a single forum, promoting judicial economy and avoiding a multiplicity of repetitive lawsuits. *See Jermyn*, 256 F.R.D. at 436 ("A class action will also save enormous litigation costs for all parties and allow them to efficiently prosecute their claims and defenses. From the standpoint of judicial economy, the only rational way to proceed is to concentrate the class' claims in a single action, rather than have numerous second trials on the same issue, based on the same evidence.").  The class action mechanism is indeed superior to any other method of disposing of the legal claims of the New York Subclass.

3.    **A Subclass for Unjust Enrichment Should Be Certified For All New York Citizens Who Were Overcharged For Any Time Period Which the Court Finds Outside a Limitations Period for the General Business Law**

Besides the GBL claim, the New York Subclass should be certified for prosecution of unjust enrichment claims. In New York, unjust enrichment requires "proof that (1) defendant was enriched; (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). While "[t]he statute of limitations for claims under section[] 349 . . . of New York's [GBL] is three years," *Jermyn*, 256 F.R.D. at 430 (citation omitted), "in New York, [t]he statute of limitations for an unjust enrichment claim is six years." *Id.*, at 431 (citing *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001).

Multiple district courts have certified New York classes for unjust enrichment claims based on deceptive business practices similar to those at issue here. *See, e.g.*, *Seekamp*, 2012 WL 860364, at *9 (N.D.N.Y. 2012) ("The predominant issue for the unjust

enrichment claim is whether Defendants were enriched at the class' expense by selling them the [anti-theft discounts] for $295.00 each, and then failing to perform the guarantees enumerated in the [anti-theft discount policies]."); *Jermyn*, 256 F.R.D. at 436 ("[F]or the same  reasons articulated for the section 349 claim, the Court believes that 'common questions of law and fact will continue to predominate because it does not appear any such [individual] issues would be unique to each plaintiff'.   The predominant issue for the unjust enrichment claim is whether Best Buy was enriched at the class' expense by using an undisclosed policy of aggressively discouraging and denying customers' valid price match requests."); *Dupler,* 249 F.R.D. at 46 ("Plaintiff alleges that Costco was unjustly enriched at the Class members expense when members paid renewal membership fees for periods of time that had already elapsed . . .  [T]he Court finds that common issues predominate over any individual questions . . . with regard to the unjust enrichment claim").

Defendants' "policy and procedure" here of overcharging New York citizens took place "[f]rom February 2002 through November 29, 2006." Vandor Aff., Balestriere Decl., Ex. 9, ¶ 8.  Given the filing date of October 2007 of this action, there are many New York citizens who would otherwise have valid claims under § 349, but whose actions may have been time-barred by the time this lawsuit was filed in October 2007, and should be part of the New York Subclass.  *See id.* at 431 ("[T]o resolve the statute of limitations problem for the section 349 [] claims . . . the Court exercises its discretion to create a subclass of class members who do not have timely claims under New York [GBL], and whose only claim is for unjust enrichment.") (citing Fed. R. Civ. P. 23(c)(5));

and *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 at 141).  *See also Jermyn*, 256 F.R.D. at 437 ("The Court also certifies a subclass of persons within the class whose claims under New York [GBL] are time-barred because their alleged injury occurred prior to January 10, 2005.").  A New York Subclass should be certified to recover the funds IJL wrongly overcharged New Yorkers for its valueless service.

## II.    A NATIONAL CLASS SHOULD BE CERTIFIED UNDER RULE 23

### A.  The Putative Class Satisfies the Requirements of Rule 23(a)

#### 1.    Numerosity: There Are Many Class Members Spread Across the Nation

The Class falls within Rule 23(a)(1)'s numerosity requirement because joinder of all possible members of the Class would be exceedingly difficult and inconvenient.   The Class satisfies the factor of geographical dispersion.  *See Robidoux,* 987 F.2d 931 at 936 (2d Cir. 1993)  (numerosity factors include "geographic dispersion of class members, financial resources of class members . . . .").  Moreover, potential class members surpass the Second Circuit's threshold of forty members, as it includes tens of thousands dispersed throughout the United States.   TAC, ¶ 61; It's Just Lunch – About IJL, http://www.itsjustlunch.com/about-ijl/ (last visited July 11, 2013).   Since every IJL customer received the exact same sales pitch, the Class consists of the tens of thousands of members that IJL boasts, in addition to its alleged continued growth in membership. *See In re Deutsche Telekom Ag Sec. Litig.*, 229 F. Supp. 2d 277, 281 (S.D.N.Y. 2002) (finding that the numerosity requirement was met even though plaintiffs did not know the *precise* number of class members but estimated the number to be in the thousands).

### 2.    Commonality: The Entire Class was Fraudulently Induced to Join IJL By Defendants' Misrepresentations

*All* Class members share common questions of law and fact.   IJL and its franchises lied to *all* customers about the services they promised to provide and *none* of them received such services, resulting in the IJL's unjust enrichment.   Common questions of fact and law include (1) whether the sales script and tactics employed by IJL misrepresented IJL's actual services; and (2) whether the Class members were fraudulently induced to enter into contracts for matchmaking services.   IJL sales representatives were specifically trained to tell *all* clients that IJL *already* had at least two members in mind who would be a "perfect" match for that member, even though that was "patently false".   Le Page Dep., Balestriere Decl., Ex. 1, at 120.   This uniform fabrication was designed to induce sales.   Craig Dep., Balestriere Decl., Ex. 3, at 225. Indeed, IJL sales representatives lied about prospective matches from the very beginning, regardless of who the prospective client was, in order to induce a sale. Velasquez Dep., Balestriere Decl., Ex. 2, at 73, 106, 131.

Moreover, since IJL sales representatives employed *the same script* with *each* member of the Class, and that script contained fraudulent misrepresentations as discussed above (pages 5-9 of the Preliminary Statement), the Class members' individual fraudulent misrepresentation claims against IJL lack material variation, if any at all.  *See Banyai v. Mazur*, 205 F.R.D. 160 (S.D.N.Y. 2002) ("commonality [] is met here because the named plaintiffs' claims arise from the same course of conduct and are based on the same legal theories as all the class members.").

25

### 3.   Typicality: Lead Plaintiffs' Claims Are Like Those Shared By All Class Members

Lead Plaintiffs' claims are typical of all the Class members who detrimentally relied on IJL's misrepresentations.  As this Court has previously found, "[a]ll plaintiffs provided evidence of a misrepresentation of a material fact – namely, that the IJL interviewer had at least two matches in mind during the intake interview." *See* Memorandum Order, Dkt. No. 167, at 7.  Further,"[t]he evidence of IJL's corporate training would allow a reasonable jury to find that defendants made these statements with at least reckless disregard for the truth and for the purpose of inducing plaintiff's action." *Id*.  Indeed, IJL's use of a customary script and precise training of its sales representatives ensured that *all* Class members were fraudulently induced into entering the contracts in the same manner.  Lead Plaintiffs' experiences with IJL were identical to the thousands of IJL customers who were repeatedly lied to by IJL, giving rise to the same claims among all Class members.  Craig Dep., Balestriere Decl., Ex. 3, at 225 ("[T]hat was part of the script.  We *had* to tell them that we had two or three matches for them") (emphasis added).  Finally, because Lead Plaintiffs share the same experience and claims with all Class members, they are not subject to any unique defenses and thus will appropriately represent the claims that are typical of all Class members.  *See In re Oxford Health Plans, Inc. Sec. Litig.,* 199 F.R.D. 119, 123 (S.D.N.Y. 2001); *See also In re Deutsche,* 299 F. Supp. 2d at 281 (typicality prong was satisfied by lead plaintiffs who purchased securities from defendant during the relevant class period and "were injured as a result of false and misleading statements" made by defendant).

### 4. Adequacy: Lead Plaintiffs' Share Same Incentives and Have No Individual Defenses From the Rest of the Class and Balestriere Fariello is Suitable to Represent the Class as Counsel

Lead Plaintiffs Bruno, Cameron, Tortora, and Malak do not have any conflicts of interest with other members. *See* TAC, ¶ 14-18. Moreover, Lead Plaintiffs do not have any unique defenses that threaten "to become the focus of this litigation" or "prejudice absent class members who may have stronger [claims]." *Dauphin*, 2009 WL 2596636, at *3. And as noted above (pages 18-20), Balestriere Fariello is respectfully the only choice for Class Counsel.

### B. The Putative Class Satisfies the Requirements of Rule 23(b)(3)

The Class should be certified as a Rule 23(b)(3) class action, as questions regarding IJL's fraudulent misrepresentations of their services and Plaintiff's resulting losses predominate over any individual issues of each member, and Class action is the superior method of resolving Plaintiffs' claims against IJL.

### 1. Predominance: Defendants' Fraudulent Misrepresentations Resulting in Plaintiffs' Losses Predominate Over Individual Issues

The nature of Plaintiffs' allegations demonstrates that common questions of law and fact overwhelmingly predominate in this case. If the degree of damages differs between Class members, the difference would be slight, and would not alter the fact that IJL's uniform misrepresentations create common question of law among all Class members. The Class-wide issue of whether IJL's fraudulent sales tactics induced the Class members to pay for IJL's services, and whether that resulted in an unjust enrichment by IJL, predominates over any particular question of fact or law of any individual Class member.

(a) **IJL's Fraudulent Misrepresentation Can Be Established by Generalized Proof Through Uniform Scripts and Centralized Training of Sales Representatives**

The Court of Appeals has held in a decision directly on point here that "fraud claims based on uniform misrepresentations made to all members of the class . . . are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof." *Moore*, 306 F.3d at 1253. Similarly here, a class action based on fraud can be certified provided there is "a showing that the misrepresentations were made pursuant to *written, standardized sales script* and that the sales agent participated in a *common training program that emphasized the uniformity in sales techniques*." *Id.* (emphasis added). Accordingly, "if class members received materially uniform misrepresentations," then "generalized proof be used to establish any element of the fraud." *Id.* at 1255.

*All* IJL sales representatives were trained with the *exact* same script and were instructed to tell the *exact* same lies to every single prospective client, including that the sales representative had "three individuals off the top of [her] head" (Velasquez Dep., Balestriere Decl., Ex. 2, at 106), when in reality there was "no way of knowing" whether matches existed for that individual. Le Page Dep., Balestriere Decl., Ex. 1, at 47. These same *exact* statements were made to everyone, since anyone who was willing to pay was accepted by IJL. Velasquez Dep., Balestriere Decl., Ex. 2, at 75; Craig Dep., Balestriere Decl., Ex. 3, at 147, 196, 226, 260, 261, 262; Le Page Dep., Balestriere Decl., Ex. 1, at 63. IJL was simply "[t]elling people [it had] matches for them, when [it didn't] and taking their money". Le Page Dep., Balestriere Decl., Ex. 1, at 77. Every Class member

heard the same lies and entered into the same contracts for the same rate at a minimum of $1,000.00.  TAC, ¶ 14-18, 86, 91.

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof."  *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (quotation omitted); *see also In re Nassau County Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) ("[A]n issue is common to the class when it is susceptible to generalized, class-wide proof.").  "The predominance requirement is satisfied unless it is clear that individual issues will *overwhelm* the common questions and render the class action valueless."  *In re Nasdaq*, 169 F.R.D. at 515 (emphasis added).  If there is "one common question of fact . . . and at least one common question of law," the predominance inquiry will be met.  *Burley v. City of New York*, 2005 WL 668789, at * 6 (S.D.N.Y. 2005).

Every Class member's fraudulent inducement claim against IJL rests on IJL's universally employed sales script and tactics.  Sales Script, Balestriere Decl., Ex. 12.  This is precisely the type of fraud action which is contemplated under Rule 23.  As the Advisory Committee on Rule 23 noted:

> [A] fraud perpetrated on numerous persons *by the use of similar misrepresentations* may be an appealing situation for a class action and it may remain so despite the need, if liability is found, for a separate determination of the damages suffered by individuals within the class.

Fed. R. Civ. P. 23(b)(3) advisory committee's note (1966 amendment).

29

Where the cause of action alleged against the party opposing the class is fraud, the Second Circuit has identified two categories of claims: first, "fraud claims based on uniform misrepresentations made to all members of the class" and second, "fraud claims based on individualized misrepresentations." *Moore*, 306 F.3d at 1253 (corporation made misrepresentations to clients about a life insurance plan in order to get them to invest in it as a replacement for their retirement accounts). The *Moore* Court noted the first category of fraud claims—which covers this action because it involves sales scripts and sales training—"are appropriate subjects for class certification because the standardized misrepresentations may be established by generalized proof."

While the Second Circuit does not explicitly require the showing of a uniform script and centralized training of agents in order to find a common question of fraudulent misrepresentation, like other Circuit Courts of Appeals, Plaintiffs can nevertheless meet both standards of proof. *Compare In re LifeUSA Holding, Inc.*, 242 F.3d 136 (3d Cir. 2001) (holding that "virtually identical" sales presentations of some 30,000 agents to around 280,000 purchasers failed to meet predominance requirements because the presentations were neither scripted nor standardized) with *Moore*, 306 F.3d at 1255 (holding that the existence of scripts and centralized training are merely relevant factors in determining whether material variations existed among numerous misrepresentations). As demonstrated, the Class members' claims involve generalized proof, including, uniform scripts and centralized training of sales staff, falling under the first category of fraud claims, making this matter appropriate for certification.

### (b)     The Question of IJL's Unjust Enrichment Predominates

While the record more than amply supports a Class asserting a fraudulent inducement claim, the Court should also certify the Class to prosecute the unjust enrichment claim.  Courts have recognized that state claims of unjust enrichment are universally recognized causes of action that are *materially the same throughout the United States*." (*Id.*)(internal quotation marks and citations omitted) (emphasis supplied). Unjust enrichment requires "proof that (1) defendant was enriched; (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd.,* 373 F.3d at 306.  Thus, "Plaintiffs' unjust enrichment . . . claim [] do[es] not require proof of reliance." *Westways World Travel, Inc. v. Sundance Travel Service v. AMR*, 218 F.R.D. 223, 239 (C.D. Cal. 2003). *See McAnaney v. Astoria Fin. Corp.*, No. 04 Civ. 1101, 2006 U.S. Dist. LEXIS 66941 (E.D.N.Y. Sept. 19, 2006) (certifying national class for, inter alia, common law fraud and unjust enrichment claims, for "[a]ll consumers or borrowers in the United States" who were defrauded by defendants).   A national Class should be certified for prosecution of the unjust enrichment claim.

### (c)   Damages Resulting from IJL's Fraudulent Misrepresentation Predominate Over Individual Damages

Damages among Class members not only predominate and outweigh damages on an individual level, but a common method also exists to determine those damages. Common determination of damages is a factor recognized as tending to establish commonality for the purposes of Rule 23(b)(3).   *See Cordes & Co. Fin. Serv. v. A.G.*

*Edwards & Sons, Inc.*, 502 F.3d 91 (2d Cir. 2007) (common proof derived from a common method tended to show commonality for the purposes of Rule 23(b)(3)).   IJL misrepresented the dating services they promised to provide at every initial intake meeting.  Le Page Dep., Balestriere Decl., Ex. 1, at 120, 123; Velasquez Dep., Balestriere Decl., Ex. 2, at 59-60, 64, 70-80; Craig Dep., Balestriere Decl., Ex. 3, at 225, 312.  Thus, every IJL customer purchased IJL's services in reliance on misrepresentations that ultimately resulted in damages.  The pricing scheme for IJL's purported services is no secret.  Each member of the Class has suffered at least the price of becoming an IJL member.  *See Dupler,* 249 F.R.D. at 29 (each member has at least suffered the price of becoming a member of Costco and being subjected unknowingly to Costco's backdating renewal policy).  As already mentioned, there is little variation in the price paid for an IJL membership.  An average amount of the fees paid by each customer to access IJL's promised dating services, multiplied by the number of customers would be a fair way to determine damages across the Class.  While there are, of course, extremes on both ends of the damages spectrum, the vast majority of damages fall within this range, satisfying the predominance requirement.

### 2.    Superiority: A Class Action is the Only Reasonable Way for the Tens of Thousands of Class Members Nationwide to Seek Relief

A nationwide class action is not only the superior but the only method of adjudicating this controversy.  There have not been thus far any other similar claims brought against IJL.  *See Clark v. Astrue*, 274 F.R.D. 462, 471 (S.D.N.Y. 2011) ("There is no reason to suppose that such relief will interfere with ongoing litigation elsewhere, since

no similar cases have been brought to the Court's attention.")   Class members are located in geographically diverse areas, and the advent of e-mail and other electronic forms of communication facilitate the management of the class action among and between Plaintiffs.  Because the class action mechanism ensures an efficient expenditure of private resources, Plaintiffs have an interest in one consolidated class action.

Moreover, multiple other federal courts have certified national fraud class actions such as this one, rejecting defendants' claims that individual reliance precluded certification. *See, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. Fla. 2004) (certifying national fraud class action for doctors who were fraudulently induced into entering into contracts with HMOs) (It does "not strain credulity to conclude that each plaintiff, in entering into the contracts with defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due."); *Spencer*, 256 F.R.D. at 284 (certifying national fraud class for plaintiffs who entered into contracts for structured settlements); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 559-61, 63 (E.D. Va. 2000) (certifying national fraud class where plaintiffs signed uniform contracts and received standardized forms as part of a uniform fraud scheme.) ("Often reliance is a matter that is demonstrated inferentially and by circumstantial proof").  *See also Green v. Wolf*, 406 F.2d 291, 301 (2d Cir. 1968) (certifying national fraud action in security litigation case, and rejecting defendants' argument that issues of individual reliance barred certification) ("We see no sound reason why the trial court, if it determines individual reliance is an essential element of proof, cannot order separate trials on that particular issue, as on the question of damages, if necessary.  The effective

administration of 23(b)(3) will often require the use of [this] sensible device of split trials.") (citation and quotation marks omitted).

New York state courts have similarly held that fraud actions may be suitable for treatment as class actions, rejecting claims that issues of individual reliance preclude certification, instead finding that reliance may be presumed. *See, e.g., Weinberg v. Hertz*, 499 N.Y.S.2d 693, 696 (1st Dept. 1986) ("The emphasis by defendant on the alleged rule that because fraud claims are made, questions of individual reliance defeat a determination of class certification, has been answered otherwise by this court . . . [o]*nce it has been determined that the representations alleged are material and actionable*, thus warranting certification, *the issue of reliance may be presumed* subject to such proof as is required on the trial.") (internal citations omitted) (emphasis added); *Stellama v. Vantage Press, Inc.*, 109 A.D.2d 423, 426 (1st Dept. 1985) ("Reliance is palpably an issue in every fraud case, including class actions.  However, *once it has been determined that the representations alleged, if made, are material and actionable if false,* and thus sufficient to warrant certification, *the issue of reliance may be presumed*.  What remains is the order and quantity of proof, plainly matters for case management by the Trial Judge.  If so-called "mini-trials" are necessary on this issue, the Trial Judge may so direct.") (citations omitted) (emphasis added).  *See also Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 198 (1st Dept. 1998) ("[W]e have previously held that where a defendant makes materially misleading omissions, justifying a presumption of reliance, class certification should not be denied on the ground that individual issues of reliance exist.  Additionally, we have

stated that reliance issues are no bar to class certification where identical representations are made in writing to a large group.").

## CONCLUSION

WHEREFORE, Plaintiffs on behalf of the Class and New York Subclass respectfully request that this this Court:

     i.    certify this action to proceed as a class action;

    ii.    appoint Brad Berkowitz to serve as the representative for the New York Subclass;

   iii.    certify New York Subclass of members who were overcharged by IJL;

   iv.    appoint Lisa Bruno, Janeen Cameron, Karen McBride and James Tortora to serve as representatives of the national class;

    v.    appoint Balestriere Fariello to serve as Class counsel; and

   vi.    grant such other and further relief as the Court deems just and proper.

Dated:      July 18, 2013
           New York, New York

                          Respectfully Submitted,

                          _____
                          John G. Balestriere
                          Jon L. Norinsberg
                          **BALESTRIERE FARIELLO**
                          *Attorneys for Plaintiffs and the Class*